# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SUSAN GIORDANO, ANGELENE HAYES, and YING-LIANG WANG, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

SAKS INCORPORATED, SAKS & COMPANY LLC, SAKS FIFTH AVENUE LLC, LOUIS VUITTON USA INC., FENDI NORTH AMERICA, INC., LORO PIANA & C. INC., GUCCI AMERICA, INC., PRADA USA CORP., and BRUNELLO CUCINELLI, USA, INC.,

Defendants.

Civil Action No.: 1:20-cv-00833

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Susan Giordano, Angelene Hayes, and Ying-Liang Wang (together, "Plaintiffs"), on behalf of themselves and all other similarly situated individuals, by and through their undersigned attorneys, hereby allege as follows against Defendants Saks Incorporated, Saks & Company LLC, Saks Fifth Avenue LLC (together, "Saks"), Louis Vuitton USA Inc. ("Louis Vuitton"), Fendi North America, Inc. ("Fendi"), Loro Piana & C. Inc. ("Loro Piana"), Gucci America, Inc. ("Gucci"), Prada USA Corp. ("Prada") and Brunello Cucinelli, USA, Inc. ("Brunello Cucinelli") (collectively, "Defendants" and each, individually, "Defendant"):

## INTRODUCTION

1.     This class action challenges an illegal conspiracy among Louis Vuitton, Fendi, Loro Piana, Gucci, Prada and Brunello Cucinelli (collectively, the "Leased Entities" and each, individually, a "Leased Entity") and Saks to suppress the total compensation of their employees. Without the knowledge or consent of their employees, Defendants entered into express agreements to eliminate or reduce competition among them for skilled luxury retail labor, including employees

who: (i) work in Defendants' stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers ("Luxury Retail Employees"). This conspiracy consists of agreements between Saks and each of the Leased Entities not to hire or attempt to hire Saks's Luxury Retail Employees.

2.      The intended and actual effect of these agreements is to suppress Luxury Retail Employees' total compensation and to impose unlawful restrictions on Luxury Retail Employees' mobility. Because Defendants control a significant number and proportion of the luxury retail jobs in the United States, their no-hire agreements have reduced competition for Luxury Retail Employees, thereby suppressing Luxury Retail Employee pay.

3.      Defendants' conspiracies and agreements have restricted trade and are *per se* unlawful under federal law. Plaintiffs seek injunctive relief and damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, and obtain injunctive relief arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6.      Venue is appropriate within this District under 15 U.S.C. §§ 15 and 22, as well as under 28 U.S.C. § 1391(b). Defendants transact business within this District, and Defendants transact their affairs and carry out interstate trade and commerce, in substantial part, in this District. Further, Defendants and/or their agents may be found in this District.

7.      This Court has personal jurisdiction over Defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District.  Defendants' scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

### A.      Plaintiffs

8.      Plaintiff Susan Giordano is a resident of Queens County, New York.  Ms. Giordano worked for Saks as a Luxury Retail Employee from approximately November 2012 through March 2019.  Ms. Giordano has been injured in her business or property by reason of the violations alleged herein.

9.      Plaintiff Angelene Hayes is a resident of the State of New Jersey.  Ms. Hayes worked for Saks as a Luxury Retail Employee from August 2013 through July 27, 2016.  Ms. Hayes has been injured in her business or property by reason of the violations alleged herein.

10.      Plaintiff Ying-Liang Wang is a resident of the State of Ohio.  Ms. Wang worked for Saks as a Luxury Retail Employee from approximately October 2014 to April 2016.  Ms. Wang has been injured in her business or property by reason of the violations alleged herein.

### B.      Defendants

11.      Defendant Saks Incorporated is a Tennessee corporation with its principal place of business at 225 Liberty Street, New York, New York 10281.

12.      Defendant Saks & Company, LLC is a Delaware limited liability company with its principal place of business at 225 Liberty Street, New York, New York 10281.

13. Defendant Saks Fifth Avenue, LLC is a Massachusetts limited liability company with its principal place of business at 12 East 49th Street, New York, New York.

14. Defendant Louis Vuitton USA Inc. is a Delaware corporation with its principal place of business at 1 East 57th Street New York, New York.

15. Defendant Fendi North America, Inc. is a Delaware corporation with its principal place of business at 555 Madison Avenue, New York, New York 10022.

16. Defendant Loro Piana & C. Inc. is a Delaware corporation with its principal place of business at 711 5th Avenue, New York, New York 10022.

17. Defendant Gucci America, Inc. is a New Jersey corporation with its principal place of business at 195 Broadway, New York, NY 10007.

18. Defendant Prada USA Corp. is a Delaware corporation with its principal place of business at 610 West 52nd Street, New York, NY 10019.

19. Defendant Brunello Cucinelli, USA, Inc. is a New York corporation with its principal place of business at 350 Fifth Avenue, New York, New York 10118.

