# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN GIORDANO, ANGELENE HAYES, YING-LIANG WANG, and ANJA BEACHUM on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAKS INCORPORATED, SAKS & COMPANY LLC, SAKS FIFTH AVENUE LLC, LOUIS VUITTON USA INC., LORO PIANA & C. INC., GUCCI AMERICA, INC., PRADA USA CORP., and BRUNELLO CUCINELLI, USA, INC., <br><br> Defendants. | Civil Action No.: 1:20-cv-00833 <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Susan Giordano, Angelene Hayes, Ying-Liang Wang, and Anja Beachum (together, "Plaintiffs"), on behalf of themselves and all other similarly situated individuals, by and through their undersigned attorneys, hereby allege as follows against Defendants Saks Incorporated, Saks & Company LLC, Saks Fifth Avenue LLC (together, "Saks"), Louis Vuitton USA Inc. ("Louis Vuitton"), Loro Piana & C. Inc. ("Loro Piana"), Gucci America, Inc. ("Gucci"), Prada USA Corp. ("Prada") and Brunello Cucinelli, USA, Inc. ("Brunello Cucinelli") (collectively, "Defendants" and each, individually, "Defendant"):

## INTRODUCTION

1.      This class action challenges an illegal conspiracy among Louis Vuitton, Loro Piana, Gucci, Prada and Brunello Cucinelli (collectively, the "Brand Defendants" and each, individually, a "Brand Defendant") and Saks to suppress the total compensation of their employees. Without the knowledge or consent of their employees, Defendants entered into express agreements to eliminate or reduce competition among them for skilled luxury retail

labor, including employees who: (i) work in Defendants' stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers ("Luxury Retail Employees"). This conspiracy consists of agreements between Saks and each of the Brand Defendants not to hire or attempt to hire Saks's Luxury Retail Employees.

2.     The intended and actual effect of these agreements is to suppress Luxury Retail Employees' total compensation and to impose unlawful restrictions on Luxury Retail Employees' mobility. Because Defendants control a significant number and proportion of the luxury retail jobs in the United States, their no-hire agreements have reduced competition for Luxury Retail Employees, thereby suppressing Luxury Retail Employee pay.

3.     Defendants' conspiracies and agreements have restricted trade and are *per se* unlawful under federal law. Plaintiffs seek injunctive relief and damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### JURISDICTION AND VENUE

4.     Plaintiffs bring this action to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, and obtain injunctive relief arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6.     Venue is appropriate within this District under 15 U.S.C. §§ 15 and 22, as well as under 28 U.S.C. § 1391(b). Defendants transact business within this District, and Defendants transact their affairs and carry out interstate trade and commerce, in substantial part, in this District. Further, Defendants and/or their agents may be found in this District, including because each Defendant operates at least one store in this District employing Luxury Retail Employees.

7.     This Court has personal jurisdiction over Defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendants' scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

**A.     Plaintiffs**

8.     Plaintiff Susan Giordano is a resident of Queens County, New York. Ms. Giordano worked for Saks as a Luxury Retail Employee from approximately November 2012 through March 2019. Ms. Giordano has been injured in her business or property by reason of the violations alleged herein.

9.     Plaintiff Angelene Hayes is a resident of the State of New Jersey. Ms. Hayes worked for Saks as a Luxury Retail Employee from August 2013 through July 27, 2016. Ms. Hayes has been injured in her business or property by reason of the violations alleged herein.

10.     Plaintiff Ying-Liang Wang is a resident of the State of Ohio. Ms. Wang worked for Saks as a Luxury Retail Employee from approximately October 2014 to April 2016. Ms. Wang has been injured in her business or property by reason of the violations alleged herein.

11.     Plaintiff Anja Beachum is a resident of the State of Michigan. Ms. Beachum worked for Saks as a Luxury Retail Employee between approximately February 2016 and September 2016, and between the summer of 2018 and December 2019. Ms. Beachum has been injured in her business or property by reason of the violations alleged herein.

**B.**     **Defendants**

12.     Defendant Saks Incorporated is a Tennessee corporation with its principal place of business at 225 Liberty Street, New York, New York 10281.

13.     Defendant Saks & Company, LLC is a Delaware limited liability company with its principal place of business at 225 Liberty Street, New York, New York 10281.

14.     Defendant Saks Fifth Avenue, LLC is a Massachusetts limited liability company with its principal place of business at 12 East 49th Street, New York, New York.

15.     Defendant Louis Vuitton USA Inc. is a Delaware corporation with its principal place of business at 1 East 57th Street New York, New York.

16.     Defendant Loro Piana & C. Inc. is a Delaware corporation with its principal place of business at 711 5th Avenue, New York, New York 10022.

17.     Defendant Gucci America, Inc. is a New Jersey corporation with its principal place of business at 195 Broadway, New York, NY 10007.

18.     Defendant Prada USA Corp. is a Delaware corporation with its principal place of business at 610 West 52nd Street, New York, NY 10019.

19.     Defendant Brunello Cucinelli, USA, Inc. is a New York corporation with its principal place of business at 350 Fifth Avenue, New York, New York 10118.

20.     All of Defendants' actions described herein are part of, and in furtherance of, the unlawful conduct alleged. These actions were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual and/or apparent authority. On information and belief, Defendants also entered into unlawful No-Hire Agreements

with other competitors in the market for Luxury Retail Employees, referred to herein as unnamed co-conspirators.

**FACTUAL ALLEGATIONS**

**A.**     **Luxury Retail Goods and Apparel in the United States**

21.     Defendants consist of a premier nationwide department store chain that sells luxury goods and apparel (Saks) as well as five luxury brands (the Brand Defendants) that sell their goods and apparel through department stores (including Saks), concessions (including concessions at Saks stores), and their own standalone boutiques.

22.     For a long time, luxury goods manufacturers relied on the rarity of materials and skilled craftsmanship and manufacturing to separate them from other lower-priced goods, but beginning in the 1990s, the luxury retail sector began mass marketing, including by increasing the number of store locations, developing online businesses, and changing production methods to produce higher volumes of goods.

23.     To create and maintain the distinction between (and demand for) luxury goods over other, lower-priced goods, luxury goods manufacturers have gone to great lengths to market their luxury brands and create shopping experiences for customers.