20. All of Defendants' actions described herein are part of, and in furtherance of, the unlawful conduct alleged. These actions were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual and/or apparent authority. On information and belief, Defendants also entered into unlawful No-Hire Agreements with other competitors in the market for Luxury Retail Employees, referred to herein as unnamed co-conspirators.

<h1 style="text-align:center">FACTUAL ALLEGATIONS</h1>

**A.  Competition for Luxury Retail Employees in the United States**

21.     Defendants are the dominant employers of Luxury Retail Employees in the United States.  Defendants are all horizontal competitors in the market for Luxury Retail Employees.

22.     Saks operates 39 Saks Fifth Avenue stores and 111 Saks Off 5th stores across the country.

23.     Saks is part of a retail conglomerate that employs approximately 40,000 employees worldwide,[1] including thousands of Luxury Retail Employees at Saks stores in the United States that sell luxury retail goods to consumers.

24.     LVMH Moet Hennessey Louis Vuitton SE ("LVMH"), the parent corporation of Louis Vuitton, Fendi, and Loro Piana, has more than 32,000 employees in the United States,[2] including thousands of Luxury Retail Employees who sell luxury retail goods to consumers at Louis Vuitton, Fendi, and Loro Piana stores.

25.     In the United States, Louis Vuitton operates over 100 stores, whereas Fendi and Loro Piana operate 36 and 22 stores, respectively.

26.     Gucci employs more than 14,000 employees worldwide,[3] including hundreds of Luxury Retail Employees who sell luxury retail goods to consumers at Gucci stores in the United States.

27.     Gucci operates approximately 59 stores in the United States.

---

[1]     *Annual Information Form*, Hudson's Bay Co. (May 3, 2019), http://investor.hbc.com/static-files/2d2843d8-291f-465f-bfa1-ca290e366e9a.

[2]     *LVMH 2018 Annual Report*, LVMH, https://r.lvmh-static.com/uploads/2019/03/rapport-annuel-lvmh-2018_va.pdf (last visited February 14, 2020).

[3]     *Reference Document 2018*, Kering, https://solutions.vwdservices.com/products/documents/2ce929cb-bd6e-41d6-8252-167e3c7dd2db/?c=ioaFOwi1MPp9C84tyO%2FpcJyN%2B3cnv7KOPq6ZNlUGxi2CmO7mqhwuX9G E9D7s4HZk (last visited February 14, 2020).

5

28.     According to The Prada Group's website,[4] Prada employees more than 13,000 employees worldwide, including hundreds of Luxury Retail Employees who sell luxury retail goods to consumers at Prada stores.

29.     Prada operates approximately 52 stores in the United States.

30.     Brunello Cucinelli employs more than 1,800 employees worldwide,[5] including hundreds of Luxury Retail Employees who sell luxury retail goods to consumers at Brunello Cucinelli stores in the United States.

31.     Brunello Cucinelli operates approximately 21 stores in the United States.

32.     Cumulatively, Defendants employ thousands of Luxury Retail Employees at hundreds of stores across the country.

**i.     Defendants Rely on Well-Trained, Experienced Luxury Retail Employees to Enhance and Maintain Their Luxury Brands**

33.     To run their businesses, each Defendant depends upon attracting and retaining Luxury Retail Employees who reflect their respective brand images and cultures.

34.     Each Defendant requires Luxury Retail Employees to undergo extensive training on service, selling, and product-knowledge.

35.     Each Defendant encourages Luxury Retail Employees to maintain frequent, personal conduct with customers, especially customers who regularly purchase luxury retail goods.

36.     Defendants invest in their Luxury Retail Employees because well-trained, motivated salespeople are a crucial component of success for luxury retailers, and what sets them apart from other retailers. Indeed, Saks President Marc Metrick has emphasized the importance

---

[4]     Investors/Investor Relations Overview – Prada Group H1 2019 Results Announcement (Aug. 1, 2019), https://www.pradagroup.com/en/investors/investor-relations/results-presentations.html.

[5]     *Interim Financial Report*, Brunello Cucinelli (June 30, 2019), http://investor.brunellocucinelli.com/yep-content/media/PDF_Cucinelli_Semestrale_ENG.pdf.

of creating a "very deep connection" with Saks customers by "becoming a much more emotionally connected retailer for [Saks's] customers."[6]  Moreover, studies have shown that retailers that invest more in training their employees are more profitable and have more sales per employee and per square foot.[7]

### ii.     The Benefits to Defendants of Lateral Hiring

37.     Each Defendant faces competition from rival retailers, including department stores and boutiques, that provide luxury retail goods to customers.

38.     In a properly functioning and lawfully competitive labor market, each Defendant would openly compete for the services of Luxury Retail Employees, including by hiring current employees from each other, or so-called lateral hiring.  Defendants would obtain significant advantages by engaging in lateral hiring.  By laterally hiring a Luxury Retail Employee from one of its rivals, a Defendant would save on training costs and receive the immediate benefit of a well-trained, motivated salesperson who knows how to cultivate relationships with customers and enhance the Defendant's brand, both of which would lead to increased sales and profitability.