24.     Luxury brands endeavor to cast themselves as shaped by cultural and historical heritage, and market their luxury brands as rooted in longer-term traditions rather than constantly-changing fashions. For example, Louis Vuitton markets that "[i]t was in 1837 that a 16-year-old Louis Vuitton arrived in Paris by foot and started apprenticing for Monsieur Maréchal."[1]

---

[1]     LOUIS VUITTON, *A Legendary History*, *available at* https://us.louisvuitton.com/eng-us/magazine/articles/a-legendary-history#the-begining (last visited Apr. 28, 2020).

5

25. As one author put it, luxury brands are "auratic":

Similar to works of art, they 'possess an aura of authenticity which surrounded the original – nonmechanically reproducible – work, endowing it with qualities of uniqueness, distance and otherness.' Thus managing luxury consists in managing the aura of the brand over time… [T]he challenge [for luxury brands over time] is to create new products within the brand but without losing the brand's aura.[2]

26. The Brand Defendants have been tremendously successful in maintaining their luxury brands' auras, accounting for substantial market shares in the markets for luxury goods and apparel, and doing so at prices far higher than for comparable standard mass-market goods.

27. One way that the Brand Defendants accomplish this feat is by creating luxury shopping experiences at their boutiques and concessions through the décor and design as well as, importantly, through the customer service their Luxury Retail Employee staff supplies. Among the keys to this experience are their Luxury Retail Employees' ability to create and maintain the "aura of authenticity" the brands seek to establish and connect the customer's experience and purchase to the longer-term traditions of the brand. Doing so entails, *inter alia*, substantial skill and training of Luxury Retail Employees.

28. Saks also endeavors to maintain a similar luxury shopping experience for its department store customers, launching Brand Defendants' concessions at their Saks stores, selling the Brand Defendants' goods in Saks stores at which the Brand Defendants do not have concessions, and by selling other, competing luxury brands. Saks accomplishes its luxury shopping experience goals, like the Brand Defendants, through décor and design as well as through the customer service their sales staff supplies. As Saks President Marc Metrick said at a recent Wharton "CEO Summit," "When you're spending the kind of money that we're asking

---

[2] Delphine Dion & Eric Arnould, *Retail Luxury Strategy: Assembling Charisma through Art and Magic*, Journal of Retailing 502, 503 (Dec. 2011).

people to spend, there needs to be an experience, there needs to be theater; you don't stream Hamilton on Netflix . . . . You go to the theater and watch it."[3]

29.     To run their businesses, each Defendant depends upon attracting and retaining Luxury Retail Employees who reflect their respective brand images and cultures.

30.     Thus, Saks and the Brand Defendants are competitors in the labor market for Luxury Retail Employees' services.

**B.    Luxury Retail Employees Are Skilled, Well-Trained Employees Who Enhance and Maintain Luxury Goods and Apparel Retailers' Brand**

31.     The customer-facing task of selling luxury goods and apparel in physical stores is performed by thousands of Luxury Retail Employees in the United States.

32.     Selling luxury goods and apparel requires extensive training on service, selling, and product-knowledge. Defendants invest in training their Luxury Retail Employees because well-trained salespeople are a crucial component of success for luxury retailers and what sets them apart from other retailers.

33.     Luxury goods and apparel retailers seek to create a shopping experience for customers—an atmosphere of exclusivity and opulence surrounding their luxury products.

34.     Defendants and customers expect Luxury Retail Employees to be knowledgeable about the particular products each Defendant manufactures and/or sells, as well as current trends, because a knowledgeable salesperson can make all the difference for consumers considering purchasing expensive luxury items.

35.     Defendants encourage their Luxury Retail Employees to maintain frequent personal contact with customers, especially customers who regularly purchase luxury retail

---

[3]     CEO Summit – Powering the Future of Retail in a Changing Environment, The Wharton School Baker Retailing Center (Oct. 15, 2019), *available at* https://bakerretail.wharton.upenn.edu/wp-content/uploads/2019/11/2019-CEO-Summit.pdf.

goods. Sales associates provide business cards to, and endeavor to establish a rapport with such customers to encourage them to return to Defendants' stores for their luxury goods purchases.

36.    Prada, for example, operates its "Prada Academy," at which it offers retail training to employees, including "brand knowledge" and "selling and customer experience" trainings. According to Prada, "A particular focus [at Prada Academy] is put on the adoption of new ways of communication and relations with customers[.]"[4]

37.    Indeed, Chantal Gaemperle, Executive Vice President, Human Resources and Synergies, of LVMH Moet Hennessey Louis Vuitton SE ("LVMH"), the parent corporation of Louis Vuitton and Loro Piana, explained the importance of nourishing talent, stating that it is "[e]ven more so [important] in luxury than anywhere else. Because we are trying to reinvent the brands, trying to set trends, and selling dreams in many ways, this takes special personalities. You don't have to go up to the creative director or CEO, you can see it at store management."[5]

38.    For its part, Saks has robust employee training and emphasizes customer relationships with its employees. Then-Saks Senior Vice President of Organizational Effectiveness Jim Viola said, "Service is one of the most important expectations as a luxury retailer. We are setting these expectations as soon as someone comes to work for us, and [we] make it easy for them to learn[.]"[6] Saks President Marc Metrick has emphasized that Saks outpaced its luxury retail competitors over the past few years by "deliver[ing] exceptional service by creating a very deep connection" with Saks customers. Metrick also called Saks's

---

[4]    Academy, *available at* https://www.pradagroup.com/en/talents/prada-academy.html (last visited Apr. 28, 2020).
[5]    The Business of Fashion, *available at* https://www.businessoffashion.com/articles/careers/lvmh-luxurys-global-talent-academy (last visited Apr. 28, 2020).
[6]    Jeanine Poggi, *Saks Updates Training Program*, WWD (Aug. 6, 2007), *available at* https://wwd.com/business-news/financial/saks-updates-training-program-488005/.

stylists and in-house sales associates the key differentiator for the business against pure play e-commerce companies (which, by their nature, cannot offer the luxury shopping experience that Defendants seek to create for luxury goods purchasers).[7]

## C.   Competition for Luxury Retail Employees in the United States

39.     Each Defendant faces competition from rival luxury retailers in the labor market for Luxury Retail Employees, including each other and other department stores, concessions, and standalone boutiques. These different sales outlets frequently operate in close proximity to each other.

40.     Defendants are the dominant employers of Luxury Retail Employees in the United States. Defendants are all horizontal competitors in the market for Luxury Retail Employees.

41.     Saks operates 39 Saks Fifth Avenue stores and 111 Saks Off 5th stores across the country.

42.     Saks is part of a retail conglomerate that employs approximately 40,000 employees worldwide,[8] including thousands of Luxury Retail Employees at Saks stores in the United States that sell luxury retail goods to consumers.