39.     By contrast, hiring salespeople who lack the experience and training of Luxury Retail Employees is costly in a number of ways.  The hiring company must invest significant resources in identifying, assessing, and training the new employees, and would lose the benefit of the close customer relationships, enhanced brand image, and increased sales an experienced Luxury Retail Employee would have produced while the new employee gets up to speed.

40.     Defendants in a competitive market would each utilize "cold calling," the practice

---

[6]     *CEO Summit - Powering the Future of Retail in a Changing Environment*, The Wharton School Baker Retailing Center (Oct. 15, 2019), https://bakerretail.wharton.upenn.edu/wp-content/uploads/2019/11/2019-CEO-Summit.pdf.

[7]     James Surowiecki, *The More The Merrier*, The New Yorker, Mar. 19, 2012, https://www.newyorker.com/magazine/2012/03/26/the-more-the-merrier.

by which a prospective employer freely communicates with prospective employees, even if the employee does not first express interest.

41. For instance, in a properly functioning and lawfully competitive labor market, if Prada believed that a certain Luxury Retail Employee performed his or her job well at Saks, Prada would be free to contact that Luxury Retail Employee about an employment opportunity and, if Prada so chose, hire that Luxury Retail Employee .

42. Similarly, in a properly functioning and lawfully competitive labor market, if a Saks Luxury Retail Employee perceived Prada to be a better organization – whether because of increased wages, enhanced commission sales opportunities, better benefits, or for any other reason – he or she would be free to communicate with Prada about potential employment opportunities, apply to Prada, and ultimately obtain employment at Prada.

43. Cold calling is an important aspect of a properly functioning and lawfully competitive market.

44. Companies perceive rival companies' current employees, especially those who are not actively seeking other employment, in a more favorable way.

45. This is true at least in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than candidates who are unemployed or actively seeking employment outside of their current jobs.

46. Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.

47. Further, through lateral hiring, a luxury retail store is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training skilled labor, while

simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend.

48.    For example, if Louis Vuitton is able to hire a Luxury Retail Employee that Saks has recruited, interviewed, and trained, Louis Vuitton will itself benefit from the new hire's labor while simultaneously harming Saks by taking away Saks's valued employee.

49.    For these reasons and others, lateral hiring, including through cold calling, is a key form of competition among luxury retail employers.

**iii.    The Benefits to Luxury Retail Employees of Lateral Hiring**

50.    Competition for employees via lateral hiring has a significant beneficial impact on Luxury Retail Employees in a variety of ways.

51.    ***First***, when employers become aware of attractive outside opportunities for their Luxury Retail Employees, the threat of losing employees to competitors encourages employers to preemptively raise compensation to increase morale and competitive positioning in the hopes of retaining valuable Luxury Retail Employees.

52.    If employers do not react to competition, their Luxury Retail Employees may seek positions that offer more generous compensation and benefits elsewhere, or may be receptive to recruiting by a rival employer.

53.    Once a Luxury Retail Employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for that individual, if retention is possible at all.

54.    Employers therefore have an incentive to preempt lateral departures by paying all Luxury Retail Employees well enough that they are unlikely to seek or pursue outside opportunities.

55.     Preemptive retention measures thus lead to increased compensation for all Luxury Retail Employees.

56.     **Second,** the availability of desirable positions at competing companies forces employers to reactively increase compensation to retain Luxury Retail Employees who are likely to join a competitor.

57.     This can occur, for example, when a particular Luxury Retail Employee or a group of Luxury Retail Employees becomes interested in switching employers and the current employer responds by offering an increase in base pay or an enhancement in commission sales incentives to retain them.

58.     This may also occur when an employer responds to overall attrition rates among its Luxury Retail Employees by increasing compensation levels in base pay or enhancing commission sales incentives.

59.     In the former scenario, even a targeted increase designed to retain specific Luxury Retail Employees may put upward pressure on the entire compensation structure.

60.     **Third,** the positive compensation effects of hiring Luxury Retail Employees from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have pursued new positions but for the anticompetitive agreements alleged herein.

61.     Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all Luxury Retail Employees, such as those at Saks and each of the Leased Entities.

62.     Defendants carefully monitor and manage their respective internal compensation levels to achieve certain goals, including:

a.  Maintaining approximate compensation parity among Luxury Retail Employees within the same employment categories (for example, among Sales Associates);

b.  Maintaining certain compensation relationships among Luxury Retail Employees across different employment categories (for example, among Brand Ambassadors relative to Sales Associates);

c.  Maintaining high employee morale and productivity;

d.  Retaining Luxury Retail Employees; and

e.  Attracting new and talented Luxury Retail Employees.

63.     To accomplish these objectives, each Defendant sets baseline compensation levels for different employee categories that apply to all Luxury Retail Employees within those categories. Each Defendant also compares baseline compensation levels across different employee categories. Each Defendant also regularly updates their baseline compensation levels.

64.     While each Defendant may engage in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation levels. The eventual compensation any particular Luxury Retail Employee receives is entirely determined by the baseline level, or at least profoundly influenced by it. In either case, suppression of baseline compensation results in suppression of total compensation.