43.     LVMH has more than 32,000 employees in the United States,[9] including thousands of Luxury Retail Employees who sell luxury retail goods to consumers at Louis Vuitton and Loro Piana.

---

[7]     *CEO Summit – Powering the Future of Retail in a Changing Environment*, The Wharton School Baker Retailing Center (Oct. 15, 2019), *available at* https://bakerretail.wharton.upenn.edu/wp-content/uploads/2019/11/2019-CEO-Summit.pdf.

[8]     *Annual Information Form*, Hudson's Bay Co. (May 3, 2019), *available at* https://www.sedar.com/DisplayCompanyDocuments.do?lang=EN&issuerNo=00033738.

[9]     *LVMH 2018 Annual Report*, LVMH, *available at* https://r.lvmh-static.com/uploads/2019/03/rapport-annuel-lvmh-2018_va.pdf (last visited Apr. 28, 2020).

44.     In the United States, Louis Vuitton operates over 100 stores, whereas Loro Piana operates 22 stores.

45.     Gucci employs more than 14,000 employees worldwide,[10] including hundreds of Luxury Retail Employees who sell luxury retail goods to consumers at Gucci stores in the United States.

46.     Gucci operates approximately 59 stores in the United States.

47.     According to The Prada Group's website,[11] Prada employees more than 13,000 employees worldwide, including hundreds of Luxury Retail Employees who sell luxury retail goods to consumers at Prada stores.

48.     Prada operates approximately 52 stores in the United States.

49.     Brunello Cucinelli employs more than 1,800 employees worldwide,[12] including hundreds of Luxury Retail Employees who sell luxury retail goods to consumers at Brunello Cucinelli stores in the United States.

50.     Brunello Cucinelli operates approximately 21 stores in the United States.

51.     Cumulatively, Defendants employ thousands of Luxury Retail Employees at hundreds of stores across the country.

---

[10]     *Reference Document 2018*, Kering, *available at* https://solutions.vwdservices.com/products/documents/2ce929cb-bd6e-41d6-8252-167e3c7dd2db/?c=ioaFOwi1MPp9C84tyO%2FpcJyN%2B3cnv7KOPq6ZNlUGxi2CmO7mqhwuX9GE9D7s4HZk (last visited Apr. 28, 2020).

[11]     Investors/Investor Relations Overview – Prada Group H1 2019 Results Announcement (Aug. 1, 2019), *available at* https://www.pradagroup.com/en/investors/investor-relations/results-presentations.html.

[12]     *Interim Financial Report*, Brunello Cucinelli (June 30, 2019), *available at* http://investor.brunellocucinelli.com/yep-content/media/PDF_Cucinelli_Semestrale_ENG.pdf.

### i. The Benefits to Defendants of Lateral Hiring

52. Each Defendant faces competition from rival retailers, including department stores and boutiques, that provide luxury retail goods to customers.

53. In a properly functioning and lawfully competitive labor market, each Defendant would openly compete for the services of Luxury Retail Employees, including by hiring current employees from each other, or so-called lateral hiring. Defendants would obtain significant advantages by engaging in lateral hiring. By laterally hiring a Luxury Retail Employee from one of its rivals, a Defendant would save on training costs and receive the immediate benefit of a well-trained, motivated salesperson who knows how to cultivate relationships with customers and enhance the Defendant's brand, both of which would lead to increased sales and profitability.

54. By contrast, hiring salespeople who lack the experience and training of Luxury Retail Employees is costly in a number of ways. The hiring company must invest significant resources in identifying, assessing, and training the new employees, and would lose the benefit of the close customer relationships, enhanced brand image, and increased sales an experienced Luxury Retail Employee would have produced while the new employee gets up to speed.

55. Defendants in a competitive market would each utilize "cold calling," the practice by which a prospective employer freely communicates with prospective employees, even if the employee does not first express interest.

56. For instance, in a properly functioning and lawfully competitive labor market, if Prada believed that a certain Luxury Retail Employee performed his or her job well at Saks, Prada would be free to contact that Luxury Retail Employee about an employment opportunity and, if Prada so chose, hire that Luxury Retail Employee.

57.     Similarly, in a properly functioning and lawfully competitive labor market, if a Saks Luxury Retail Employee perceived Prada to be a better organization – whether because of increased wages, enhanced commission sales opportunities, better benefits, or for any other reason – he or she would be free to communicate with Prada about potential employment opportunities, apply to Prada, and ultimately obtain employment at Prada.

58.     Cold calling is an important aspect of a properly functioning and lawfully competitive market.

59.     Companies perceive rival companies' current employees, especially those who are not actively seeking other employment, in a more favorable way.

60.     This is true at least in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than candidates who are unemployed or actively seeking employment outside of their current jobs.

61.     Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.

62.     Further, through lateral hiring, a luxury retail store is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training skilled labor, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend.

63.     For example, if Louis Vuitton is able to hire a Luxury Retail Employee that Saks has recruited, interviewed, and trained, Louis Vuitton will itself benefit from the new hire's labor while simultaneously harming Saks by taking away Saks's valued employee.

64.     For these reasons and others, lateral hiring, including through cold calling, is a

key form of competition among luxury retail employers.

### ii. The Benefits to Luxury Retail Employees of Lateral Hiring

65. Competition for employees via lateral hiring has a significant beneficial impact on Luxury Retail Employees in a variety of ways.

66. *First*, when employers become aware of attractive outside opportunities for their Luxury Retail Employees, the threat of losing employees to competitors encourages employers to preemptively raise compensation to increase morale and competitive positioning in the hopes of retaining valuable Luxury Retail Employees.

67. If employers do not react to competition, their Luxury Retail Employees may seek positions that offer more generous compensation and benefits elsewhere or may be receptive to recruiting by a rival employer.

68. Once a Luxury Retail Employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for that individual, if retention is possible at all.

69. Employers therefore have an incentive to preempt lateral departures by paying all Luxury Retail Employees well enough that they are unlikely to seek or pursue outside opportunities.

70. Preemptive retention measures thus lead to increased compensation for all Luxury Retail Employees.

71. *Second,* the availability of desirable positions at competing companies forces employers to reactively increase compensation to retain Luxury Retail Employees who are likely to join a competitor.

72. This can occur, for example, when a particular Luxury Retail Employee or a

group of Luxury Retail Employees become interested in switching employers and the current employer responds by offering an increase in base pay or an enhancement in commission sales incentives to retain them.