65.     Thus, if operating under competitive and lawful conditions, each Defendant would use lateral hiring as an important tool for recruiting and retaining skilled labor, which would increase total compensation and mobility of Luxury Retail Employees across Defendants and throughout the labor market.

iv. **No-Hire Agreements Enable Defendants to Avoid the Cost of Competitive Compensation for Luxury Retail Employees**

66.     No-hire agreements like those existing between Saks and each of the Leased Entities negatively impact employee compensation throughout the luxury retail industry.

67.     For example, without the benefit of cold calling and open communications with prospective employers such as Fendi, a Saks Luxury Retail Employee lacks information regarding Fendi's pay packages and other compensation terms.  Without this information, the employee lacks leverage when negotiating with Saks.

68.     If this same Saks employee were not constrained (unbeknownst to him or her) by Saks's no-hire agreement with Fendi and received an offer of higher compensation from Fendi, the employee could accept Fendi's offer or attempt to negotiate a pay increase with Saks.  Either way, the Luxury Retail Employee's compensation would increase.

69.     A Saks employee who receives information regarding potential compensation from a rival employer will also likely inform other Saks employees.  These Saks employees can then similarly use that information to negotiate pay increases or move other employers, even if they do not themselves receive cold calls.

70.     In other words, lateral hiring benefits all Luxury Retail Employees because of the effect it has on information flow and competition for labor.

71.     For all of these reasons, the principle of free competition applies to and impacts not only trade writ large, but also the labor market specifically.

72.     Joseph Harrington, a professor of business economics and public policy at the Wharton School of the University of Pennsylvania ("Wharton"), describes an agreement not to hire or attempt to hire, also termed a "no poaching agreement," as an unreasonable restraint of trade: "In terms of suppressing competition, companies agreeing not to compete for each other's

12

employees is the same as companies agreeing not to compete for each other's customers."[8]

73.     According to Peter Cappelli, the George W. Taylor Professor of Management at the Wharton School and Director of Wharton's Center for Human Resources, a no-hire agreement restrains trade and "benefits the companies at the expense of their employees." *Id.* Indeed, Mr. Cappelli notes that no-hire agreements are illegal and violate both antitrust and employment laws as "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave." *Id.*

**B.      Defendants Conspired to Fix the Compensation of Luxury Retail Employees at Artificially Low Levels**

74.     Defendants' conspiracies comprise express agreements between Saks and each of the Leased Entities that the Leased Entities will not hire Luxury Retail Employees who work for Saks or who were employed by Saks within the previous six months (hereinafter, the "No-Hire Agreements").

75.     The full scope of the No-Hire Agreements will be determined through discovery.

76.     Upon information and belief, the No-Hire Agreements have been in place since at least 2014 and have been recognized, ratified, and enforced since that time.

77.     The No-Hire Agreements have specific, narrowly limited exceptions. Under the terms of the No-Hire Agreements, a Leased Entity may hire a current or former Saks Luxury Retail Employee only if: (i) managers from both co-conspirators (*i.e.*, Saks and the given Leased Entity) agree to allow a Luxury Retail Employee transfer; or (ii) if more than six (6) months have passed since the Luxury Retail Employee was last employed by Saks.

---

[8]      *Silicon Valley's No-poaching Case: The Growing Debate over Employee Mobility*, Knowledge @ Wharton, Apr. 30, 2014, https://knowledge.wharton.upenn.edu/article/silicon-valleys-poaching-case-growing-debate-employee-mobility/.

78.    Each Defendant entered into the No-Hire Agreements and the overarching conspiracy with knowledge of the other Defendants' participation, and with the intent of accomplishing the conspiracy's objective: to reduce Luxury Retail Employee compensation and mobility through eliminating competition for skilled labor.

## C.    **The No-Hire Agreements Were Concealed from the Members of the Proposed Class, Including Plaintiffs**

79.    Each Defendant actively concealed its No-Hire Agreement(s) from the members of the Proposed Class (defined *infra* at ¶ 150), including Plaintiffs.

80.    But for Plaintiffs' own experiences seeking employment at Louis Vuitton and Loro Piana, as well as their interactions with managers at Prada and Gucci and with headhunters discussing Fendi and Brunello Cucinelli, Plaintiffs would have remained unaware of the No-Hire Agreements.

81.    As summarized below, Ms. Hayes's experience seeking employment at Louis Vuitton, Ms. Wang's experience speaking with representatives from Prada and Gucci, and Ms. Giordano's experience looking for other luxury retail employment illustrate some of the effects of the No-Hire Agreements on the members of the Proposed Class.

82.    In particular, and among various other negative impacts, members of the Proposed Class have been and continue to be unable to seek or accept positions for which they are qualified, without their knowledge or consent.

### i.    **Plaintiff Angelene Hayes's Efforts to Obtain Employment at Louis Vuitton While Working at Saks**

83.    On or around August 3, 2013, Ms. Hayes was hired as a Sales Consultant at a Saks Fifth Avenue store located in Beachwood, Ohio.