73.     This may also occur when an employer responds to overall attrition rates among its Luxury Retail Employees by increasing compensation levels in base pay or enhancing commission sales incentives.

74.     In the former scenario, even a targeted increase designed to retain specific Luxury Retail Employees may put upward pressure on the entire compensation structure.

75.     ***Third,*** the positive compensation effects of hiring Luxury Retail Employees from competitors are not limited to the particular individuals who seek new employment, or to the particular individuals who would have pursued new positions but for the anticompetitive agreements alleged herein.

76.     Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all Luxury Retail Employees, such as those at Saks and each of the Brand Defendants.

77.     Defendants carefully monitor and manage their respective internal compensation levels to achieve certain goals, including:

      a.     Maintaining approximate compensation parity among Luxury Retail Employees within the same employment categories (for example, among Sales Associates);

      b.     Maintaining certain compensation relationships among Luxury Retail Employees across different employment categories (for example, among Brand Ambassadors relative to Sales Associates);

      c.      Maintaining high employee morale and productivity;

      d.      Retaining Luxury Retail Employees; and

      e.      Attracting new and talented Luxury Retail Employees.

78. To accomplish these objectives, each Defendant sets baseline compensation levels for different employee categories that apply to all Luxury Retail Employees within those categories. Each Defendant also compares baseline compensation levels across different employee categories. Each Defendant also regularly updates their baseline compensation levels.

79. While each Defendant may engage in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation levels. The eventual compensation any particular Luxury Retail Employee receives is entirely determined by the baseline level, or at least profoundly influenced by it. In either case, suppression of baseline compensation results in suppression of total compensation.

80. Thus, if operating under competitive and lawful conditions, each Defendant would use lateral hiring as an important tool for recruiting and retaining skilled labor, which would increase total compensation and mobility of Luxury Retail Employees across Defendants and throughout the labor market.

**iii.    No-Hire Agreements Enable Defendants to Avoid the Cost of Competitive Compensation for Luxury Retail Employees**

81. No-hire agreements like those existing between Saks and each of the Brand Defendants negatively impact employee compensation throughout the luxury retail industry.

82. For example, without the benefit of cold calling and open communications with prospective employers such as Brunello Cucinelli, a Saks Luxury Retail Employee lacks

information regarding Brunello Cucinelli's pay packages and other compensation terms. Without this information, the employee lacks leverage when negotiating with Saks.

83.     If this same Saks employee were not constrained (unbeknownst to him or her) by Saks's no-hire agreement with Brunello Cucinelli and received an offer of higher compensation from Brunello Cucinelli, the employee could accept Brunello Cucinelli's offer or attempt to negotiate a pay increase with Saks. Either way, the Luxury Retail Employee's compensation would increase.

84.     A Saks employee who receives information regarding potential compensation from a rival employer will also likely inform other Saks employees. These Saks employees can then similarly use that information to negotiate pay increases or move to other employers, even if they do not themselves receive cold calls.

85.     In other words, lateral hiring benefits all Luxury Retail Employees because of the effect it has on information flow and competition for labor.

86.     For all of these reasons, the principle of free competition applies to and impacts not only trade writ large, but also the labor market specifically.

87.     Joseph Harrington, a professor of business economics and public policy at the Wharton School of the University of Pennsylvania ("Wharton"), describes an agreement not to hire or attempt to hire, also termed a "no poaching agreement," as an unreasonable restraint of trade: "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers."[13]

---

[13]     *Silicon Valley's No-poaching Case: The Growing Debate over Employee Mobility*, Knowledge @ Wharton, Apr. 30, 2014, *available at* https://knowledge.wharton.upenn.edu/article/silicon-valleys-poaching-case-growing-debate-employee-mobility/.

88.     According to Peter Cappelli, the George W. Taylor Professor of Management at the Wharton School and Director of Wharton's Center for Human Resources, a no-hire agreement restrains trade and "benefits the companies at the expense of their employees." *Id.* Indeed, Mr. Cappelli notes that no-hire agreements are illegal and violate both antitrust and employment laws as "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave." *Id.*

**D.     Defendants Conspired to Fix the Compensation of Luxury Retail Employees at Artificially Low Levels**

89.     Defendants' conspiracies comprise express agreements between Saks and each of the Brand Defendants that the Brand Defendants will not hire Luxury Retail Employees who work for Saks or who were employed by Saks within the previous six months (hereinafter, the "No-Hire Agreements").

90.     The full scope of the No-Hire Agreements between Saks and the Brand Defendants (and also between Saks and other unnamed co-conspirators) will be determined through discovery.

91.     Upon information and belief, the No-Hire Agreements have been in place since at least 2014 and have been recognized, ratified, and enforced since that time.

92.     The No-Hire Agreements have specific, narrowly limited exceptions. Under the terms of the No-Hire Agreements, a Brand Defendant may hire a current or former Saks Luxury Retail Employee only if: (i) managers from both co-conspirators (*i.e.*, Saks and the given Brand Defendant) agree to allow the Luxury Retail Employee to transfer; or (ii) if more than six (6) months have passed since the Luxury Retail Employee was last employed by Saks.

93.     Each Defendant entered into the No-Hire Agreements and the overarching conspiracy with knowledge of the other Defendants' participation, and with the intent of

accomplishing the conspiracy's objective: to reduce Luxury Retail Employee compensation and mobility through eliminating competition for skilled labor.

**E.**     **Defendants' No-Hire Agreements Inhibit Luxury Retail Employees' Mobility and Suppress Luxury Retail Employees' Compensation**

94.     Defendants each entered into, implemented, and policed the No-Hire Agreements with the purpose and effect of restraining competition in the market for Luxury Retail Employees and fixing the compensation of their Luxury Retail Employees at artificially low levels.

95.     Each Defendant also actively concealed its No-Hire Agreement(s) from the members of the Class (defined *infra* at ¶ 197), including Plaintiffs.

96.     But for Plaintiffs' own experiences seeking employment at each of the Brand Defendants, their specific interactions with managers from each of the Brand Defendants, their interactions with Saks's Human Resources Director, as well as their interactions with headhunters discussing Louis Vuitton, Loro Piana, and Brunello Cucinelli, Plaintiffs would have remained unaware of the No-Hire Agreements. While some employees heard rumors of the No-Hire Agreements, Defendants kept employees from learning the terms and scope of the No-Hire Agreements.