84.    Prior to working at Saks, Ms. Hayes earned her Bachelor of Fine Arts degree in Fashion Design/Textiles from Moore College of Art & Design.

85.     Prior to joining Saks, Ms. Hayes had worked at Gucci as a Selling Supervisor and at Louis Vuitton as a Service Specialist, Accessories Manager.

86.     From her previous experience at Louis Vuitton, Ms. Hayes was aware that she was qualified for positions that would pay her a salary, as opposed to the hourly wage of $17 that she earned at Saks.

87.     Further, a position at Louis Vuitton would provide Ms. Hayes with the opportunity to earn larger commissions on luxury goods that she sold, as Louis Vuitton sells more expensive luxury products that are more expensive than those sold at Saks.

88.     Additionally, Ms. Hayes was qualified for positions at Louis Vuitton that would provide her with more managerial experience than her role at Saks.

89.     Ms. Hayes believed that a promotion to one of these positions could enable her to advance further in her career.

90.     In or around December 2014, Ms. Hayes had a conversation with Saks's Human Resources Director, Marcia Miller.

91.     Ms. Miller informed Ms. Hayes about a policy between Saks and the Leased Entities under which a Saks Luxury Retail Employee seeking employment with a Leased Entity, such as Louis Vuitton, must resign from Saks and wait six months before the Leased Entity would be allowed to hire the Luxury Retail Employee.

92.     Ms. Miller explained further that Saks and the Leased Entity could relax the policy only by mutual agreement between the two companies that the Leased Entity was permitted to hire the given Luxury Retail Employee.

93.     On June 24, 2015, Ms. Hayes contacted Hope Frate, a Store Manager for Louis Vuitton, by email.  *See* Exhibit A.

94.     In Ms. Hayes's email to Ms. Frate, she stated, in part, "I'm interested in scheduling a time with you to talk about future employment with Louis Vuitton." *Id.*

95.     On July 1, 2015, Ms. Frate replied, "Unfortunately we have an agreement with Saks that we cannot take their employees and have to wait 6 months before hiring.  We have strict guidelines we have to follow.  Sorry." *Id.*

96.     In approximately November 2015, Ms. Hayes spoke in person to Ms. Frate that she remained interested in a position at Louis Vuitton.

97.     In response, Ms. Frate again explained to Ms. Hayes that she would need to obtain the approval of Saks to apply for employment with Louis Vuitton because this was the protocol that Saks employees were required to follow to apply for employment with Louis Vuitton.

**ii.     Proceedings Before the U.S. Equal Employment Opportunity Commission in Connection with Plaintiff Angelene Hayes's Charge of Discrimination against Louis Vuitton**

98.     After being informed that she could not pursue employment with Louis Vuitton, Ms. Hayes continued to work at Saks.

99.     In or around November 2015, Ms. Hayes observed that a former colleague of hers at Saks had been hired by Louis Vuitton prior to the expiration of the six-month period referenced in Ms. Frate's July 1, 2015 email.  *See id.*

100.    On June 14, 2016, Ms. Hayes filed a Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") against Louis Vuitton.

101.    On July 12, 2016, Louis Vuitton submitted a position statement to the EEOC in opposition to Ms. Hayes's Charge.  *See* Exhibit B.

102.    In its position statement, Louis Vuitton confirmed the existence of its No-Hire Agreement with Saks:

> Although [Ms. Hayes's Saks colleague] was previously an employee of the Saks Department store, [he] received approval from his previous manager at Saks and the Saks Department store manager prior to applying for the position with Louis Vuitton. As such, [he] followed the proper protocol during the application process.

*Id.*

103.    In other words, Louis Vuitton stated that it refused to consider Ms. Hayes for employment not because of her race, color, or sex, but because it was restricted from hiring her under its No-Hire Agreement with Saks.

104.    Ms. Hayes continued working at Saks for approximately 13 months after her July 2015 exchange with Ms. Frate.

105.    During this period, Saks continued to pay her $17 per hour and assigned her to sales positions where she sold handbags and perfume.

106.    Despite her qualifications, Saks did not offer Ms. Hayes a promotion to expand into a management role akin to the positions she hoped to pursue at Louis Vuitton.

107.    Ultimately, Ms. Hayes's employment with Saks was terminated on or around July 27, 2016.

108.    Despite seeking alternate employment within the luxury retail space thereafter, Ms. Hayes was forced to accept an entry level position at a small medical office, a position where her skills developed in luxury retail were not transferrable.

109.    Due to the No-Hire Agreement(s), Ms. Hayes was unable to seek and obtain employment at Saks's competitor, Louis Vuitton, where she would have benefited from greater compensation and opportunities for upward mobility.

### iii. Gucci's and Prada's Abbreviated and Restricted Recruitment of Plaintiff Ying-Liang Wang

110.     In October 2014, Saks hired Ms. Wang as a Sales Associate at the same Saks store in Beachwood, Ohio where Ms. Hayes worked.