97.     As summarized below, Ms. Hayes's experience seeking employment and interacting with managers from Louis Vuitton, Gucci, and Prada, Ms. Wang's experience seeking employment at Gucci and Prada, Ms. Beachum's experience seeking employment at Louis Vuitton, and Ms. Giordano's experience seeking employment at Louis Vuitton, Gucci, Prada, Loro Piana and Brunello Cucinelli, as well as looking for other luxury retail employment illustrate some of the effects of the No-Hire Agreements on the members of the Class.

98.     In particular, and among various other negative impacts, members of the Class have been and continue to be unable to seek or accept positions for which they are qualified,

without their knowledge or consent.

99.    As Plaintiffs' experiences illustrate, the No-Hire Agreements had the effect of preventing Luxury Retail Employee mobility and suppressed compensation for individual Luxury Retail Employees that were prevented from seeking and obtaining better-paying positions with other Defendants, even when managers at those other Defendants expressed a desire to hire the Saks employees. This effect spread through the market for Luxury Retail Employees.

100.    Moreover, the No-Hire Agreements suppressed compensation for all members of the Class as a group because they eliminated competitive pressure for each Defendant to preemptively raise Plaintiffs' and members of the Class's compensation by eliminating the potential for attractive employment opportunities at other Defendants' and their unnamed co-conspirators' stores, concessions, and boutiques. Because the agreements eliminated competition in the labor market for Luxury Retail Employees, each Defendant benefited from the absence of competitive pressure that would have increased compensation to Plaintiffs and other members of the Class under competitive conditions.

101.    Each Defendant could therefore retain Plaintiffs and other members of the Class at artificially suppressed compensation levels because, even if more highly compensated positions became available with other Defendants or unnamed co-conspirators, Plaintiffs and other members of the Class would be unable to seek those positions.

102.    Moreover, because Defendants and their unnamed co-conspirators are competitors for Luxury Retail Employees, the No-Hire Agreements drastically increased the costs for Plaintiffs and the Class to seek or accept employment elsewhere. Through their unlawful agreements not to hire one another's employees, Defendants and their unnamed co-conspirators

were able to prevent Plaintiffs and other members of the Class from seeking and obtaining other employment opportunities in the market for Luxury Retail Employee services. As a direct result of these unlawful agreements, Plaintiffs and members of the Class who wished to change positions had no choice but to accept employment for lower compensation at less prestigious companies where the same opportunities to sell luxury retail goods do not exist or leave the labor market for Luxury Retail Employees altogether, thus losing their the opportunity to use their skills. As a result, Defendants were able to retain Plaintiffs and the Class at artificially low compensation levels by inhibiting Plaintiffs' and the Class's ability to switch employers.

103.    The No-Hire Agreements thus artificially suppressed compensation for Plaintiffs and the Class.

104.    Defendants' conspiracies were ideal tools to suppress their Luxury Retail Employees' compensation. Whereas agreements to fix specific and individual compensation packages would be hopelessly complex and impossible to monitor, implement, and police, eliminating entire categories of competition for skilled labor (that affected the compensation and mobility of all Luxury Retail Employees in a common and predictable fashion) was simple to implement and easy to enforce.

105.    The absence of labor competition in the market for Luxury Retail Employees is not merely theoretical. Plaintiffs and many other members of the Class sought employment from a Defendant other than the Defendant for whom they worked and were unable to gain and/or decided not to apply for such employment because of the No-Hire Agreements.

    **i.**    **Plaintiff Angelene Hayes's Efforts to Obtain Employment at Various Brand Defendants While Working at Saks**

106.    On or around August 3, 2013, Ms. Hayes was hired as a Sales Consultant at a Saks Fifth Avenue store located in Beachwood, Ohio.

107.     Prior to working at Saks, Ms. Hayes earned her Bachelor of Fine Arts degree in Fashion Design/Textiles from Moore College of Art & Design.

108.     Prior to joining Saks, Ms. Hayes worked at Gucci as a Selling Supervisor and at Louis Vuitton as a Service Specialist, Accessories Manager.

109.     From her previous experience at Gucci and Louis Vuitton, Ms. Hayes was aware that she was qualified for positions that would pay her a salary, as opposed to the hourly wage of $17 that she earned at Saks.

110.     Further, a position at either Gucci or Louis Vuitton would provide Ms. Hayes with the opportunity to earn larger commissions on luxury goods that she sold, as both Gucci and Louis Vuitton sell more expensive luxury products than those sold at Saks.

111.     Additionally, Ms. Hayes was qualified for positions at Gucci and Louis Vuitton that would have provided her with more managerial experience than her role at Saks.

112.     Ms. Hayes believed that a promotion to one of these positions would enable her to advance further in her career.

113.     Shortly after she began working at Saks, Ms. Hayes contacted a Gucci Store Manager to seek employment at Gucci.

114.     The Gucci Store Manager explained that while Ms. Hayes was certainly qualified for a position at Gucci, especially since she previously worked as a Selling Supervisor at Gucci, that Gucci simply could not consider her for employment at their company because she was an employee of Saks.

115.     After further inquiry into why Gucci could not consider her for employment, the Gucci Store Manager flatly stated: "We're not allowed to hire Saks employees."

116.    In or around December 2014, Ms. Hayes had a conversation with Saks's Human Resources Director, Marcia Miller, to seek clarification about this No-Hire Agreement she was made aware of.

117.    Specifically, Ms. Hayes inquired from Ms. Miller whether the No-Hire Agreement was only limited to Saks and Gucci and whether she was free to seek employment with Louis Vuitton, since she already had prior experience working for the company, as well as the other Brand Defendants.

118.    Ms. Miller confirmed the No-Hire Agreement and explained that it extended beyond just Saks and Gucci. Indeed, Ms. Miller informed Ms. Hayes that such No-Hire Agreements exist between Saks and each of the Brand Defendants, as well as numerous other unnamed co-conspirators.

119.    Ms. Miller further explained that pursuant to these No-Hire Agreements, a Saks Luxury Retail Employee seeking employment with a Brand Defendant, must first resign from Saks and wait six months before the Brand Defendants would be allowed to hire them.

120.    Ms. Miller also explained that Saks and each Brand Defendant could relax the policy only by mutual agreement between the two companies that would permit the Brand Defendant to hire the given Luxury Retail Employee.

121.    On June 24, 2015, Ms. Hayes contacted Hope Frate, a Store Manager for Louis Vuitton, by email. *See* Exhibit A.

122.    In Ms. Hayes's email to Ms. Frate, she stated, in part, "I'm interested in scheduling a time with you to talk about future employment with Louis Vuitton." *Id.*

123.    On July 1, 2015, Ms. Frate replied, "Unfortunately we have an agreement with Saks that we cannot take their employees and have to wait 6 months before hiring. We have strict guidelines we have to follow. Sorry." *Id.*

124.    In approximately November 2015, Ms. Hayes spoke to Ms. Frate in person, stating that she remained interested in a position at Louis Vuitton.