111.     During her employment at Saks, Ms. Wang developed an ease with customers while providing service and educated advice about Saks's luxury products.

112.     Ms. Wang was especially adept at selling products to a diverse group of clients and was a top seller within the Shoes department at Saks.

113.     During her employment, Ms. Wang had multiple conversations with a Gucci Store Manager.

114.     In approximately January 2015, the Store Manager told Ms. Wang that she believed Ms. Wang was a perfect fit to work at Gucci.

115.     The Store Manager said that, although she wanted Ms. Wang to come to Gucci, she could not "technically recruit" Ms. Wang.

116.     The Store Manager encouraged Ms. Wang to explore available opportunities at Gucci on the company's website but warned Ms. Wang that she would have to wait a "six-month cooling off period" after leaving Saks in order to be hired by Gucci.

117.     Similarly, Ms. Wang spoke with a General Manager at Prada in February 2016.

118.     The General Manager told Ms. Wang that Prada has an agreement with Saks not to recruit Saks Luxury Retail Employees.

119.     Accordingly, despite Prada's interest in Ms. Wang, neither the General Manager nor anyone else with hiring authority at Prada could "initiate contact" with Ms. Wang regarding a potential employment opportunity.

120.     In sum, both representatives from Gucci and Prada were interested in hiring Ms. Wang while she was employed by Saks; however, they were restricted from doing so as a result of the No-Hire Agreement(s).

121.     Had Gucci, Prada, and/or any of the other Leased Entities been permitted to offer Ms. Wang employment, Saks would have been forced to adopt a strategy to retain Ms. Wang (*e.g.*, increasing her hourly rate, enhancing the terms of her commission agreement, or matching the compensation terms of the Leased Entity's offer) or allow one of its desired Luxury Retail Employees to depart for its competitor in the luxury retail space.

122.     Under either scenario, Ms. Wang would have received greater compensation and/or opportunities for advancement in her career.

123.     Because of the No-Hire Agreements, she was denied these benefits of a competitive labor market.

124.     For the remainder of her employment at Saks, Ms. Wang's wages stagnated, as Saks continued to pay approximately $65,000.00 annually.

iv.     **Plaintiff Susan Giordano's Efforts to Obtain Employment at Various Leased Entities While Working at Saks**

125.     Ms. Giordano was hired as a Sales Associate by Saks at a New York-based Saks 5th Avenue store location in 2012.

126.     In 2014, Ms. Giordano was promoted to the role of Brand Ambassador by Saks.

127.     Ms. Giordano grew frustrated that, even in a role where she was given managerial responsibilities, she earned commissions against a draw.

128.     Accordingly, Ms. Giordano explored opportunities to work at other luxury retailers.

129.     Beginning in 2017, Ms. Giordano spoke with two prominent recruitment agencies with experience placing candidates within the luxury retail industry.

130.     In both instances, representatives from the recruitment agencies told Ms. Giordano that, despite her experience, it would be difficult to place Ms. Giordano with brands carried by Saks.

131.     In particular, one headhunter informed Ms. Giordano of positions with Loro Piana, Louis Vuitton, and Brunello Cucinelli for which she was well suited.

132.     However, the headhunter instructed Ms. Giordano that she could not place her in those positions at Loro Piana, Louis Vuitton, or Brunello Cucinelli unless she quit her current job at Saks and waited to seek work again in the industry.

133.     Despite her dissatisfaction with her compensation at Saks, Ms. Giordano was unwilling and unable to quit her job at Saks without having procured another source of income.

134.     Therefore, Ms. Giordano refused to resign from her position at Saks at that time, hoping an opportunity to transfer directly from Saks to another luxury retail employer would arise.

135.     For months, Ms. Giordano sought luxury retail employment outside of Saks with no success.

136.     Finally, in March 2019, Ms. Giordano obtained a managerial position at a smaller luxury retailer that is not carried by Saks.

137.     Due to the No-Hire Agreements between Saks and each of Loro Piana, Louis Vuitton, and Brunello Cucinelli, as well as the analogous No-Hire Agreements between Saks and the other Leased Entities, Ms. Giordano was unable to seek and obtain employment from many larger luxury retailers.

**D.** **Defendants' Conspiracies Suppressed the Wages and Career Mobility of Plaintiffs and the Proposed Class**

138.    Defendants each entered into, implemented, and policed the No-Hire Agreements with the purpose and effect of restraining competition in the market for Luxury Retail Employees and fixing the compensation of their Luxury Retail Employees at artificially low levels.

139.    As Plaintiffs' experiences illustrate, the No-Hire Agreements had the effect of suppressing compensation for individual Luxury Retail Employees that were prevented from seeking and obtaining better-paying positions with other Defendants, even when managers at those other Defendants expressed a desire to hire the Plaintiffs and other members of the Proposed Class. This effect spread throughout the Proposed Class as individual Luxury Retail Employees, such as Plaintiffs, related their stories of being denied employment as a result of the unlawful No-Hire Agreements between and among Defendants and their unnamed co-conspirators.