125.    Ms. Frate provided no additional response on the issue of Ms. Hayes's potential employment at Louis Vuitton.

126.    Shortly thereafter, Ms. Hayes spoke to a Prada Store Manager who explained that Ms. Hayes could not be considered for employment until she leaves Saks and waits for a period of six (6) months.

127.    The Prada Store Manager confirmed that this was the same policy all the Brand Defendants and other unnamed co-conspirators had to follow as part of their agreements with Saks.

**ii.    Proceedings Before the U.S. Equal Employment Opportunity Commission in Connection with Plaintiff Angelene Hayes's Charge of Discrimination against Louis Vuitton**

128.    After being informed that she could not pursue employment with Louis Vuitton, Gucci, Prada, or any of the other Brand Defendants, Ms. Hayes continued to work at Saks.

129.    In or around November 2015, Ms. Hayes observed that a former colleague of hers at Saks had been hired by Louis Vuitton prior to the expiration of the six-month period referenced in Ms. Frate's July 1, 2015 email. *See id.*

130.    On June 14, 2016, Ms. Hayes filed a Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") against Louis Vuitton.

131.    On July 12, 2016, Louis Vuitton submitted a position statement to the EEOC in opposition to Ms. Hayes's Charge. *See* Exhibit B.

132. In its position statement, Louis Vuitton confirmed the existence of its No-Hire Agreement with Saks:

> Although [Ms. Hayes's Saks colleague] was previously an employee of the Saks Department store, [he] received approval from his previous manager at Saks and the Saks Department store manager prior to applying for the position with Louis Vuitton. As such, [he] followed the proper protocol during the application process.

*Id.*

133. In other words, Louis Vuitton stated that it refused to consider Ms. Hayes for employment not because of her race, color, or sex, but because it was restricted from hiring her under its No-Hire Agreement with Saks.

134. Ms. Hayes continued working at Saks for approximately 13 months after her July 2015 exchange with Ms. Frate.

135. During this period, Saks continued to pay her $17 per hour and assigned her to sales positions where she sold handbags and perfume.

136. Despite her qualifications, Saks did not offer Ms. Hayes a promotion to expand into a management role akin to the positions she hoped to pursue at Louis Vuitton.

137. Ultimately, Ms. Hayes's employment with Saks was terminated on or around July 27, 2016.

138. Despite seeking alternate employment within the luxury retail space thereafter, Ms. Hayes was forced to accept an entry level position at a small medical office, a position where her skills developed in luxury retail were not transferrable.

139. Due to the No-Hire Agreements, Ms. Hayes was unable to seek and obtain employment at Saks's competitors, Louis Vuitton, Gucci, Prada, and the other Brand Defendants, where she would have benefited from greater compensation and opportunities for

upward mobility.

### iii. Gucci's and Prada's Abbreviated and Restricted Recruitment of Plaintiff Ying-Liang Wang

140.    In October 2014, Saks hired Ms. Wang as a Sales Associate at the same Saks store in Beachwood, Ohio where Ms. Hayes worked.

141.    During her employment at Saks, Ms. Wang developed an ease with customers while providing service and educated advice about Saks's luxury products.

142.    Ms. Wang was especially adept at selling products to a diverse group of clients and was a top seller within the Shoes department at Saks.

143.    During her employment, Ms. Wang had multiple conversations with a Gucci Store Manager.

144.    In approximately January 2015, the Store Manager told Ms. Wang that she believed Ms. Wang was a perfect fit to work at Gucci.

145.    The Store Manager said that, although she wanted Ms. Wang to come to Gucci, she could not "technically recruit" Ms. Wang.

146.    The Store Manager encouraged Ms. Wang to explore available opportunities at Gucci on the company's website but warned Ms. Wang that she would have to wait a "six-month cooling off period" after leaving Saks in order to be hired by Gucci.

147.    Similarly, Ms. Wang spoke with a General Manager at Prada in February 2016.

148.    The General Manager told Ms. Wang that Prada has an agreement with Saks not to recruit Saks Luxury Retail Employees.

149.    Accordingly, despite Prada's interest in Ms. Wang, neither the General Manager nor anyone else with hiring authority at Prada could "initiate contact" with Ms. Wang regarding a potential employment opportunity.

150. In sum, both representatives from Gucci and Prada were interested in hiring Ms. Wang while she was employed by Saks; however, they were restricted from doing so as a result of their No-Hire Agreements with Saks.

151. Had Gucci, Prada, and/or any of the other Brand Defendants been permitted to offer Ms. Wang employment, Saks would have been forced to adopt a strategy to retain Ms. Wang (*e.g.*, increasing her hourly rate, enhancing the terms of her commission agreement, or matching the compensation terms of the Brand Defendants' offers) or allow one of its desired Luxury Retail Employees to depart for its competitor in the luxury retail space.

152. Under either scenario, Ms. Wang would have received greater compensation and/or opportunities for advancement in her career.

153. Because of the No-Hire Agreements, she was denied these benefits of a competitive labor market.

154. For the remainder of her employment at Saks, Ms. Wang's wages stagnated, as Saks continued to pay approximately $65,000.00 annually.

**iv.** **Plaintiff Susan Giordano's Efforts to Obtain Employment at Various Brand Defendants While Working at Saks**

155. In 2012, Ms. Giordano was hired as a Sales Associate by Saks at a New York-based Saks Fifth Avenue store location.

156. Ms. Giordano was initially assigned to work at the Loro Piana boutique at the Saks store, where she learned the ins-and-outs of Loro Piana's product lines and customer base.

157. After approximately 18 months of experience working with Loro Piana merchandise, Ms. Giordano thought she was keenly qualified for a job at the Loro Piana standalone boutique on Madison Avenue.

158.    Ms. Giordano was interested in working at Loro Piana because she was aware that their Luxury Retail Employees earned considerably higher wages than those working at Saks.

159.    In approximately 2013, Ms. Giordano approached a Loro Piana Store Manager to seek employment at Loro Piana and to discuss her qualifications for same.

160.    The Loro Piana manager noted that Ms. Giordano would surely be an asset to the Loro Piana standalone boutique because of her familiarity with Loro Piana's cashmere line and the company's other merchandise. However, the manager explained that Ms. Giordano could not be considered for employment at Loro Piana because she was a current employee of Saks.