140.    Moreover, the No-Hire Agreements suppressed compensation for all members of the Proposed Class as a group because they eliminated competitive pressure for each Defendant to preemptively raise Plaintiffs' and members of the Proposed Class' compensation by eliminating the potential for attractive employment opportunities at other Defendants and their unnamed co-conspirators. Because the agreements eliminated competitors for lateral hires of certain Luxury Retail Employees, each Defendant was relieved from competitive pressure to increase the compensation of Plaintiffs and other members of the Proposed Class.

141.    Each Defendant could therefore retain Plaintiffs and other members of the Proposed Class at artificially depressed compensation levels because, even if more highly compensated positions became available at competitors, Plaintiffs and other members of the Proposed Class would be unable to seek those positions.

142.     Moreover, because Defendants and their unnamed co-conspirators are competitors for Luxury Retail Employees, the No-Hire Agreements drastically increased the costs for Plaintiffs and other members of the Proposed Class to seek or accept employment elsewhere.  Through their unlawful agreements not to hire one another's employees, Defendants and their unnamed co-conspirators were able to prevent Plaintiffs and other members of the Proposed Class from seeking and obtaining other employment opportunities in the market for Luxury Retail Employees.  As a direct result of these unlawful agreements, Plaintiffs and other members of the Proposed Class who wished to change positions had no choice but to accept employment for lower compensation at less prestigious companies where the same opportunities to sell luxury retail goods do not exist, an untenable option.  As a result, Defendants were each able to retain Plaintiffs and other members of the Proposed Class at artificially low compensation levels by increasing costs associated with changing employers.

143.     The No-Hire Agreements thus artificially suppressed compensation for Plaintiffs and all members of the Proposed Class.

144.     Defendants' conspiracies were ideal tools to suppress their Luxury Retail Employees' compensation.  Whereas agreements to fix specific and individual compensation packages would be hopelessly complex and impossible to monitor, implement, and police, eliminating entire categories of competition for skilled labor (that affected the compensation and mobility of all Luxury Retail Employees in a common and predictable fashion) was simple to implement and easy to enforce.

145.     Plaintiffs and all other members of the Proposed Class were harmed by the No-Hire Agreements alleged herein.  Defendants' unlawful No-Hire Agreements restrained competition in the market for the services of Luxury Retail Employees, which had the effect of suppressing

compensation and mobility for all members of the Proposed Class.

146. Without this class action, Plaintiffs and the Proposed Class will remain unable to receive compensation for the harm they suffered, and Defendants will continue to reap the benefits of their illegal conspiracies.

147. The unlawful No-Hire Agreements entered into by Defendants and their unnamed co-conspirators are *per se* illegal horizontal restraints on competition.

148. In the alternative, Defendants are liable under a "quick look" analysis where someone with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

149. In the alternative, Defendants are liable under a Rule of Reason analysis because their unlawful agreements not to hire one another's Luxury Retail Employees reduced compensation and restrained competition in the market for Luxury Retail Employees. The unlawful No-Hire Agreements entered into by Defendants and their agents and co-conspirators had no procompetitive effects and were not intended to have procompetitive effects. Indeed, the No-Hire Agreements had substantial anticompetitive effects, including, but not limited to, eliminating competition, preventing Plaintiffs and members of the Proposed Class from obtaining employment and earning compensation in a competitive market, reducing compensation, and preventing or limiting employment opportunities and choice with respect to such opportunities. The anticompetitive effects outweighed any procompetitive benefits of the conspiracy.

## CLASS ACTION ALLEGATIONS

150. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of themselves and as representatives of a class of Luxury Retail Employees

(collectively, the "Proposed Class," and each, individually, "Proposed Class Members") defined as follows:

> All persons in the United States employed by at least one of Defendants at any time from September 30, 2015 until the effects of Defendants' conduct ceases (the "Class Period") who: (i) work in any of Defendants' respective stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers. Excluded from the Proposed Class are each of Defendants' officers and directors, as well as employees in roles where they purchase luxury retail goods on behalf of any Defendant to display and sell in the Defendant's stores and/or on its website(s).

151. The Proposed Class Members are so numerous and/or geographically dispersed that joinder is impracticable. While the exact number of Proposed Class Members is unknown to Plaintiffs, upon information and belief, there are thousands of members of the Proposed Class. The Proposed Class is readily identifiable from information and records in Defendants' possession.

152. Plaintiffs' claims are typical of members of the Proposed Class. Plaintiffs and all members of the Proposed Class were damaged by the same wrongful conduct by Defendants, *i.e.*, Defendants' anticompetitive practices.

153. As a result of these practices, Defendants deprived the Proposed Class Members of the benefits of competition among each Defendant for their labor, causing Plaintiffs and all members of the Proposed Class to receive diminished compensation.

154. Plaintiffs will fairly and adequately protect and represent the interests of the Proposed Class.

155. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Proposed Class.

156. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of antitrust, employment, and class action litigation and who are able to meet the

demands necessary to litigate a class action of this size and complexity.

157. Questions of law and fact common to members of the Proposed Class predominate over questions, if any, that may affect only individual Proposed Class Members, because Defendants have acted on grounds generally applicable to the entire Proposed Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

158. Questions of law and fact common to the Proposed Class include:

    a. Whether Defendants' conduct violated the Sherman Act;

    b. Whether Defendants' agreements unlawfully restrained trade, commerce, and/or competition for labor among Defendants;

    c. Whether Defendants' conspiracies and associated agreements constitute *per se* violations of the Sherman Act;

    d. Whether Plaintiffs and the Proposed Class suffered antitrust injury or were threatened with injury; and

    e. The type and measure of damages suffered by Plaintiffs and the Proposed Class.

159. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not be practicably pursued individually, substantially outweighs potential difficulties in management of this class action.

160.   Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### FIRST CAUSE OF ACTION
### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

161.   Plaintiffs, on behalf of themselves and all others similarly situated, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

162.   Saks, and each of the Leased Entities, entered into and carried out unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

163.   Beginning no later than 2014, each of the Leased Entities entered into illegal contracts, combinations, and conspiracies in restraint of trade with Saks under which each Leased Entity agreed not to hire or attempt to hire Luxury Retail Employees currently employed by Saks and/or Luxury Retail Employees that had been employed by Saks within the previous six months. Defendants were only permitted to make exceptions to these No-Hire Agreements if a Luxury Retail Employee's transfer was approved by both Saks and the given Leased Entity who intended to hire the Luxury Retail Employee.

164.   Defendants' conduct included concerted efforts, actions, and undertakings with the intent, purpose, and effect of: (a) artificially suppressing the total compensation of Plaintiffs and the Proposed Class Members; (b) eliminating competition among Defendants for skilled labor; and (c) restraining Luxury Retail Employees' ability to secure better compensation, advancement, benefits, and working conditions.

165.   Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants.

166.   Defendants' actions in furtherance of their contracts, combinations, and/or

conspiracies were authorized, ordered, or done by Defendants' respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' respective affairs.

167.    Plaintiffs and the Proposed Class Members have received lower total compensation than they would otherwise have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

168.    Contracts, combinations, and/or conspiracies between each of the Leased Entities and Saks are *per se* violations of Section 1 of the Sherman Act.

169.    In the alternative, Defendants are each respectively liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and markets.

170.    In the alternative, Defendants are liable under a Rule of Reason analysis because their unlawful agreements not to hire one another's Luxury Retail Employees reduced compensation and restrained competition in the market for Luxury Retail Employees.

171.    Contracts, combinations, and/or conspiracies between each of the Leased Entities and Saks have had a substantial effect on interstate commerce.

172.    As a direct and proximate result of contracts, combinations, and/or conspiracies between each of the Leased Entities and Saks to restrain trade and commerce, Plaintiffs and the Proposed Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

173. Plaintiffs and the Proposed Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Proposed Class, request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Issue an order certifying the Proposed Class as defined above;

C. Appoint Plaintiffs as the representatives of the Proposed Class and their counsel as Class Counsel;

D. Declare that Defendants' actions as set forth in this complaint violate the law;

E. Award Plaintiffs and the Proposed Class damages in an amount according to proof against Defendants for violations of 15 U.S.C. § 1, to be trebled in accordance therewith;

F. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Proposed Class Members are entitled;

G. Grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

H. Declare Defendants be permanently enjoined and restrained from enforcing or adhering to any existing agreements that unreasonably restrict competition as described herein;

I. Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

J.     Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to the Proposed Class Members;

K.     Award post-judgment interest on such monetary relief;

L.     Award reasonable attorneys' fees and costs; and

M.     Grant such further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Proposed Class, hereby demands a trial by jury on all issues of fact and damages.

Dated: February 14, 2020                **FARUQI & FARUQI, LLP**

                                        By:  */s/ Innessa Melamed Huot*
                                             Innessa Melamed Huot
                                             Alex J. Hartzband
                                             Patrick J. Collopy

                                             685 Third Avenue, 26th Floor
                                             New York, New York 10017
                                             Telephone: 212-983-9330
                                             Facsimile: 212-983-9331
                                             ihuot@faruqilaw.com
                                             ahartzband@faruqilaw.com
                                             pcollopy@faruqilaw.com

                                             Joseph R. Saveri (*pro hac vice* to be submitted)
                                             Steven N. Williams
                                             Kevin E. Rayhill (*pro hac vice* to be submitted)
                                             **JOSEPH SAVERI LAW FIRM, INC.**
                                             601 California Street, Suite 1000
                                             San Francisco, CA 94108
                                             Telephone: (415) 500-6800
                                             Facsimile: (415) 395-9940
                                             jsaveri@saverilawfirm.com
                                             swillliams@saverilawfirm.com
                                             krayhill@saverilawfirm.com

                                             *Attorneys for Plaintiffs and the Proposed Class*