161.    Ms. Giordano inquired further as to why Loro Piana would not hire her despite her qualifications. The Loro Piana manager further explained that because she was a current employee of Saks, "Loro Piana is never going to take you, and Saks is never going to let you go."

162.    Ms. Giordano continued to work at Saks, expanding her knowledge and experience to other brands, frequently working with Brunello Cucinelli and other luxury brand products.

163.    In 2014, Ms. Giordano was promoted to the role of Brand Ambassador by Saks.

164.    Ms. Giordano grew dissatisfied that, even in a role where she was given managerial responsibilities, she earned commissions against a draw.

165.    Ms. Giordano soon learned of available sales positions at the Brunello Cucinelli standalone boutique, which Ms. Giordano was qualified for.

166.    Ms. Giordano was interested in working at Brunello Cucinelli because Luxury Retail Employees at Brunello Cucinelli earned considerably higher wages than those working at Saks.

167.    Ms. Giordano applied online for employment at Brunello Cucinelli but never heard back from them.

168.    Disappointed with their lack of response, in or around 2016, Ms. Giordano went to the Brunello Cucinelli standalone boutique to apply for employment in-person.

169.    Ms. Giordano met with a Brunello Cucinelli Store Manager who agreed that Ms. Giordano was indeed qualified for various positions at Brunello Cucinelli and accepted her resume for employment.

170.    Ms. Giordano never heard back from the manager or from Brunello Cucinelli.

171.    From 2014 to 2017, after her experience at Loro Piana, Ms. Giordano sent dozens of resumes and job applications to the other Brand Defendants and numerous other unnamed co-conspirators.

172.    Ms. Giordano grew increasingly frustrated with her inability to secure even an interview with the Brand Defendants for the numerous positions she had applied for and been obviously qualified for.

173.    Beginning in 2017, Ms. Giordano spoke with two prominent recruitment agencies with experience placing candidates within the luxury retail industry.

174.    Ms. Giordano selected these two specific agencies because they specialize in placing Luxury Retail Employees with Loro Piana, Brunello Cucinelli, and Louis Vuitton.

175.    Representatives from both agencies confirmed that Loro Piana, Brunello Cucinelli, and Louis Vuitton were their clients. However, they both explained that despite Ms. Giordano's experience, they would be unable to place her with any brand carried by Saks.

176.    More specifically, the representative from the first agency explained that while Ms. Giordano was exceedingly qualified for positions at either Loro Piana, Brunello Cucinelli, or

Louis Vuitton, she would have to leave Saks "for a couple of months" before the agency could place her at any of these companies.

177.    Ms. Giordano explained that she could not leave Saks without securing another job, because she could not be unemployed for several months.

178.    The representative for the first agency responded that while Ms. Giordano was "a great candidate" and that they would love to work with her, the policies they had to follow were strict and there was simply nothing they could do.

179.    The representative earnestly requested that if Ms. Giordano was ever to leave Saks, she should come back to the agency and, after a few months, they would be happy to work on placing her with their clients.

180.    The representative from the second recruiting agency similarly instructed Ms. Giordano that she could not be placed at Loro Piana, Louis Vuitton, Brunello Cucinelli, or any of the designer companies at Saks, unless she first quit her current job at Saks and then waited to seek work again in the industry.

181.    This representative specifically explained that Loro Piana, Louis Vuitton, Brunello Cucinelli, and the other designer companies at Saks, know that Ms. Giordano is an "active employee" of Saks, so she will "never get through the front door" with any of them.

182.    Despite her dissatisfaction with her compensation at Saks, Ms. Giordano was unwilling and unable to quit her job at Saks without having procured another source of income.

183.    Therefore, Ms. Giordano refused to resign from her position at Saks at that time, hoping an opportunity to transfer directly from Saks to another luxury retail employer would arise.

184. For months, Ms. Giordano sought luxury retail employment outside of Saks with no success.

185. Finally, in March 2019, Ms. Giordano obtained a managerial position at a smaller luxury retailer that is not carried by Saks.

186. Due to the No-Hire Agreements between Saks and each of the Brand Defendants, Ms. Giordano was unable to seek and obtain employment at Saks's competitors, Loro Piana, Brunello Cucinelli, Louis Vuitton, Gucci, Prada, and the other unnamed co-conspirators, where she would have benefited from greater compensation and opportunities for upward mobility.

**v.      Plaintiff Anja Beachum's Effort to Obtain Employment at Louis Vuitton**

187. Ms. Beachum worked at the Troy, Michigan Saks as a Sales Associate and Style Advisor in the Contemporary Department from approximately February 2016 to September 2016 and again from the summer of 2018 to December 2019.

188. Ms. Beachum was unhappy with her compensation at Saks and, in late 2018 or early 2019, she began to seek to switch employers. However, the existence of a No-Hire Agreement between Saks and Louis Vuitton that prevented Louis Vuitton from considering applications to its Saks concession at the Troy, Michigan Saks was common knowledge among Saks employees.

189. Ms. Beachum had experience selling luxury goods, including those manufactured by Chanel and Prada, and, as part of her position in the Contemporary Department at Saks, often assisted luxury goods customers in their shopping experience. In particular, she had experience helping such luxury goods customers find luxury goods that met their needs, including by taking customers to the Louis Vuitton and/or Gucci concessions when appropriate. By virtue of this

position, she developed considerable luxury goods product knowledge that is valuable to luxury goods retailers such as the Brand Defendants.

190.     Because of Ms. Beachum's knowledge of a No-Hire Agreement that would prevent her from obtaining employment, at the very least, at the Louis Vuitton concession in the Saks Troy, Michigan store, she did not even bother to apply to Louis Vuitton's concession during her job search. She did, however, leave her resume with the Louis Vuitton boutique in the same Troy, Michigan mall in which her Saks store was located. She never heard back from Louis Vuitton concerning that application for employment.

191.     Because she was unable to obtain other employment as a Luxury Retail Employee, Ms. Beachum left the Luxury Retail Employee labor market. And, in particular, due to the No-Hire Agreement(s), she was unable to seek and obtain employment at Saks's competitor, Louis Vuitton, where she may have benefited from greater compensation.

**F.**     **Plaintiffs Suffered Antitrust Injury From Defendants Illegal Conspiracy**

192.     Plaintiffs and all other members of the Class were harmed by the No-Hire Agreements alleged herein. Defendants' unlawful No-Hire Agreements restrained competition in the market for the services of Luxury Retail Employees, which had the effect of suppressing compensation and mobility for all members of the Class.

193.     Without this class action, Plaintiffs and the Class will remain unable to receive compensation for the harm they suffered, and Defendants will continue to reap the benefits of their illegal conspiracies.

194.     The unlawful No-Hire Agreements entered into by Defendants and their unnamed co-conspirators are *per se* illegal horizontal restraints on competition.

195.     In the alternative, Defendants are liable under a "quick look" analysis where

someone with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

196.    In the alternative, Defendants are liable under a Rule of Reason analysis because their unlawful agreements not to hire one another's Luxury Retail Employees reduced compensation and restrained competition in the market for Luxury Retail Employees. The unlawful No-Hire Agreements entered into by Defendants and their agents and co-conspirators had no procompetitive effects and were not intended to have procompetitive effects. Indeed, the No-Hire Agreements had substantial anticompetitive effects, including, but not limited to, eliminating competition, preventing Plaintiffs and members of the Class from obtaining employment and earning compensation in a competitive market, reducing compensation, and preventing or limiting employment opportunities and choice with respect to such opportunities. The anticompetitive effects outweighed any procompetitive benefits of the conspiracy.

## CLASS ACTION ALLEGATIONS

197.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of themselves and as representatives of a class of Luxury Retail Employees (collectively, the "Class," and each, individually, "Class Members") defined as follows:

> All persons in the United States employed by at least one of Defendants at any time from September 30, 2015 until the effects of Defendants' conduct ceases (the "Class Period") who: (i) work in any of Defendants' respective stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers. Excluded from the Class are each of Defendants' officers and directors, as well as employees in roles where they purchase luxury retail goods on behalf of any Defendant to display and sell in the Defendant's stores and/or on its website(s).

198.    The Class Members are so numerous and/or geographically dispersed that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiffs, upon information and belief, there are thousands of members of the Class. The Class is readily identifiable from information and records in Defendants' possession.

199.    Plaintiffs' claims are typical of members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, Defendants' anticompetitive practices.

200.    As a result of these practices, Defendants deprived the Class Members of the benefits of competition among each Defendant for their labor, causing Plaintiffs and all members of the Class to receive diminished compensation.

201.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.

202.    Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

203.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of antitrust, employment, and class action litigation and who are able to meet the demands necessary to litigate a class action of this size and complexity.

204.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class Members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

205.    Questions of law and fact common to the Class include:

        a.      Whether Defendants' conduct violated the Sherman Act;

b. Whether Defendants' agreements unlawfully restrained trade, commerce, and/or competition for labor among Defendants;

c. Whether Defendants' conspiracies and associated agreements constitute *per se* violations of the Sherman Act;

d. Whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury; and

e. The type and measure of damages suffered by Plaintiffs and the Class.

206. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not be practicably pursued individually, substantially outweighs potential difficulties in management of this class action.

207. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

208. Plaintiffs, on behalf of themselves and all others similarly situated, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

209. Saks, and each of the Brand Defendants, entered into and carried out unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

210. Beginning no later than 2014, each of the Brand Defendants entered into illegal contracts, combinations, and conspiracies in restraint of trade with Saks under which each Brand Defendant agreed not to hire or attempt to hire Luxury Retail Employees currently employed by Saks and/or Luxury Retail Employees that had been employed by Saks within the previous six months. Defendants were only permitted to make exceptions to these No-Hire Agreements if a Luxury Retail Employee's transfer was approved by both Saks and the given Brand Defendant who intended to hire the Luxury Retail Employee.

211. Defendants' conduct included concerted efforts, actions, and undertakings with the intent, purpose, and effect of: (a) artificially suppressing the total compensation of Plaintiffs and the Class Members; (b) eliminating competition among Defendants for skilled labor; and (c) restraining Luxury Retail Employees' ability to secure better compensation, advancement, benefits, and working conditions.

212. Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants.

213. Defendants' actions in furtherance of their contracts, combinations, and/or conspiracies were authorized, ordered, or done by Defendants' respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' respective affairs.

214. Plaintiffs and the Class Members have received lower total compensation than they would otherwise have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

215. Contracts, combinations, and/or conspiracies between each of the Brand Defendants and Saks are *per se* violations of Section 1 of the Sherman Act.

216. In the alternative, Defendants are each respectively liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and markets.

217. In the alternative, Defendants are liable under a Rule of Reason analysis because their unlawful agreements not to hire one another's Luxury Retail Employees reduced compensation and restrained competition in the market for Luxury Retail Employees.

218. Contracts, combinations, and/or conspiracies between each of the Brand Defendants and Saks have had a substantial effect on interstate commerce.

219. As a direct and proximate result of contracts, combinations, and/or conspiracies between each of the Brand Defendants and Saks to restrain trade and commerce, Plaintiffs and the Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

220. Plaintiffs and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Issue an order certifying the Class as defined above;

C. Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

D. Declare that Defendants' actions as set forth in this complaint violate the law;

E. Award Plaintiffs and the Class damages in an amount according to proof against Defendants for violations of 15 U.S.C. § 1, to be trebled in accordance therewith;

F. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class Members are entitled;

G. Grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

H. Declare Defendants be permanently enjoined and restrained from enforcing or adhering to any existing agreements that unreasonably restrict competition as described herein;

I. Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

J. Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to the Class Members;

K. Award post-judgment interest on such monetary relief;

L. Award reasonable attorneys' fees and costs; and

M. Grant such further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class, hereby demands a trial by jury on all issues of fact and damages.

Dated: May 1, 2020          **FARUQI & FARUQI, LLP**

By: ___*/s/ Innessa Melamed Huot*___
       Innessa Melamed Huot
       Alex J. Hartzband
       Patrick J. Collopy

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com
ahartzband@faruqilaw.com
pcollopy@faruqilaw.com

Joseph R. Saveri*
Steven N. Williams
Kevin E. Rayhill*
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swillliams@saverilawfirm.com
krayhill@saverilawfirm.com

Eric L. Cramer*
Sarah Schalman-Bergen*
Patrick F. Madden*
Michaela Wallin*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ecramer@bm.net
Email: sschalman-bergen@bm.net
Email: pmadden@bm.net
Email: mwallin@bm.net

Daniel J. Walker*
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Tel: (202) 559-9745

Email: dwalker@bm.net

John D. Radice
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Email: jradice@radicelawfirm.com

Michael K. Yarnoff
**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Tel: (215) 792-6676
Email: myarnoff@kehoelawfirm.com

*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Class*