SUSAN GIORDANO, ANGELENE HAYES, YIANG-LIANG WANG, and ANJA BEACHUM on behalf of themselves and others similarly situated,

Plaintiffs,

v.

SAKS INCORPORATED, SAKS & COMPANY LLC, SAKS FIFTH AVENUE LLC, LOUIS VUITTON USA INC., LORO PIANA & C. INC., GUCCI AMERICA, INC., PRADA USA CORP., and BRUNELLO CUCINELLI, USA, INC.,

Defendants.

Case No. 1:20-cv-0833-MKB-CLP

Hon. Margo K. Brodie

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND....................................................................................3

    A.    The Parties. ...............................................................................................3

    B.    The Alleged Market. ..................................................................................4

    C.    The Alleged Restraints.............................................................................6

    D.    Plaintiffs' Claim.......................................................................................7

ARGUMENT ..........................................................................................................8

I. THE CLAIM IS TIME BARRED. .........................................................................9

    A.    The Statute of Limitations Has Run.......................................................10

    B.    No "Continuing Violation" Would Justify Disturbing Repose.............10

    C.    Plaintiffs Do Not Allege Any "Overt Act.".........................................13

II. THE ALLEGED CONSPIRACY IS IMPLAUSIBLE. ......................................19

    A.    Plaintiffs Fail to Allege Any Plausible Agreement................................20

        1.    There Is No "Overarching" Conspiracy.....................................20

        2.    Plaintiffs Allege, At Most, Permissible Ancillary Restraints. ...................28

    B.    The Relevant Market Is Implausible.......................................................30

        1.    The CAC Fails To Allege A Plausible Relevant Product Market. ...........31

        2.    The CAC Fails To Allege A Plausible Geographic Market. ....................36

    C.    Harm To Competition Is Implausible. ...................................................39

CONCLUSION.....................................................................................................42

ARGUMENT APPENDIX .....................................................................................45

I. Brunello Cucinelli Individual Section .................................................................45

II. Loro Piana Individual Section...........................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
No. 13-MD-2481 KBF, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .................................23

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) .............................................................................15, 16

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*,
No.18-cv-4903(JMF), 2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ...........................................41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................... *passim*

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
459 U.S. 519 (1983) ..................................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ......................................................................................................35

*Aurora Enterps., Inc. v. Nat'l Broadcasting Co., Inc.*,
688 F.2d 689 (9th Cir. 1982) .............................................................................................14, 18

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
No. 17CV205-MMA (MDD), 2018 WL 3032552 (S.D. Cal. June 19, 2018) ........................28

*Barry's Cut Rate Stores, Inc. v. Visa, Inc.*,
05-MD-1720 (MKB) (JO), 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019)............................27

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011) .....................................................................................31

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................... *passim*

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
142 F. Supp. 2d 296 (E.D.N.Y. 2001),
*aff'd*, 35 F. App'x 29 (2d Cir. 2002) ......................................................................................21

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999)...........................................................................................19, 20, 31

ii

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013) .................................................................41

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..........................................................................................31

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) ..........................................................................................20

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ..........................................................................................30

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) ..........................................................................23

*Charych v. Siriusware, Inc.*,
  CV 17-468 (JS) (GRB), 2018 WL 4870906 (E.D.N.Y. July 30, 2018).................46

*Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*,
  No. 15-CV-05488 (RJS), 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016),
  *aff'd*, 708 F. App'x 29 (2d Cir. 2017) ...............................................................37

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...................................................11, 14, 17

*Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003)..................................................................41

*Concord Assocs., L.P. v. Entm't Properties Tr.*,
  No. 12 CIV. 1667 ER, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014)
  *aff'd*, 817 F.3d 46 (2d Cir. 2016) .............................................................. *passim*

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977)............................................................................................20

*In re Dental Suppliers Antitrust Litig.*,
  16 Civ. 696 (BMC), 2016 WL 5415681 (E.D.N.Y. Sept 28, 2016) ......................47

*Dicar, Inc. v. Stafford Corrugated Prod., Inc.*,
  No. CIV.A 205CV5426DMCMF, 2010 WL 988548 (D.N.J. Mar. 12, 2010).........38

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) .............................................................................24

*Downtown Music Publishing LLC v. Peloton Interactive, Inc.*,
  No. 19-02426, 2020 WL 469639 (S.D.N.Y. Jan. 29, 2020) .................................31

*Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*,
104 F. Supp. 2d 184 (W.D.N.Y. 2000) ................................................................41

*DXS, Inc. v. Siemens Med. Sys., Inc.*
100 F.3d 462 (6th Cir. 1996) ....................................................................14, 15

*E & L Consulting, Ltd. v. Doman Indus., Ltd.*,
472 F.3d 23 (2d Cir. 2006) ......................................................................20, 39

*Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1997) ...........................................................................29

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ......................................................................21, 23

*Epstein v. Haas Secs. Corp.*,
731 F. Supp. 1166 (S.D.N.Y. 1990) ..................................................................9

*Ferrari v. Cty. of Suffolk*,
790 F. Supp. 2d 34 (E.D.N.Y. 2011) .................................................................4

*Fonseca v. Hewlett-Packard Co.*,
No. 19CV1748-GPC-MSB, 2020 WL 4596758 (S.D. Cal. Aug. 11, 2020) ...........46

*Frost v. LG Electronics Inc.*,
No. 16-cv-05206, 2017 WL 1425919 (N.D. Cal. Apr. 21, 2017) ......................25

*Frost v. LG Electroncs Inc.*,
No. 16-CV-05206-BLF, 2018 WL 6256790 (N.D. Cal. July 9, 2018),
*aff'd sub nom. Frost v. LG Elecs., Inc.*, 801 F. App'x 496 (9th Cir. 2020) ...............27, 45

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) ........................................13, 15, 16, 18

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
No. 10 CIV. 8 DAB, 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011),
*aff'd on other grounds*, 711 F.3d 68 (2d Cir. 2013) ..........................................29

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ......................................................................39, 49

*Global Discount Travel Svcs., LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) ..............................................................32, 33

*GO Comp., Inc. v. Microsoft Corp.*,
508 F.3d 170 (4th Cir. 2007) .....................................................................12, 13

*Hall v. E. I. Du Pont De Nemours & Co.*,
    312 F. Supp. 358 (E.D.N.Y. 1970) ........................................................................12

*In re High-Tech Employee Antitrust Litigation*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..........................................................26, 27

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)................................................................23

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) ...................................................................................35

*Johnson v. Nyack Hosp.*,
    86 F.3d 8 (2d Cir. 1996)......................................................................................10

*K.M.B. Warehouse Distrs., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)......................................................................20, 39, 40

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)......................................................................................11, 15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..................................................................................4, 19, 20

*Mathias v. Daily News, L.P.*,
    152 F.Supp. 2d 465 (S.D.N.Y. 2001).................................................................33

*Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) .......................................................................11, 12

*Molinari v. Consol Energy Inc.*,
    No. 12CV1085, 2012 WL 5932979 (W.D. Pa. Nov. 27, 2012)...........................33

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 753 (1984)...........................................................................................20

*Mooney v. AXA Advisors, LLC*,
    19 F. Supp. 3d 486 (S.D.N.Y. 2014)............................................................31, 33

*Mori v. Saito*,
    No. 10 Civ. 6454, 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013)..........................9

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ...........................................................................24

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984)..............................................................................................30

*Ogden v. Little Caesar's,*
    393 F. Supp. 3d 622 (E.D. Mich. 2019)............................................................29

*Ohio v. Am. Express,*
    138 S. Ct. 2274 (2018) .......................................................20, 30, 39, 40

*In re Parcel Tanker Shipping Servs. Antitrust Litig.,*
    541 F. Supp. 2d 487 (D. Conn. 2008) ...............................................................21

*Peck v. Gen. Motors Corp.,*
    894 F.2d 844 (6th Cir. 1990) ............................................................................14

*Polk Bros., Inc. v. Forest City Enters., Inc.,*
    776 F.2d 185 (7th Cir. 1985) ............................................................................28

*In re Pool Prods. Distrib. Market Antitrust Litig.,*
    940 F. Supp. 2d 367 (E.D. La. 2013) ................................................................24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997)........................................................................31, 32

*Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.,*
    138 F. Supp. 3d 303 (S.D.N.Y. 2014)..........................................................40, 41

*Robb v. Conn. Bd. Of Veterinary Med.,*
    157 F. Supp. 3d 130 (D. Conn. 2016) ...............................................................21

*Ryan v. Microsoft Corp.,*
    147 F. Supp. 3d 868 (N.D. Cal. 2015) ..............................................................16

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.,*
    661 F. Supp. 2d 218 (E.D.N.Y. 2009),
    *aff'd sub nom.* 391 F. App'x 59 (2d Cir. 2010) ...............................................38

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.,*
    947 F. Supp. 2d 88 (D.D.C. 2013) ....................................................................38

*Standard Oil Co. v. United States,*
    221 U.S. 1 (1911)...............................................................................................19

*Stouter v. Smithtown Cent. Sch. Dist.,*
    687 F. Supp. 2d 224 (E.D.N.Y. 2010) ...............................................................11

*Tera Grp., Inc. v. Citigroup, Inc.,*
    No. 17 CIV. 4302 (RJS), 2019 WL 3457242 (S.D.N.Y. July 30, 2019) ...............21

*Thomas v. City of New York,*
    953 F. Supp. 2d 444 (E.D.N.Y. 2013) ...............................................................13

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001).............................................................*passim*

*Turner v. McDonald's USA, LLC*,
  No. 19 C 5524, 2020 WL 3044086 (N.D. Ill. Apr. 24, 2020)................................15

*Twersky v. Yeshiva Univ.*,
  993 F. Supp. 2d 429 (S.D.N.Y. 2014).................................................9, 13

*U.S. Gypsum Co. v. Indiana Gas Co., Inc.*,
  350 F.3d 623 (7th Cir. 2003) ............................................................15

*Ulrich v. Moody's Corp.*,
  No. 13-CV-0008 VSB MHD, 2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014),
  *report and recommendation adopted as modified*, No. 13-CV-00008 VSB,
  2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014).........................................*passim*

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016),
  *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .........................40

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019)......................................................1, 14, 15, 17

*Vitale v. Marlborough Gallery*,
  No. 93 Civ. 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994) .........................10, 13

*Wai Hoe Liew v. Cohen & Slamowitz, LLP*,
  265 F. Supp. 3d 260 (E.D.N.Y. 2017), *as revised* (June 16, 2017) .........................4

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007).............................................23, 46

*Xerox Corp. v. Media Sciences, Inc.*,
  609 F. Supp. 2d 319 (S.D.N.Y. 2009).................................................12

*Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*,
  No. No. 00 CIV. 5663, 2001 WL 1468168 (S.D.N.Y. 2001) ................................23

*Z Techs. Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) .......................................11, 12, 14, 15, 17

**Statutes**

15 U.S.C. § 1...............................................................................*passim*

15 U.S.C. § 15b...................................................................................9

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2000)........................................11

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2007)........................................11

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
    (4th ed., 2020 Cum. Supp.)........................................................................................12

## PRELIMINARY STATEMENT

Plaintiffs recite buzzwords and catchphrases to try to assemble their sparse factual allegations into the antitrust fad-of-the-moment: a supposed nationwide "no poach" conspiracy among Defendant retailers. But all the Consolidated Amended Class Action Complaint ("CAC") offers is bare conclusions with no facts or substance to sustain them, and implausible allegations often contradicted by Plaintiffs themselves. It comprises only the stale employment grievances of four isolated former Saks retail employees. Long after the relevant statute of limitations has run, they now seek to reshape those grievances into an antitrust "no-poach" treble damages claim without any viable basis to do so. Their supposed "antitrust" case fails as a matter of law in multiple independent respects.

To begin with, Plaintiffs' sole cause of action is time-barred under the Clayton Act's four-year statute of limitations. Each named Plaintiff admits she learned of the supposed "agreements" long ago, but did not bring a claim for as long as six years after supposedly suffering an antitrust injury. The "continuing violation" doctrine cited in Plaintiffs' pre-motion letter cannot rescue them from a statute-of-limitations bar, as the Second Circuit strongly disfavors this doctrine absent a showing by Plaintiffs of compelling circumstances. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019). Plaintiffs' CAC alleges nothing, let alone anything "compelling," to justify such relief. Plaintiffs' delay and the absence of any "overt" act vitiates any continuing violation theory in this case in any event.

Moreover, Plaintiffs fail to plausibly allege *any* of the requisite elements to state a Sherman Act Section 1 claim. *First*, Plaintiffs' bare conclusion that Defendants entered into some sweeping "overarching conspiracy" that is *per se* or automatically unlawful fails at the most basic level under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and its progeny. Plaintiffs nowhere allege that all six (originally seven) Defendants ever reached a blanket agreement amongst each other not

1

to hire each other's employees. To the contrary, the CAC admits that **Saks has** hired employees from the Brand Defendants and these and other luxury retailers **have** hired employees from Saks.

Instead, the CAC contains a few vague references to what Plaintiffs refer to inconsistently as a series of bilateral "agreements" (CAC ¶ 192), hiring "protocols" (*id.* ¶ 132, Ex. B at 5), or "policies" (*id.* ¶ 120), which some (but not all) of the remaining Brand Defendants allegedly followed. And even then, Plaintiffs fail to allege any facts that could plausibly support an agreement between or among any Brand Defendants related to such purported "protocols" or "policies." In fact, Plaintiffs affirmatively allege these supposed "agreements," "protocols," or "policies" existed in the context of Brand Defendants **leasing retail space** within Saks department stores. Allegations of a few, individual, one-way "protocols" or "policies" to delay hiring of Saks employees for six months (or seek permission if they wish to immediately hire them) do not come close to meeting the kind of "agreement" that might state a claim under the traditional "rule of reason" test under Sherman Act Section 1, much less the far more restrictive *per se* standard.

*Second*, Plaintiffs' proffered relevant market, also a necessary element of a Sherman Act Section 1 claim, fails the plausibility test. Plaintiffs attempt to construct an artificial product market that either (i) restricts the distribution of a "single-brand" of only Saks retail sales employees, or (ii) consists of a "buyer-side" product market for luxury retail labor containing a mere fraction of the vast number of retail employers ("luxury" or not). Neither is sufficient to state an antitrust claim. Plaintiffs' purported *nationwide* geographic market is equally implausible. Plaintiffs claim they are participants in a national labor market for a single pool of "Luxury Retail Employees"— *i.e.*, in-store retail salespeople—when Plaintiffs are from just three different locations (Beachwood, Ohio; New York, New York; and, Troy, Michigan) and never allege they sought employment or might be recruited from outside of the shopping malls where they already worked,

let alone in different cities or states.

*Third*, Plaintiffs fail to allege any facts showing "harm to competition" within any market, however defined. Remarkably, the CAC does not contain *a single* factual allegation regarding the market share or market power of *any* Defendant. Instead, Plaintiffs vaguely assert, without facts, that Defendants are the "dominant" employers in the putative U.S. "luxury retail" labor market. But merely alleging that Defendants are "dominant" in a vacuum, without more, is both insufficient and implausible on its face in light of Plaintiffs' own concession that there are at least a dozen or more well-known non-Defendant luxury brand retailers against whom Defendants compete for the services of Luxury Retail Employees.

Despite being made aware of these fatal deficiencies, Plaintiffs chose not to amend. For the reasons set forth below, Defendants respectfully submit that Plaintiffs' pleading should be dismissed with prejudice.

## FACTUAL BACKGROUND

**A.     The Parties.**

Plaintiffs Angelene Hayes, Ying Liang-Wang, Susan Giordano, and Anja Beachum are four former retail sales employees who worked, respectively, at three (or 2%) of approximately 150 Saks department stores throughout the United States. (CAC ¶¶ 8-11, 41.)[1] Saks (here, Saks Incorporated, Saks & Company LLC, and Saks Fifth Avenue LLC) operates department stores that sell goods and apparel. (*Id.* ¶ 21.) Defendants Louis Vuitton USA Inc. ("Louis Vuitton"), Loro Piana & C. Inc. ("Loro Piana"), Gucci America, Inc. ("Gucci"), Prada USA Corp. ("Prada") and Brunello Cucinelli, USA, Inc. ("Brunello Cucinelli") are five among the dozens of brands that produce and sell goods and apparel in and/or through department stores and their own standalone

---

[1] Exhibit 1 to the Declaration of Eric Hochstadt ("Hochstadt Decl."), contemporaneously served herewith.

boutiques nationwide (collectively, "Brand Defendants"). (*Id.*)

Saks is only one of the many department stores where some of the Brand Defendants sell goods and apparel, including at "concessions." (*Id.*)[2] As Plaintiffs alleged in earlier pleadings, the Brand Defendants (whom they originally labeled the "Concessionaire" or "Leased" Defendants) "rent space in [] Saks stores and operate relatively independently: they hire their own staff, make their own inventory determinations, and determine the depth and timing of markdowns and pricing." (*Beachum* Compl. ¶ 3.)[3] Thus, while Plaintiffs drop their prior, revealing terminology in the CAC, they cannot avoid the underlying admission that Saks has distribution arrangements with Brand Defendants in which the Brand Defendant's own employees—not Saks employees—sell their respective goods and apparel to consumers *inside* of Saks stores.[4] In antitrust terminology, these relationships are described as "vertical," because Saks and each Brand Defendant operate at different levels of the supply chain (*e.g.*, manufacturer and distributor, or lessor and lessee).[5]

**B.    The Alleged Market.**

Plaintiffs allege that within the larger context of these vertical distribution arrangements, Defendants are also "horizontal" or direct competitors with one another in a "labor market" for "Luxury Retail Employees"—*i.e.*, a purported subgroup of retail workers who "work in

---

[2] One of the Brand Defendants, Brunello Cucinelli, has not sold through department store "concessions" at any location.

[3] In the *Giordano* Complaint filed on February 14, 2020 the other Defendants were labeled the "Leased Entities," ECF No. 1, ¶ 1 (Hochstadt Decl., Ex. 2); and in the *Beachum* Complaint filed on April 10, 2020, they were labeled the "Concessionaire Defendants," No. 1:20-cv-01769-LDH-JO (E.D.N.Y.), ECF No. 1, ¶ 3 (Hochstadt Decl., Ex. 3).

[4] "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings . . . that appear in the court records of prior litigation and that relate to the case *sub judice*." *Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d 34, 38 (E.D.N.Y. 2011); *Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 271 (E.D.N.Y. 2017), *as revised* (June 16, 2017) (same).

[5] Vertical relationships are distinguished from horizontal ones, in which entities compete with one another at the same level of the supply chain (*e.g.*, two manufacturers of competing products). *See generally Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

Defendants' stores and/or boutiques" and "sell and/or manage the sale of luxury goods to consumers." (CAC ¶¶ 1, 20.)[6] Rather than asserting facts supporting such a narrow market, Plaintiffs merely list each Defendant's alleged store count and total employee numbers— regardless of whether the employees sell goods to consumers (*i.e.*, the subgroup that comprises the putative class); whether all of the Defendants operate stores in the same geographic areas; or, whether the stores or employees are even in the United States. (*Id.* ¶¶ 41-42 (Saks employees worldwide); ¶¶ 43-44 (Louis Vuitton and Loro Piana)[7]; ¶¶ 45-46 (Gucci employees worldwide); ¶¶ 47-48 (Prada employees worldwide); ¶¶ 49-50 (Brunello Cucinelli employees worldwide).

Plaintiffs admit that "[e]ach Defendant faces competition from *rival luxury retailers* in the labor market for Luxury Retail Employees, including each other and other department stores, concessions, and standalone boutiques." (*Id.* ¶ 39 (emphasis added); *see also id.* ¶ 52.) Indeed, the CAC references and therefore incorporates sources that identify at least 16 other non-party luxury retailers – including Giorgio Armani, Cartier, Burberry, Chanel, Chloe, Dolce & Gabbana, Jean-Paul Gaultier, Hermes, Hugo Boss, Lancel, Mauboussin, Nina Ricci, Ralph Lauren (CAC ¶ 25 n.2, Hochstadt Decl., Ex. 5), and Yves Saint Laurent, Alexander McQueen, and Bottega Veneta (*id.* ¶ 28 n.3, Hochstadt Decl., Ex. 6). Thus, it is not surprising that the CAC fails to state any allegation of Defendants' individual or combined share of the purported labor market in relation to those and numerous other unidentified competitors. Ignoring their own factual allegations of Defendants' long list of competitors, Plaintiffs assert only the vague and inert conclusion that "Defendants are

---

[6] As discussed below, Plaintiffs at times refer to their purported market as a "labor market" for "Luxury Retail Employees services." CAC ¶ 30.

[7] Specifically, Plaintiffs allege that LVMH, which is not a defendant in the case, has "32,000 employees in the United States," *including* retail employees who sell luxury retail goods to consumers at Louis Vuitton and Loro Piana. (*Id.* ¶ 43.) But LVMH does not employ retail sales employees—Louis Vuitton's, Loro Piana's, or otherwise.

the dominant employers of Luxury Retail Employees in the United States." (*Id.* ¶¶ 40, 52.)

## C. The Alleged Restraints.

Within this market construct, Plaintiffs allege that "since at least ***2014***," Saks and each Brand Defendant had an "express agreement[] … that the Brand Defendants will not hire Luxury Retail Employees *who work for Saks or who were employed by Saks* within the previous six months." (*Id.* ¶¶ 89, 91 (emphasis added).) Among other omissions, the CAC does not identify who from each Defendant, if anyone, entered into the agreements or had the authority and ability to do so; where and when the agreements were made; or how they were implemented or enforced.[8]

Plaintiffs nevertheless label these supposed "agreements" as "No-Hire Agreements." (*Id.* ¶ 89.) Despite this terminology, Plaintiffs acknowledge the purported "agreements" did *not* restrain (i) Saks from hiring the Brand Defendants' employees, (ii) the Brand Defendants from hiring one another's employees, (iii) the Brand Defendants' from hiring Saks employees with Saks' consent or after six months, or (iv) any unnamed "rival luxury retailer" from hiring any Defendant's employees or vice versa. (*Id.* ¶¶ 92, 129.) Plaintiff Hayes, for example, admits that she worked *for two Brand Defendants* before she was hired by Saks (*id.* ¶ 108), and "observed [that] a former colleague of hers at Saks [was] hired by Louis Vuitton *prior to the expiration of the six-month period*." (*Id.* ¶ 129 (emphasis added).) Likewise, Plaintiff Giordano admits that she left Saks in 2019 for "a managerial position at a smaller *luxury retailer that is not carried by Saks*" and is *not* a Brand Defendant. (*Id.* ¶ 185 (emphasis added).)

---

[8] For example, Plaintiffs make much of a July 1, 2015 email from Hope Frate, the Store Manager for the Louis Vuitton concession located in the Beachwood, Ohio Saks store, which allegedly informed Plaintiff Hayes of a challenged "agreement." (CAC ¶¶ 121-123; *see e.g.,* Ex. A (Hope Frate's signature block stating that she is store manager of "***Louis Vuitton Saks*** Cleveland") (emphasis added).) But Plaintiffs do not allege any facts to explain how or why this local store manager would know she was describing a company-wide policy. Moreover, this email predates the filing of the Complaint by more than four years, and therefore alleges nothing about the existence of any agreement *within* the limitations period.

Plaintiffs' own allegations thus belie their use of the "No-Hire" label. The supposed restraints they allege were, at most, merely *limited, one-way* agreements between Saks (the lessor) and each of the Brand Defendants (lessees of space in Saks stores) that the Brand Defendants operating within a Saks store would hire a Saks employee only with Saks' consent or if the employee left Saks for six months. Moreover, the CAC expressly disclaims that Defendants agreed or otherwise attempted to fix wages for any "Luxury Retail Employees." (*Id.* ¶ 104.) To the contrary, Plaintiffs acknowledge (as they must) that "*[e]ach Defendant* sets baseline compensation levels for different categories," that "*[e]ach Defendant* also regularly updates their baseline compensation levels," and that "*[e]ach Defendant* may engage in negotiations regarding compensation levels with *individual employees*." (*Id.* ¶¶ 78-79 (emphasis added).)

## D.     Plaintiffs' Claim.

Plaintiffs allege that these *limited, one-way* agreements between one department store chain and a handful of its lessees violate federal antitrust law—specifically, Section 1 of the Sherman Act—by producing the outsize effect of "suppressing the total compensation of Plaintiffs and the Class Members," "eliminating competition among Defendants for skilled labor," and "restraining Luxury Retail Employees' ability to secure better compensation, advancement, benefits, and working conditions." (*Id.* ¶¶ 1, 210-11.)

Moreover, although Plaintiffs worked in only three Saks stores (Beachwood, Ohio; New York, New York; and Troy, Michigan) out of dozens in the United States, they purport to represent a *nationwide* class comprising "[a]ll persons in the United States employed by at least one of Defendants from September 30, 2015 … who: (i) work in any of Defendants' respective stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers." (*Id.* ¶ 197.) In short, Plaintiffs claim that their individual employment experiences enable them to represent a nationwide class of all of Saks' and all of the Brand Defendants' past and present "Luxury Retail

Employees," spanning multiple years and approximately 350 stores.

Plaintiffs' specific allegations (based on their purported personal experiences many years ago) yield little support for their nationwide class claim. (*See, e.g.*, *id.* ¶¶ 106, 109, 137 (Hayes); *id.* ¶¶ 140, 154 (Wang); *id.* ¶¶ 155, 163, 185 (Giordano); *id.* ¶ 187 (Beachum).) Plaintiffs each allege, in fact, that they knew about the so-called "No-Hire Agreements" more than four years before they chose to assert their Sherman Act claim. (*id.* ¶¶ 113, 115, 144, 146, 157, 161, 187-88.) Plaintiffs' claim is therefore untimely, as well as implausible in all material respects.

## **ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' meaning that there is 'more than a sheer possibility that a defendant acted unlawfully.'" *Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (citation omitted). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

The requirement for a plaintiff to plead factual non-conclusory allegations stating a *plausible* claim for relief has special significance in antitrust cases because the Supreme Court in *Twombly* recognized that "[p]rivate antitrust litigation can be enormously expensive." *Id.* at 573. That is why the Supreme Court cautioned that there should be "some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 558 (quoting *Associated Gen.*

*Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).[9] Just as in *Twombly*, "the plaintiffs here have not nudged their claims across the line from conceivable to plausible, [and] their complaint must be dismissed." *Id.* at 570.

## I. THE CLAIM IS TIME BARRED.

Plaintiffs' Sherman Act claim, which arises under the Clayton Act's private right of action, is barred by the latter's four-year statute of limitations. 15 U.S.C. § 15b. Because the "statute that creates the cause of action also contains a limitations period," Plaintiffs have the burden to "affirmatively plead compliance with the statute of limitations." *Epstein v. Haas Secs. Corp.*, 731 F. Supp. 1166, 1180 (S.D.N.Y. 1990); *see also Mori v. Saito*, No. 10 Civ. 6454, 2013 WL 1736527, at *3 (S.D.N.Y. Apr. 19, 2013) (citing a "general congruence of opinion that when the very statute which creates the cause of action also contains a limitation period, the plaintiff must plead and prove facts showing that he is within the statute") (internal quotation marks and citation omitted); *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014) (claims that are *prima facie* time-barred survive a motion to dismiss "only if the plaintiffs have plausibly alleged that they fall within an exception to the applicable statute of limitations"). Plaintiffs fail to do so here.

Indeed, Plaintiffs allege both that they suffered injury and had actual knowledge of Defendants' alleged agreements more than four years before filing their respective claims. There is no factual basis alleged to support tolling the statute of limitations. Accordingly, the CAC should be dismissed.

---

[9] Defendants have moved to stay discovery pending the resolution of their Motion to Dismiss. *See* ECF No. 80.

## A. The Statute of Limitations Has Run.

A federal antitrust claim accrues when the plaintiff first suffers an antitrust injury. *See Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996). In the CAC, Plaintiffs allege that Defendants had supposedly entered into "no-hire" agreements *by 2014*, and that these alleged agreements "artificially suppressed compensation for Plaintiffs and the Class" as of that date. (CAC ¶¶ 102-03.) It follows that Plaintiffs' antitrust claim accrued no later than when they first received allegedly "suppressed compensation" from Saks.

The three original named plaintiffs—Plaintiffs Giordano, Hayes, and Wang—began working at Saks, respectively, in 2012 (*id.* ¶ 155); on or about August 3, 2013 (*id.* ¶ 106); and in October 2014 (*id.* ¶ 140). All three of these Plaintiffs therefore began receiving their supposedly "artificially suppressed compensation" no later than 2014. They did not file their claim, however, until February 14, 2020—clearly more than four years later. The fourth named plaintiff, Beachum, began working at Saks in February 2016, and did not file her claim until April 10, 2020—again, more than four years later. It is therefore apparent on the face of the CAC that each Plaintiff suffered her alleged injury more than four years before filing her claim. Absent tolling of the limitations period or an applicable exception, Plaintiffs' claim is thus time-barred. *See Vitale v. Marlborough Gallery*, No. 93 Civ. 6276, 1994 WL 654494, *4 (S.D.N.Y. July 5, 1994) ("When the anticompetitive act causing the injury and giving rise to the cause of action occurs outside of the statutory period, the claim is time barred.").

## B. No "Continuing Violation" Would Justify Disturbing Repose.

The so-called "continuing violation" doctrine provides no refuge for Plaintiffs' claim.[10]

---

[10] The CAC includes a single unsupported allegation that Defendants "actively concealed" the alleged "no-hire agreements." (*See* CAC ¶ 95.) In their pre-motion letter (ECF No. 60 at 2-4), Plaintiffs abandon this theory, and for good reason. First, the CAC is replete with allegations that the supposed conspiracies were not concealed; rather, Plaintiffs allege that Defendants frequently told Plaintiffs about, or that Plaintiffs

Although that doctrine provides that "each overt act that is part of the violation and that injures the plaintiff" restarts the limitations period, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), "courts within the Second Circuit consistently have looked unfavorably on continuing violation arguments," *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) ("*Cipro*") (quotations and citation omitted). For this reason, "compelling circumstances must exist before the limitations period will be extended." *Id.*; *accord Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010) ("As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances."). No such "compelling circumstances" are alleged or exist here.

To begin with, "where the plaintiff had actual knowledge of the initial violation and suffered sufficient injury, courts generally do not toll the statute of limitations based on a continuing violation theory." *Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265, 272 (8th Cir. 2004) (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c1 at 210–11 (2d ed. 2000) ("Hovenkamp")). "[B]ecause we want to encourage plaintiffs not to sit on their rights, the statute of limitations is not extended under the continuing violations doctrine if the plaintiff had actual knowledge of the initial violation and suffered an injury." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 603 (6th Cir. 2014) (quoting Hovenkamp ¶ 320c1 at 282 (3d ed. 2007). Here, each Plaintiff admits that she **knew** of the alleged policy or agreement before the limitations period but neglected to act on her purported rights. (CAC ¶¶ 113, 115 (Plaintiff Hayes

---

otherwise knew about, the alleged agreements. (*See, e.g.*, CAC ¶¶ 114-15, 118-20, 123, 145-46, 148-49, 160.) Second, in any event, Plaintiffs' bare recitation of a legal conclusion is insufficient as a matter of law. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

learned of alleged agreements in August 2013); ¶¶ 144, 146 (Plaintiff Wang learned of alleged agreements in January 2015); ¶¶ 157, 161 (Plaintiff Giordano learned of alleged agreements in 2013); ¶¶ 187-88 (Plaintiff Beachum began working at Saks in "approximately February 2016" and the alleged agreements were "common knowledge among Saks employees").)

Courts decline for good reason to re-start the limitations period in such cases. "There is a place for finality in the law. Defendants are prejudiced when memories fade, documents are lost, and witnesses become unavailable. And defendants are entitled to the security of knowing when legal action against them has been foreclosed." *GO Comp., Inc. v. Microsoft Corp.*, 508 F.3d 170, 180 (4th Cir. 2007) (internal quotation marks and citations omitted). These maxims are especially salient in private antitrust actions such as this one, "where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations." *Xerox Corp. v. Media Sciences, Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) (quoting Hovenkamp ¶ 320a, at 282); *see also Lubrizol*, 753 F.3d at 603 (noting special value of repose in antitrust); *Hall v. E. I. Du Pont De Nemours & Co.*, 312 F. Supp. 358, 361 (E.D.N.Y. 1970) (noting "strong Congressional policy in favor of repose in antitrust suits").

Moreover, because "one purpose of the Clayton Act statute of limitation is to take into account that the private plaintiff … is also acting as a 'private attorney general'" armed by Congress to vindicate the public interest, the policy favoring strict repose "is particularly strong" when the alleged antitrust violations "are known by those at whom they are directed." Hovenkamp ¶ 320a (4th ed., 2020 Cum. Supp.); *see also Midwest Mach.*, 392 F.3d at 272 ("[B]ecause private suits under the antitrust laws are allowed to correct public wrongs, it is appropriate to encourage suits as soon as possible to stop (or at least compensate) harm to the public.").

Here, however, Plaintiffs conceive of the continuing violation doctrine as an exception that

would swallow the rule. Plaintiffs admit to having ***actual knowledge*** of their purported rights more than four years before filing suit, but ***chose*** not to sue. If Plaintiffs now were permitted to invoke the "continuing violation" doctrine to reverse their decision, they would "eviscerate Congress' intent" to circumscribe private suits under the antitrust laws and undermine the strong policy reasons for doing so. *GO Comp.*, 508 F.3d at 180. Plaintiffs' actual knowledge of their claim outside of the limitations period thereby prevents them from demonstrating the "compelling circumstances" necessary to apply it. *Vitale*, 1994 WL 654494, at *5 (quotation omitted).

### C.    Plaintiffs Do Not Allege Any "Overt Act."

Plaintiffs also cannot take advantage of the "continuing violation" doctrine because they fail to plausibly allege that any Defendant committed an "overt act" during the limitations period. *E.g., Thomas v. City of New York*, 953 F. Supp. 2d 444, 452 (E.D.N.Y. 2013) ("[I]t is of course plaintiff's burden to show the applicability of the continuing violation doctrine once defendants show that the action is time-barred."); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1070-71 (N.D. Cal. 2016) (dismissing antitrust claims with prejudice because complaint failed to allege "*any* dates or details" regarding the alleged overt acts) (emphasis in original); *see also Twersky*, 993 F. Supp. 2d at 436 (time-barred claims survive dismissal "only if the plaintiffs have plausibly alleged that they fall within an exception to the applicable statute of limitations").

In Plaintiffs' pre-motion letter to the Court, they appear to advance two theories of Defendants' purported "overt acts." (ECF No. 60, at 3.)[11] First, Plaintiffs contend that Defendants committed an "overt act" each time Saks allegedly paid diminished wages to Plaintiffs resulting from Defendants' supposed ongoing "No-Hire Agreements." Second, Plaintiffs argue that Defendants committed an "overt act" each time a Plaintiff sought, but did not obtain, employment

---

[11] *See* ECF No. 60, Hochstadt Decl., Ex. 4.

with a Defendant. Neither constitutes an "overt act" for "continuing violation" purposes.

In the Second Circuit, an "overt act" must *both* (1) "be a new and independent act that is not merely a reaffirmation of a previous act," *and* (2) "inflict new and accumulating injury on the plaintiff." *Sabre Holdings Corp.*, 938 F.3d at 68 (quoting with approval *DXS, Inc. v. Siemens Med. Sys., Inc.* 100 F.3d 462, 467 (6th Cir. 1996)). In adopting this standard for an "overt act," the Second Circuit expressly followed the rule applied by the Sixth, Eighth, and Ninth Circuits, and by this District. *Id.* at 68-69 (adopting the "categorical rule articulated in *Cipro*").[12]

Applying *Sabre*, Plaintiffs' "diminished wage" theory fails to plead any "overt act" because it posits no "new and independent act" within the limitations period, but rather the mere ***effects*** of alleged acts—the supposed "No Hire Agreements"—that occurred beforehand. *Sabre*, 938 F.3d at 69 ("[E]ach supracompetitive price charged to US Airways by Sabre pursuant to the 2006 contract was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract."); *see also Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) ("For statute of limitations purposes, … the focus is on the timing of the causes of injury, *i.e.*, the defendant's overt acts, as opposed to the effects of the overt acts."); *Aurora Enterps., Inc. v. Nat'l Broadcasting Co., Inc.*, 688 F.2d 689, 694 (9th Cir. 1982) (the "mere fact that defendants receive a benefit today" as a result of an allegedly anticompetitive act does not constitute a continuing violation; "any other holding would destroy the function of the statute, since parties may continue indefinitely to receive some benefit as a result of an illegal act performed in the distant past"); *Lubrizol*, 753 F.3d at 600-01 ("benefits and profits derived from wrongful conduct are not "independent" overt acts but,

---

[12] Nothing in *Sabre*'s text or reasoning limits its application to "claims stemming from anticompetitive agreements to which [] the plaintiff and defendants were parties," as Plaintiffs asserted in their pre-motion letter. (*See* ECF No. 60 at 3 (no citation to *Sabre*).) In fact, the Second Circuit expressly followed *Cipro*, where only the defendants were parties to the allegedly anticompetitive contract. *See* 261 F. Supp. 2d at 229 (payments contemplated by contract between generic drug defendants and brand drug defendants were not new overt acts).

rather, reaffirmations of a previous act" that are "uniformly viewed as 'ripples' caused by the initial injury, not as distinct injuries themselves"); *DXS*, 100 F.3d at 467-68 (an act that "simply reflect[s] or implement[s] a prior refusal to deal" is not an "overt act").[13]

Plaintiffs cite *Klehr* for the proposition that in a price-fixing conspiracy, "each sale to the plaintiff" is an "overt act" in furtherance of the conspiracy. (ECF No. 60, at 3 (citing *Klehr*, 521 U.S. at 189).) But a price-fixing conspiracy is, as its name implies, an agreement *to charge a fixed price*. Each fixed-price sale is not merely an *effect* of the conspiracy; it *is* the conspiracy. *Cf. Sabre*, 938 F.3d at 67 (describing "overt acts" in context of "a price–fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years").

Here, however, Plaintiffs do *not* allege that Defendants agreed to fix, cap, or lower employee wages, or to share employee wage information in any way, shape, or form. (CAC ¶ 104.) Instead, Plaintiffs allege that Saks' regular payment of wages reflected, in sum and substance, the downstream *effect* of Defendants' alleged overt acts, in other words, the "ripple" or "unabated inertial consequence" of the alleged no-hire agreements that preceded the limitations period. *See DXS*, 100 F.3d at 462; *Lubrizol*, 753 F.3d at 600.[14]

For these reasons, courts have repeatedly held that the continuing violation doctrine does *not* apply to alleged ongoing conspiracies involving "no-hire" or "no-poach" agreements. *E.g.*, *Garrison*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016); *In re Animation Workers Antitrust Litig.*, 87 F.

---

[13] The Second Circuit adopted the clear majority rule in *Sabre* and declined to adopt weaker standards applied in other circuits. For example, the Seventh Circuit does not require a plaintiff to show *both* a "new and independent act" *and* a "new and accumulating injury," as the Second Circuit does, but rather merely that the plaintiff's "most recent injury" occurred within the limitations period. *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003).

[14] Plaintiffs' apparent reliance on *Turner v. McDonald's USA, LLC*, No. 19 C 5524, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) (cited in ECF No. 60 at 3), a district court decision applying the Seventh Circuit's lesser standard, is therefore misplaced. *See supra* n.13.

Supp. 3d 1195, 1213 (N.D. Cal. 2015); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 883 (N.D. Cal. 2015). The plaintiffs in each of the foregoing cases alleged that no-poach agreements among competing employers "artificially depressed their compensation" and/or prevented them from "obtain[ing] employment" at co-conspirator companies long after the no-poach agreements were first consummated. *Garrison*, 159 F. Supp. 3d at 1072; *Animation Workers*, 87 F. Supp. 3d at 1212; *Ryan*, 147 F. Supp. 3d at 884-85. In each case, the court held that the allegations did not amount to "new and independent acts" or did not "inflict new and accumulating injury." *Garrison*, 159 F. Supp. 3d at 1072; *Animation Workers*, 87 F. Supp. 3d at 1213-14; *Ryan*, 147 F. Supp. 3d at 884-85. As the court explained in *Garrison*, a defendant's actions "[m]erely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act." 159 F. Supp. 3d at 1071-72.

Plaintiffs' diminished wage allegations here are identical to those rejected in *Animation Workers*. 87 F. Supp. 3d at 1212-13. The plaintiffs there asserted "that because they entered into employment agreements with Defendants during the alleged [no-poach] conspiracy, and because Plaintiffs received artificially depressed compensation as a result, Plaintiffs suffered antitrust injury each time they received 'price-fixed' compensation." *Id.* at 1212. The court held that this theory was "insufficient as a matter of law" to invoke the continuing violation doctrine, because at most it "merely allege[s] a continuing violation," and does not "also allege an overt act." *Id.* The same is true here. In any event, Plaintiffs do not allege that any Brand Defendant ever made any supposedly diminished wage payments to them. *Garrison*, 159 F. Supp. 3d at 1072 ("Oracle has not committed a continuing violation based on the acts of other companies"); *Ryan*, 147 F. Supp. 3d at 885 ("[O]ther companies' inaction … is not an 'overt act' by Microsoft, as required to show a continuing violation.").

In addition to Plaintiffs' "diminished wage" theory, Plaintiffs' pre-motion letter also suggests that Defendants engaged in "independent acts of enforcement during the limitations period" constituting "overt acts" under the continuing violation doctrine. (ECF No. 60, at 3.) But Plaintiffs' argument fails, first and foremost, because all of the alleged acts of enforcement occurred *before* the four-year limitations period. Because "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period," these purported predicate acts are irrelevant under the continuing violation doctrine. *Lubrizol*, 753 F.3d at 600; *accord Sabre*, 938 F.3d at 68 (an "overt act" that is a "new and independent act" that "inflict[s] new and accumulating injury" merely "restarts" the statute of limitations); *Cipro*, 261 F. Supp. 2d at 227 ("[I]n the context of a continuing conspiracy to violate the antitrust laws, 'each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act, and that, as to those damages, the statute of limitations runs from the date of commission of the act.'") (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338-39 (1971)).

According to the CAC:

- More than four years before filing suit, Plaintiff Hayes allegedly had conversations with various Defendants about moving employers, and each of them told her the alleged "no-hire agreements" forbid or restricted her movement. (CAC ¶¶ 113, 115 ("[s]hortly after" she began at Saks in August 2013); ¶¶ 116, 120 (December 2014); ¶¶ 123, 125 (June 2015 and November 2015); ¶ 126 ("shortly thereafter" November 2015).)

- Plaintiff Wang allegedly was told in separate conversations with Gucci and Prada managers that they could not hire her because of the alleged "no-hire agreements." (*Id.* ¶¶ 144-46 (January 2015); 147-50 (February 2016).) Wang alleges imprecisely that the *later* of these two conversations took place in "February 2016" (*id.* ¶¶ 147-50), thus choosing to not allege that it occurred *after* February 14, 2016—the end of the limitations period for her claim.

- "[I]n approximately 2013," Plaintiff Giordano allegedly spoke with a Loro Piana manager who explained that she "could not be considered for employment" because "she was a current employee of Saks." (*Id.* ¶¶ 159-61.)

- Plaintiff Giordano also alleges imprecisely that "in or around 2016," she submitted her resume to a Brunello Cucinelli store manager but was not hired. Like Plaintiff Wang, however, Giordano fails to allege that this purported conversation occurred **after** February 14, 2016, and thus within the limitations period. (*Id.* ¶¶ 169-70.)

- Plaintiff Giordano alleges that "[f]rom 2014 to 2017," she mailed resumes and job applications to the "other Brand Defendants **and numerous other unnamed co-conspirators**," but was not hired. (*Id.* ¶¶ 171-72 (emphasis added).) Giordano notably does **not** allege that she sent applications to any of the **Brand Defendants** after February 14, 2016—*i.e.*, within the limitations period.

- Plaintiff Beachum does not allege any statement or act of any Defendant, but merely that a purported no-hire agreement "was common knowledge among Saks employees." Beachum alleges, however, that she started as Saks employee in February 2014, more than four years before she filed her claim in April 2020. (*See* CAC ¶¶ 187-91.)

In any event, supposed "acts of enforcement" are not always overt acts, and Plaintiffs fail to plausibly allege any acts of enforcement in the CAC that might qualify as overt acts. *See Aurora Enterps.*, 688 F.2d at 694; *Garrison*, 159 F. Supp. 3d at 1072. For example, Plaintiff Giordano does not allege that any Brand Defendant to whom she purportedly mailed a resume or job application was actually hiring at the time, and therefore fails to plausibly suggest any wrongdoing by any Defendant. *Iqbal*, 556 U.S. at 678 (must allege "more than a sheer possibility that a defendant has acted unlawfully"). Likewise, Giordano alleges that unidentified non-party "recruitment agencies" told her "they would be unable to place her with any brand carried by Saks." (CAC ¶¶ 173-81.) But such statements, even if made, were not made by any *Defendant*, and therefore "cannot be overt acts *by* [a Defendant]" that would restart the statute of limitations *against* the Defendant. *Garrison*, 159 F. Supp. 3d at 1072 (emphasis in original).

Similarly, Plaintiff Beachum never alleges that any Defendant warned her against applying for a job, rejected or deterred her application, or otherwise referred in any way to any agreement restricting hiring. (*See* CAC ¶¶ 187-91.) Rather, she concedes that she "did not even bother to apply" to the Louis Vuitton concession inside of Saks, though she did "leave her resume" with the

standalone Louis Vuitton store in the same mall and "never heard back." (*Id.* ¶¶ 188, 190.) Moreover, none of these purported "overt acts" to revive Plaintiffs' stale claim were allegedly done by Saks after 2014. These allegations do not therefore plausibly allege any conduct whatsoever by any Defendant, let alone any wrongful "overt act" in furtherance of an anti-competitive agreement. *See Iqbal*, 556 U.S. at 678.

In sum, *none* of the individual Plaintiffs has alleged that *any* Defendant took *any* action to enforce the purported no-hire agreements against them during the limitations period. The only other references to supposed "overt acts" Plaintiffs cite in their pre-motion letter are vague generalizations about the alleged purpose and effect of the alleged No-Hire Agreements (*see* Compl. ¶¶ 99-104), or bare assertions that "due to the No-Hire Agreements," various Plaintiffs suffered harm (*id.* ¶¶ 139, 152-53, 186, 191). These allegations are deficient for two independent reasons. First, they are mere conclusions. *E.g.*, *Twombly*, 550 U.S. at 555 (mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do"). Second, they contain no dates or other details from which this Court could plausibly infer any "overt act" by any specific Defendant within the limitations period. The continuing violation doctrine thus fails here, and Plaintiffs' claim should be dismissed as untimely.

## II. THE ALLEGED CONSPIRACY IS IMPLAUSIBLE.

Plaintiffs' sole claim under Section 1 of the Sherman Act prohibits only "conspiracies" or "agreements" that impose "unreasonable" restraints of trade. 15 U.S.C. § 1; *see Standard Oil Co. v. United States*, 221 U.S. 1, 64 (1911). As the Second Circuit has explained, "not all cooperative conduct has a deleterious effect on competition; indeed, some cooperative arrangements foster rather than harm competition." *Bogan v. Hodgkins*, 166 F.3d 509, 513 (2d Cir. 1999).

The "usual standard" that is "applied to determine if there is a violation of [Section] 1" is the "rule of reason." *Leegin*, 551 U.S. at 882. "Under this rule, 'the factfinder weighs all of the

circumstances of a case in deciding whether a restrictive practice should be prohibited." *K.M.B. Warehouse Distrs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977)). Courts bypass this "usual standard" in favor of automatic or *per se* condemnation only in the rare instances where experience shows that the particular restraint "would always or almost always tend to restrict competition and decrease output." *Leegin*, 551 U.S. at 886 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)).

In any event, to state a claim under **either** the rule of reason or the *per se* standard, a plaintiff must plausibly allege (i) an agreement and (ii) the relevant market where that agreement had anticompetitive effects. *See, e.g.*, *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 753 (1984) ("[T]here must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective."); *Hodgkins*, 166 F.3d at 515 ("[I]t is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur."). Under the rule of reason standard, moreover, a plaintiff must plead "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express*, 138 S. Ct. 2274, 2284 (2018); *see also E & L Consulting, Ltd. v. Doman Indus., Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (dismissing Section 1 claim for failure to allege actual anticompetitive effects).

Here, Plaintiffs' allegations fail to satisfy *Twombly*'s plausibility standard for each of these three pleading requirements, and the CAC must therefore be dismissed.

## A. Plaintiffs Fail to Allege Any Plausible Agreement.

### 1. There Is No "Overarching" Conspiracy.

Plaintiffs' theory of the case is that all Defendants engaged in a nationwide "overarching conspiracy" since 2014 to restrain the purported labor market for "luxury retail employees." (ECF

No. 60, at 1-2.) To plead a conspiracy, Plaintiffs must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Critically, Plaintiffs must allege "some factual context suggesting [an illegal] agreement," not allegations that are "merely consistent" with such an agreement. *Id*. at 549, 557.

A mere "bare bones allegation that such a conspiracy exists" does not suffice at the pleading stage. *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 300 (E.D.N.Y. 2001), *aff'd*, 35 F. App'x 29 (2d Cir. 2002) (internal quotation marks and citation omitted); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (conclusory allegations of an "agreement" were "in entirely general terms"); *Robb v. Conn. Bd. Of Veterinary Med.*, 157 F. Supp. 3d 130, 143 (D. Conn. 2016) ("[P]laintiff may not simply allege that 'the parties agreed,'" which "is a legal conclusion" under antitrust law, "not a factual allegation'"); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008) (mere allegations of "general conspiratorial activity" without "reference to specific actions by a particular defendant at a particular time" are insufficient to state antitrust claim).

Additionally, to survive a motion to dismiss, Plaintiffs must allege facts that show ***each individual defendant*** "purposefully joined and participated in the conspiracy." *Concord Assocs., L.P. v. Entm't Properties Tr.*, No. 12 CIV. 1667 ER, 2014 WL 1396524, at *23 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). "It is [Plaintiffs'] burden to set forth sufficient facts to establish that each Defendant, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17 CIV. 4302 (RJS), 2019 WL 3457242, at *11 (S.D.N.Y. July 30, 2019). (internal citation omitted). Plaintiffs "must provide ***each Defendant*** with fair notice of what the claim is and the grounds on which it rests, including the factual connection of that defendant to the scheme." *Id*.

(internal quotation marks and citation omitted) (emphasis added). Accordingly, even if Plaintiffs had pleaded an unlawful agreement in general, "[a]bsent specific allegations that link an individual Defendant to the [alleged agreement], the Complaint must be dismissed as to that Defendant." *Id*.[15]

Plaintiffs have failed to plead any facts in the CAC to support a plausible inference of any "overarching conspiracy" among Defendants or, indeed, any agreements whatsoever. The CAC impermissibly alleges nothing more than conjecture and vague generalities falling far short of the *Twombly* standard. Beyond failing to plead the facts of any supposed agreement, there is not even a single allegation of a communication or meeting between or among Defendants. That, by itself, undermines any inference that any Defendant "purposefully joined and participated in the conspiracy" with any other Defendant. *Concord*, 2014 WL 1396524, at *23. Rather, Plaintiffs' blanket assertion that each Defendant entered into the alleged conspiracy "with knowledge of the other Defendants' participation" (CAC ¶ 93) is rank speculation that cannot be credited at the pleading stage. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

Worse, despite the allegation of some industry-wide "no-poach" conspiracy, what few factual allegations are stated in the CAC suggest the opposite. For example, Plaintiffs allege there was ***lots of employee mobility***. They admit they were hired by Saks from Brand Defendants, saw colleagues hired by Brand Defendants from Saks, and left Saks to go to luxury retailers *other than the Brand Defendants*. (CAC ¶¶ 108, 129, 185.) Moreover, Plaintiffs' theory of one-way restraints applicable just to Saks employees, where Brand Defendants' employees are unrestrained (*id*. ¶ 210) and earn higher wages (*id*. ¶¶ 158, 166) further illustrates that, beyond being implausible, the

---

[15] In the Appendix hereto, Brunello Cucinelli and Loro Piana describe the CAC's failure to state factual allegations against them, in particular, that could plausibly link either of them to any purported "overarching conspiracy" or other unlawful agreement.

assertion of the Brand Defendants' supposed participation in any "overarching conspiracy" also defies common sense. *See, e.g.*, *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 516 F. Supp. 2d 270, 294–95 (S.D.N.Y. 2007) (dismissing Section 1 antitrust claim where defendant's participation in a conspiracy was "not plausibly supported by the factual allegations" and were inconsistent with the economic feasibility of the alleged conspiracy); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481 KBF, 2014 WL 4277510, at *29-30 (S.D.N.Y. Aug. 29, 2014) (dismissing claim that "did not make economic sense" and "was not economically plausible"); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (affirming dismissal where plaintiffs alleged "in essence, that [the defendant] conspired to injure itself"). Plaintiffs do not and cannot plausibly explain why any of the Brand Defendants would join such an "overarching conspiracy" that – according to Plaintiffs – allegedly impacts and restrains the solicitation or hiring of only Saks' luxury retail employees. (CAC ¶¶ 89, 210.)

Instead, Plaintiffs ask this Court for a free pass "[u]pon information and belief" to search for an illegal agreement "through discovery" (*id*. ¶¶ 90-91). In short, they ask the Court to turn *Twombly* on its head. But courts in this Circuit routinely dismiss alleged conspiracy cases pled in such a bare-bones manner. *See, e.g.*, *Elevator*, 502 F.3d at 51 (affirming dismissal where allegations of an "agreement" were "in entirely general terms"); *Ulrich v. Moody's Corp.*, No. 13-CV-00008 VSB, 2014 WL 4977562, at *18 (S.D.N.Y. Sept. 30, 2014) (dismissing conspiracy claim pled "at the highest level of generality"); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (dismissing complaint where mere allegations of an "agreement" that was "made at some unidentified place and time are insufficient to establish a plausible inference of agreement, and therefore to state a claim") (quotation omitted); *Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, No. 00 CIV. 5663, 2001 WL 1468168, at *13, *14

(S.D.N.Y. 2001) (dismissing pre-*Twombly* complaint because it was "devoid of factual support for the existence of any § 1 [conspiracy]").[16] The same result is appropriate here.

Plaintiffs' alleged "overarching conspiracy" also suffers from other fatal pleading deficiencies requiring dismissal. Many of the alleged communications recounted by Plaintiffs or ascribed to a given Defendant make no quotation of or reference to any "agreement," and at most describe only unilateral decisions by that individual Defendant. For example, Plaintiff Giordano alleges that she had one conversation with an unnamed Loro Piana retail store manager who conveyed that she could not be considered for employment at Loro Piana because she was a current employee of Saks. (CAC ¶ 160). Similarly, Plaintiffs Hayes and Wang allege that unnamed Gucci store managers told them, respectively, that Gucci is "not allowed to hire Saks employees" and that Plaintiff Wang would need to "'wait a six-month cooling off period' after leaving Saks in order to be hired by Gucci." (*id.* ¶¶ 115, 146). And Plaintiffs Giordano and Beachum allege they simply dropped off job applications with Brunello Cucinelli and Louis Vuitton and "never heard back." (*id.* ¶¶ 167-70, 190.) Without more, these allegations do not plausibly imply some "overarching conspiracy" or even any agreement between Saks and each of the Brand Defendants, rather than unilateral conduct by the latter.

Even further afield, Plaintiff Giordano alleges that two anonymous third-party recruitment agencies told her "they would be unable to place her with any brand carried by Saks" and that "she would have to leave Saks 'for a couple of months' before the agency could place her at any of

---

[16] *See also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1198 (9th Cir. 2015) (affirming Rule 12(b)(6) dismissal of alleged conspiracy between competing manufacturers that was orchestrated by large retailer because plaintiffs "failed to allege enough nonconclusory facts to support the plausible inference that any agreement among the manufacturers was made."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 204 (4th Cir. 2002) (affirming grant of motion to dismiss for "failure to allege a legally viable conspiracy"); *In re Pool Prods. Distrib. Market Antitrust Litig.*, 940 F. Supp. 2d 367, 392 (E.D. La. 2013) (dismissing a conspiracy claim where the "complaint does not specifically allege *any* contacts among or between manufacturers").

these companies" because of unattributed "policies." (*id.* ¶¶ 173-81). These vague comments from unidentified third parties do not come close to plausibly alleging that any Defendant agreed to, endorsed or directed, or even had knowledge of such "policies."

Notably, while Plaintiffs try to assert the conclusion that a subset of Brand Defendants each had some broad "agreement" with Saks, their factual allegations describe only isolated statements by individual local employees. Vague allegations, each based on alleged communications with an employee at a single location, do not create a plausible inference that each Brand Defendant entered into the alleged nationwide "overarching conspiracy," or even an agreement with Saks beyond any specific location. *See Ulrich*, 2014 WL 4977562, at *17 (granting motion to dismiss for failure to plausibly allege a conspiracy where plaintiff alleged that defendant employees stated they had an "informal agreement [with S&P] not to hire or poach each other's staff" and that there was an "unspoken rule" against hiring from S&P); *Frost v. LG Electronics Inc.*, No. 16-cv-05206, 2017 WL 1425919, at *1 (N.D. Cal. Apr. 21, 2017) (recruiter's statement and email from finance manager "that Samsung does not hire people from LG" insufficient to plausibly allege a no-poach conspiracy). And for Brunello Cucinelli and Loro Piana, Plaintiffs fail even to allege any "agreement" with Saks at all. *See infra* App. sec. I, II.

Rather, what Plaintiffs seem to be challenging is an alleged job application "policy" or "protocol" that each Brand Defendant supposedly followed with respect to the employees of Saks from whom they leased space. (CAC ¶¶ 120, 127, 132.) But none of the allegations supporting this claimed policy or protocol alleges any "overarching agreement" among Defendants not to hire each other's "luxury retail employees." Indeed, the lynchpin of Plaintiffs' claim is a statement (taken out of context from a separate employment action against Louis Vuitton) limited to ***Saks employees*** being "requested to follow" a "protocol" to apply for employment, and which would

*allow* for employment, with Louis Vuitton in one store (in Cleveland, Ohio) in 2015. (CAC, Ex. 2 at 5.) Even accepted as true, this allegation does not allege any agreement between any two Brand Defendants, and does not plausibly support the claim that Saks, Louis Vuitton, the other Defendants, and other purported unnamed co-conspirators entered into the single conspiracy alleged in the CAC—*i.e.*, that by 2014 they jointly made "a conscious commitment" not to hire Saks' "luxury retail employees" in the United States.

Plaintiffs' blueprint for their alleged "overarching conspiracy" claim is apparently taken from *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), but that decision only highlights the serious and fatal deficiencies in the CAC. (*See* ECF No. 60.) Unlike here, the *High-Tech* plaintiffs alleged facts of specific communications **between Defendants**, alleged that they entered into or monitored their conspiracy at meetings where they held **overlapping Board membership** despite being competitors, and actually identified **persons** among the defendants who orchestrated their conspiracy. 856 F. Supp. 2d at 1115–18. For example, the *High-Tech* plaintiffs alleged the agreements were entered into by C-Suite level executives (*id*. at 1116), who policed the agreements by directly communicating with one another "to complain about suspected violations of the agreement" (*id*. at 1111), and ensured compliance by placing the other defendants' employees on "internal 'Do Not Cold Call' list(s)." *Id*. at 1110.

Simply put, Plaintiffs in this case do not allege anything even close to the *High-Tech* conspiracy, and the alleged *High-Tech* conspiracy does not acquit Plaintiffs of their failure to plead *facts* in the CAC. *See, e.g.*, *Ulrich v. Moody's Corp.*, No. 13-CV-0008 VSB MHD, 2014 WL 12776746, at *28 (S.D.N.Y. Mar. 31, 2014) (rejecting plaintiff's reliance on *High-Tech* as an outlier decision with unique facts), *report and recommendation adopted as modified*, No. 13-CV-00008 VSB, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014). Rather, this case more closely

resembles *Frost v. LG Electronics Inc.*, a "no-poach" case brought by two of the three plaintiffs' counsel here, where the plaintiffs alleged similar accounts of employees not receiving an interview and being "told" by a recruiter that a "gap" year was required before one defendant could hire the other's employees. No. 16-CV-05206-BLF, 2018 WL 6256790, at *3, *5 (N.D. Cal. July 9, 2018), *aff'd sub nom. Frost v. LG Elecs., Inc.*, 801 F. App'x 496 (9th Cir. 2020). The court granted Rule 12(b)(6) dismissal because, like the CAC here, the allegations lacked the "quality and quantity of facts found adequate" in *High-Tech* to plead a plausible conspiracy. *Id.*

The other case Plaintiffs try to shoehorn their pleading into is *Barry's Cut Rate Stores, Inc. v. Visa, Inc.*, 05-MD-1720 (MKB) (JO), 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) (ECF No. 60, at 1, n.2.) But as this Court knows, *Barry's* was a parallel conduct case involving written rules dating back to when the banks **owned** Visa and MasterCard in the concentrated payment card industry. This case is distinguishable in all respects. *Barry's* followed on the heels of various government and other enforcement actions and legislative redress, and involved allegations that the competitor banks conspired through their joint control of the payment card networks—none of which is remotely analogous to the factual allegations here. Moreover, unlike in *Barry's*, Plaintiffs do not even allege any parallel conduct among Saks and the Brand Defendants.[17] Indeed, Plaintiffs acknowledge that each Defendant independently determines its own compensation levels for employees once they are hired. (*See e.g.,* CAC ¶ 78 ("*each Defendant* sets baseline compensation

---

[17] As the Supreme Court has held, alleged "parallel conduct" alone cannot state a plausible Sherman Action Section 1 claim: "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Because Plaintiffs allege that the Brand Defendants have individual relationships with Saks to sell goods and apparel through Saks department stores, *see supra* pp. 3-4, the Supreme Court's caution about inferring conspiratorial behavior or agreements from "parallel conduct" applies with more force here related to the Brand Defendants' alleged one-way policies with respect to hiring of Saks retail employees working in those department stores.

levels for different employees" and "*each Defendant* also regularly updates their baseline compensation levels") (emphasis added).) Plaintiffs nowhere allege Defendants pay the same compensation amounts. And Plaintiffs identify examples of mobility between Saks and the Brand Defendants (*see e.g., id*. ¶¶ 108, 129)—the opposite of their alleged conspiracy.

Accordingly, the Court should dismiss Plaintiffs' "overarching conspiracy" claim.

### 2.     Plaintiffs Allege, At Most, Permissible Ancillary Restraints.

Stripped of its bare conclusion that Defendants participated in an "overarching conspiracy," the CAC alleges (at most) a broad, legitimate, and procompetitive collaboration between Saks on the one hand and each Brand Defendant on the other hand through the *vertical* lease, concession and/or distribution relationship that Saks has with each Brand Defendant, accompanied by a limited *ancillary* restraint on a Brand Defendant's ability to hire Saks employees without getting Saks' consent or unless the employee had left Saks for six months. "A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) (dismissing challenge to a non-compete between competing retailers that was "ancillary" to an agreement by suppliers of complementary goods to sell out of the same building). "If the restraint, viewed at the time it was adopted, may promote the success of this more extensive cooperation, then the court must scrutinize things carefully under the Rule of Reason." *Id*.[18] By contrast, a "no poach" agreement is treated as *per se* illegal *only* if it is a "naked" restraint, *i.e.*, "if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration

---

[18] Plaintiffs point to *Aya Healthcare Services* for the proposition that one-way agreements are subject to *per se* treatment, but this is misplaced. (ECF No. 60 at 4.) The agreements at issue in *Aya Healthcare* allegedly prohibited "rival providers *in perpetuity* to initiate job offers or otherwise solicit any of [Defendant's] designated 'employees,' no matter how or where employed," and thus involved **permanent** restrictions among **horizontal** competitors. *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2018 WL 3032552, at *9 (S.D. Cal. June 19, 2018).

between the employers." *See* DOJ/FTC Antitrust Guidance for HR Professionals, at 3 (Oct. 2016), *at* https://www.justice.gov/atr/file/903511.

Consistent with this approach, courts apply the rule of reason when analyzing the sufficiency of alleged ancillary, limited no-hire agreements. *See, e.g.*, *Ulrich*, 2014 WL 12776746, at *26 (distinguishing "[n]o-hire" and "no-switching" agreements from those deserving *per se* treatment, likening them to "covenants not to compete," to which the rule of reason applies); *Ogden v. Little Caesar's*, 393 F. Supp. 3d 622, 640 (E.D. Mich. 2019) (dismissing allegations regarding alleged limited no-hire provision in franchisor/franchisee distribution context because plaintiff failed to plead rule of reason violation).

Likewise, even in circumstances where an agreement is not ancillary, the rule of reason applies so long as the agreement is between companies that have both vertical and horizontal aspects to their relationship—*i.e.*, where they operate at different levels of a distribution chain sometimes, and in direct competition with one another at other times, in so-called "dual-distribution" arrangements. *See, e.g.*, *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, No. 10 CIV. 8 DAB, 2011 WL 1044898, at *2 (S.D.N.Y. Mar. 10, 2011), *aff'd on other grounds*, 711 F.3d 68 (2d Cir. 2013) ("claims alleging a vertical relationship or mixed vertical and horizontal relationships must be evaluated under the rule of reason"); *Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) ("[V]ertical restraints are generally subject to 'rule of reason' analysis. This is so even if the distributor and manufacturer also compete at the distribution level, where, as here, the manufacturer distributes its product [both] through a distributor and independently (so called 'dual-distribution' arrangements).") (citations omitted).

Here, accepting Plaintiffs' allegations as true, the CAC itself describes and concedes why any limitation on hiring Saks employees would be part of each Brand Defendant's vertical retail

relationship with Saks where the Brand Defendant is physically operating **within a Saks store** (CAC ¶¶ 21, 28), and "reasonably necessary" to facilitate those relationships. Inside a department store, a Brand Defendant "is able to take advantage of the efforts [Saks] has expended in soliciting, interviewing, and training skilled labor, while simultaneously inflicting a cost on [Saks] by removing an employee on whom [it] may depend." (*id.* ¶¶ 62-63.) To address this inefficiency, Plaintiffs themselves allege that Defendants adopted narrowly tailored agreements that allow for hiring at any time by a Brand Defendant if they obtain approval from Saks—which Plaintiffs admit occurred (*id.* ¶ 132)—or after six months expires. (*Id.* ¶ 75.)

Accordingly, at most, the CAC alleges a handful of one-way agreements that are plainly ancillary to each Brand Defendant's vertical supply relationship with Saks, to which the rule of reason must apply.[19]

## B.     The Relevant Market Is Implausible.

The CAC should be dismissed for the additional, independent reason that it fails to allege a plausible relevant market. A "relevant market" is "the area of effective competition … within which significant substitution in consumption or production occurs." *Am. Express*, 138 S. Ct. at 2285 (internal quotation marks omitted). It includes "two components: a product market and a geographic market." *Concord*, 817 F.3d at 52-53.

On a motion to dismiss, "it is appropriate for a district court … to assess whether the

---

[19] The "quick look" rule of reason is also inapplicable here. That analysis is used only to analyze "agreement(s) not to compete in terms of price or output" such that "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement" including "proof of market power." *NCAA v. Bd. of Regents*, 468 U.S. 85, 109-110 (1984) (citations omitted); *see, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770–781 (1999) (holding that a "quick look" analysis was inappropriate for restrictions that could plausibly be thought to have procompetitive effect on competition). This analysis is inapplicable here because, at best, Plaintiffs' allegations arise within the context of a distribution agreement that is limited in scope and do not involve any clear "artificial limit" on output. *See NCAA*, 468 U.S. at 99 ("By restraining the quantity of television rights available for sale, the challenged practices create a limitation on output[.]").

plaintiff's complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market." *Id.* This is true regardless whether the alleged restraint would be treated as *per se* illegal or analyzed under the rule of reason. *See Hodgkins*, 166 F.3d at 515 ("[I]t is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur."); *Downtown Music Publishing LLC v. Peloton Interactive, Inc.*, No. 19-02426, 2020 WL 469639, at *6-7 (S.D.N.Y. Jan. 29, 2020) (plaintiff "must articulate a [plausible] relevant market" to withstand a motion to dismiss "regardless of which standard [*per se* or rule of reason] applies"); *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011) (plaintiff must "allege a relevant geographic and product market in which trade was unreasonably restrained"); *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 498-99 (S.D.N.Y. 2014) ("In order to plead an antitrust violation under the rule of reason, a plaintiff must allege a relevant market, including both a product market and a geographic market.").

Plaintiffs in this case fail to allege either a plausible product market or a plausible geographic market, requiring dismissal of their claim.

### 1. The CAC Fails To Allege A Plausible Relevant Product Market.

Plaintiffs fail to allege a plausible relevant product market, *i.e.*, where competition occurs for the product or service at issue. As the Supreme Court has explained, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).[20] "Where the plaintiff fails to define its proposed relevant market with

---

[20] "Interchangeability of use" typically exists where one product or service would be a reasonable substitute for another, accounting for factors such as price, use, and qualities. *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997). Cross-elasticity of demand is related to "interchangeability," but is distinct. Cross-elasticity between products or services exists when consumers would respond to a price increase for one by switching to the other. *See Todd*, 275 F.3d at 202.

reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City*, 124 F.3d at 436.

In this case, Plaintiffs assert the mere conclusion that the relevant product market includes the "skilled luxury retail labor" of ***all*** employees who both "(i) work in defendants' stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers." (CAC ¶ 1.) But Plaintiffs do not plead facts addressing cross-elasticity of demand or the interchangeability of these employees with one another, with other skilled luxury retail labor, with other skilled retail labor, or even with other labor generally. Indeed, Plaintiffs avoid any clarity on what they actually are alleging with regard to market definition and even use different terms to define the alleged market. They term it "the labor market for Luxury Retail Employees" as well as "the labor market for Luxury Retail Employees' services." *Compare id*. ¶¶ 39, 102 *with id*. ¶¶ 30, 192.[21] The distinction is more than mere semantics: the former market is limited to those who are already Luxury Retail Employees; the latter would include everyone who could provide the relevant services.

In other words, the alleged "labor market for Luxury Retail Employees" does not consider whether *any other employees* would be reasonably interchangeable with Luxury Retail Employees. For this reason alone, this market definition must fail. *Global Discount Travel Svcs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.") (quotation omitted).

---

[21] While Plaintiffs use these descriptions of the alleged market a few times, they generally resort to calling it a "labor market." CAC ¶¶ 53, 56-57, 80, 86, 153.

This market definition fails, moreover, because Plaintiffs allege that the purported "No-Hire Agreements" placed restrictions *only* on the potential mobility of Saks retail sales employees, and *only* with respect to potential job opportunities at the Brand Defendants. (CAC ¶¶ 57, 92, 119, 148.) Thus, despite Plaintiffs' attempt to cast their relevant market more broadly to include all "Luxury Retail Employees," their actual allegations belie such bare labels and conclusions. Indeed, Plaintiffs enshroud their product market allegations in vague and overgeneralized terms to obscure the inherent implausibility of the logical conclusion from their allegations: a single-brand market of Saks employees.

As Plaintiffs are no doubt aware, "the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market." *Global Discount*, 960 F. Supp. at 704-05; *see also Mathias v. Daily News, L.P.,* 152 F.Supp. 2d 465, 481–83 (S.D.N.Y.2001) (dismissing Section 1 claim where other newspapers competed with the Daily News in the market for newspaper readers); *AXA Advisors*, 19 F. Supp. 3d at 500-02 (dismissing complaint that failed to allege "all reasonably interchangeable substitutes for AXA-affiliated employees"); *Molinari v. Consol Energy Inc.*, No. 12CV1085, 2012 WL 5932979, at *6-7 (W.D. Pa. Nov. 27, 2012) (rejecting "any argument that the market is properly defined because of unique skills [of a medical safety coordinator] in either the industry or with Consol in particular" and joining "over one dozen Federal Courts that have rejected market definitions including only one product at the Motion to Dismiss stage") (collecting cases). Because Plaintiffs' actual allegations posit a product market that is categorically implausible, it fails as a matter of law.

As an alternative to misrepresenting the scope of their alleged relevant market, Plaintiffs focus on their other market formulation—the labor market for Luxury Retail Employees' *services*. They characterize their claim as alleging a "buyer-side [] conspiracy" among Defendants, defined

by the employers who allegedly "buy" "the services of 'skilled luxury retail labor,'" not by the allegedly more limited set of employees who "sell" it. (ECF No. 60, at 5.) This characterization of the relevant product market is inconsistent with the actual allegations of the CAC, but is also just as implausible as the single-brand market of Saks employees.

The Second Circuit has held that the relevant product market in a buyer-side conspiracy "is comprised of buyers who are seen by sellers as being reasonably good substitutes" for each other or, put differently, all buyers who compete to purchase a seller's goods or services. *Todd*, 275 F.3d at 202 (the relevant product market in buyer-side conspiracy is defined by "the commonality and interchangeability of the buyers, not … of the sellers").[22] Accordingly, the "buyers" in Plaintiffs' purported market include not only Defendants, but more broadly *all* employers who use "Luxury Retail Employees" or whom the latter would see as reasonably good substitutes for Defendants. *Id*. This would include at least *all* employers of "skilled luxury retail labor," and likely *countless other employers* as well who could make good use of the skills of "Luxury Retail Employees."

In fact, Plaintiffs *admit* that Defendants compete with "*other* department stores, concessions, and standalone boutiques" in the purported market for skilled luxury retail labor. (CAC ¶ 39 (emphasis added).) Plaintiffs' initial pleading, for example, included Fendi North America, Inc. ("Fendi") as a defendant, but Plaintiffs dropped Fendi from the CAC. (*Compare* Compl., ECF No. 1, *with* CAC, ECF No. 44.) In addition, documents referenced in the CAC itself identify, among luxury retailers alone, Giorgio Armani, Cartier, Burberry, Chanel, Chloe, Dolce

---

[22] In the more commonly alleged form of conspiracy—a seller-side conspiracy such as a price-fixing cartel—the relevant product market is composed of all reasonably interchangeable products and the competing sellers of such products. In an alleged buyer-side conspiracy, however, this framework is reversed. *See Todd*, 275 F.3d at 201 ("The fact that this case involves a buyer-side conspiracy affects how the market is defined").

& Gabbana, Jean-Paul Gaultier, Hermes, Hugo Boss, Lancel, Mauboussin, Nina Ricci, Ralph Lauren (CAC ¶ 25 n.2, Ex. 5), as well as Yves Saint Laurent, Alexander McQueen, and Bottega Veneta (*id.* ¶ 28 n.3, Ex. 6).[23] There are also numerous competing department stores, as well as "other luxury specialty apparel, cosmetics, footwear and home chains," all of which Plaintiffs concede also compete with Defendants in their purported labor market. (*Id.* ¶ 42 n.8, Hochstadt Decl., Ex. 7.)

According to Plaintiffs' own allegations, at least all of these 16 identified non-party sellers of luxury retail goods and countless "other luxury" retail employers must also be "buyers" in the purported labor market for "Luxury Retail Employees" to effectively sell their wares. (*See id.* ¶¶ 27-38.) Thus, from the perspective of Luxury Retail Employees, there are legions of reasonably interchangeable, substitute buyers for their "skilled luxury retail labor." *Todd*, 275 F.3d at 202. Plaintiff Giordano makes this very point, alleging that she departed Saks for "a managerial position at a smaller luxury retailer that is not carried by Saks." (CAC ¶ 185.)

Yet, in the CAC, Plaintiffs do *not* allege that any Defendant had any agreement with any of the myriad non-party "buyers" of "skilled luxury retail labor." As a result, Plaintiffs' purported "buyer-side conspiracy" claim would require the Court to accept the implausible inference that the *six remaining named Defendants alone* define the outer boundaries of the relevant product market for "skilled luxury retail labor." *See Ulrich*, 2014 WL 12776746, at *27 (recommending dismissal of § 1 "no-poach" claim because the alleged market "fails to encompass all interchangeable

---

[23] For purposes of a Rule 12(b)(6) motion, the complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (citations omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (courts "may consider . . . statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

substitute products; specifically it does not include employment at other comparable … agencies").

The Second Circuit's *Todd* decision demonstrates the futility of such an approach. In *Todd*, which was decided pre-*Twombly*, the plaintiff alleged that the defendants, a group of 14 major companies in the integrated oil and petrochemical industry, "regularly shar[ed] detailed information regarding compensation paid to nonunion managerial, professional, and technical ('MPT') employees and us[ed] this information in setting the salaries of these employees at artificially low levels." *Todd*, 275 F.3d at 195. These defendants collectively "account[ed] for 80-90% of the industry's revenues and employ[ed] approximately the same percentage of the industry's workforce." *Id*.

Nothing similar is or could be alleged here. Unlike in *Todd*, Plaintiffs do not (and cannot) allege that Defendants control the entire purported market for skilled luxury retail labor. (*See* CAC ¶ 40 (vaguely alleging the mere conclusion that Defendants' are "dominant employers of LREs").) To the contrary, Plaintiffs allege that numerous substitute buyers (employers) of Luxury Retail Employee labor exist within the luxury retail industry alone, to say nothing of the broader retail industry. In sum, the product market alleged in the pre-*Twombly* context of *Todd* lacked reasonably interchangeable substitute buyers; the product market Plaintiffs allege here is replete with them. Accordingly, Plaintiffs have "failed to articulate a plausible explanation as to why a market should be limited in a particular way," requiring dismissal of the CAC based on its artificial and implausible market definition allegations. *Concord*, 817 F.3d at 53 (citation omitted).

### 2. The CAC Fails To Allege A Plausible Geographic Market.

Plaintiffs also allege an implausible nationwide geographic market that departs from any common sense understanding of economic reality and lacks any factual allegations to support it. Under the Sherman Act, "the geographic market analysis seeks to identify the precise geographic boundaries of effective competition." *Id*. at 52-53. Accordingly, "[c]ourts generally measure a

market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Id.* at 53.

Here, Plaintiffs allege the relevant geographic market is *national* in scope. (*See* ECF No. 60 at 1.) They allege, in effect, that the buyers of skilled luxury retail labor—*viz.*, Defendants and their numerous unnamed competitors in the labor market—compete for the labor of Luxury Retail Employees on a nationwide basis. But Plaintiffs "have provided no basis on which to justify their proposed geographic market definition," as they must to state a plausible claim. *Concord*, 817 F.3d at 53.

*Concord* is instructive on this point. The plaintiffs in *Concord* alleged an anti-competitive scheme to obstruct their casino-resort development project, claiming that the relevant geographic market for racing/gaming was restricted to the Catskills. 817 F.3d at 53-54. The Second Circuit carefully evaluated plaintiffs' geographic market allegations before affirming a Rule 12(b)(6) dismissal of their Sherman Act claims. The court observed that similar racing/gaming facilities existed in Atlantic City and Connecticut, which are not significantly farther than the Catskills from the New York City metropolitan area, and which "the bulk of the resort's potential customers" would view as "reasonably interchangeable substitutes" in terms of "distance as well as regional character." *Id.* at 54. The court therefore concluded that the alleged relevant geographic market was too narrow or under-inclusive, and inherently implausible as a result. *Id.* at 53-54. *See also Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.,* No. 15-CV-05488 (RJS), 2016 WL 5719790, at *6 (S.D.N.Y. Sept. 29, 2016), *aff'd*, 708 F. App'x 29 (2d Cir. 2017) (dismissing complaint at the pleading stage where "plaintiff has defined the relevant market in an inconsistent and facially implausible way" between Forest Hills and all of Queens in a case challenging the distribution of

first-run movies to theatres).

Here, Plaintiffs' proffered relevant geographic market—the entire United States—suffers from the inverse but equally fatal flaw: it is **over-**inclusive in a manner that defies common sense. *See Iqbal*, 556 U.S. at 662 ("[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense."). It does not make sense, for example, that a Louis Vuitton or Prada retail store in New York City competes nationwide, rather than locally, for a pool of "skilled luxury retail labor." Although Plaintiffs allege that Luxury Retail Employees have training sufficient to characterize them as "skilled" labor, the CAC does not and cannot allege that these employees generally possess advanced degrees, technical skills, or other cultivated professional expertise such that Defendants would seek out distinctive Luxury Retail Employee talent wherever it may be found nationwide, rather than locally. *See, e.g.*, *Todd*, 275 F.3d at 203 ("Less technical jobs tend to involve skills that are not as industry-specific, creating greater cross-elasticity for these employees."); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 104 (D.D.C. 2013) (dismissing Section 1 claims alleging conspiracy among "multichannel video programming distributors" because it "is not plausible that competition among real-time MVPDs occurs on a national level, because purchasers do not practicably turn to a national market for … distribution services"); *Dicar, Inc. v. Stafford Corrugated Prod., Inc.*, No. CIV.A 205CV5426DMCMF, 2010 WL 988548, at *11 (D.N.J. Mar. 12, 2010) (granting motion to dismiss where national market alleged and complaint "focuses impermissibly on the specific geographic market in which Plaintiffs (i.e., manufactures) conduct their business—as opposed to the geographic market that consumers would be willing to access [the relevant product]").

Likewise, the suggestion that a Saks employee who, for example, works in Miami or Seattle

would consider St. Louis part of his or her job market is equally implausible. The CAC, in fact, implies just the opposite. It provides enough detail to discern the location of only two stores where a Plaintiff allegedly sought new employment. In both instances, the Plaintiff **never left the mall in which she already worked.** (CAC ¶¶ 106, 121 (Plaintiff Hayes applied to Louis Vuitton in Beachwood, Ohio mall); *id*. ¶ 190 (Plaintiff Beachum "left her resume with the Louis Vuitton boutique in the same Troy, Michigan mall in which her Saks store was located.").) Moreover, no Plaintiff alleges she *ever* sought luxury retail employment outside of her local geographic market area, let alone thousands of miles across the country. Thus, Plaintiffs' bare geographic allegations may not plausibly allege that Beachwood, Ohio shares a labor market with Cleveland, or that Troy, Michigan shares one with Detroit, let alone that the entire country is subsumed within a single *national* job market for luxury retail sales employees.

Plaintiffs' proffered relevant geographic market is therefore inherently implausible and cannot support their Section 1 claim. The CAC should be dismissed for this reason as well.

## C.     Harm To Competition Is Implausible.

Because the rule of reason applies to Plaintiffs' claim, they must also plausibly allege that the purported "no-hire" agreements have anticompetitive effects on competition "as a whole." *K.M.B. Warehouse*, 61 F.3d at 127 ("In order to fulfill this requirement, the plaintiff must show more than just he that was harmed by the defendants' conduct."); *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 507 (2d Cir. 2004) ("Because antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice.").

A plaintiff may show anticompetitive effects either "directly or indirectly." *Id.* Direct evidence of anticompetitive effects must demonstrate "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market," *E & L Consulting*, 472 F.3d at 31, including by "reduc[ing] output, increas[ing] prices or decreas[ing] quality." *Am. Express*, 138

S. Ct. at 2284. Where a plaintiff is unable to allege actual detrimental effects to competition, it must allege anticompetitive effects indirectly by "'at least establish[ing] that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide," plus some "other grounds to believe that the defendant's behavior will harm competition market-wide." *KMB Warehouse*, 61 F.3d at 129 (citation omitted). Market power is "the ability to raise prices significantly above the competitive level without losing all of one's business,'" *id.*, and is often "inferred based on market share." *United States v. Am. Express Co.*, 838 F.3d 179, 200 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

In the CAC, Plaintiffs attempt to allege anticompetitive effects only indirectly, as a product of Defendants' supposed market power.[24] Their naked conclusions, however, fail to create a plausible inference of such power. As explained above, Plaintiffs fail to allege a plausible relevant market and clearly cannot allege Defendants' market power where no market exists. *See, e.g.*, *Concord Assocs.*, 817 F.3d at 53 ("[W]ithout a definition of th[e] market there is no way to measure the defendant's ability to lessen or destroy competition."); *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 323–24 (S.D.N.Y. 2014) (same).

In addition, Plaintiffs fail to allege any market share information from which this Court could draw any inference of market power. Plaintiffs concede that each Defendant "faces competition from rival luxury retailers in the labor market for Luxury Retail Employees," but refuse to specify *how much*. In fact, as noted above, Plaintiffs admit that Defendants compete with **at least 16 non-party retailers** for the services of "luxury retail employees." It is not surprising,

---

[24] The CAC's allegations do not include any evidence that the purported "no-hire" agreements had any actual adverse effect on competition as a whole. The CAC contains examples of alleged harm suffered by individual Plaintiffs (*e.g.*, CAC ¶ 139 (alleging Ms. Hayes suffered various harms)), but individual harm is not sufficient as a matter of law to show harm to competition as a whole. *E.g.*, *K.M.B. Warehouse*, 61 F.3d at 129.

therefore, that Plaintiffs offer only the vague conclusion that Defendants are the "dominant employers" of "luxury retail employees" in the United States and do *not* allege Defendants' percentage share of the purported market. This omission is fatal. *See*, *e.g.*, *Radiancy,* 138 F. Supp. 3d at 323-24 (allegation that defendant had a "very substantial market share" was "conclusory" and fails to provide an "adequate factual basis" for a Sherman Act claim); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013) (dismissing claims against Amazon and six largest e-book publishers where, among other things, the challenged conspiracy would impact only 36% of U.S. e-book market); *cf. Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power.") (collecting cases); *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No.18-cv-4903(JMF), 2020 WL 58247, at *6 (S.D.N.Y. Jan. 6, 2020) (dismissing Sherman Act claim for lack of market power where "the most that Apotex alleges is that Hospira controlled 56.68% of the cefepime market for the month of August 2016"); *Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*, 104 F. Supp. 2d 184, 189 (W.D.N.Y. 2000) ("[T]he [Supreme] Court has concluded as a matter of law that a defendant with 30 percent of the relevant market share lacked the relevant market power for an antitrust violation.").

Thus, it is implausible and contrary to black letter antitrust law that only six retailers could somehow impact competition nationwide for all actual or potential luxury retail employees as Plaintiffs allege. *See Iqbal*, 556 U.S. at 662 ("[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense."). And without a single alleged market share or market power allegation, the CAC makes no attempt to plead the requisite harm to competition essential to a Sherman Act Section 1 claim.

## CONCLUSION

Plaintiffs have alleged that this case "challenges an illegal conspiracy among" the (originally seven) Defendants. (CAC ¶ 1.) They use the term "No-Hire Agreements" and claim that the alleged agreements are *per se* illegal. But the problem for Plaintiffs is that they have not actually alleged a conspiracy "among" the (six remaining) Defendants nor have they pled any facts in support of there being *per se* illegal "no hire" agreements. Instead, at most they have asserted that some individual Brand Defendants that sell their products to and through Saks adhered to a long-standing "policy" or "protocol" of only hiring Saks employees if Saks approved the hire or if the employee left Saks for six months.

As shown above, the stale conduct Plaintiffs challenge from their individual experiences in Beachwood, Ohio; Troy, Michigan; and New York, New York falls outside the limitations period and cannot be revived when Plaintiffs acknowledge they knew of this "policy" or "protocol" well before the limitations period and there were no new overt acts within the last four years. And the generalities with which Plaintiffs have alleged the creation, existence, and monitoring of this supposed "conspiracy" do not come close to pleading an actionable *per se* or automatic violation of Sherman Act Section 1. Instead, the handful of individual "agreements" that Plaintiffs challenge as a "policy" or "protocol" between Saks and some Brand Defendants in the context of a leasing arrangement fail to harm competition in any purported nationwide market for the services of "luxury retail employees." As detailed above, Plaintiffs' labor market is implausible across the board as being both under- and over-inclusive in terms of (1) the "policy" only impacting Saks employees, (2) six Defendants comprising a fraction of luxury retailers, and (3) three Saks department stores in three cities where the four Plaintiffs worked somehow being part of one national market. Beyond that artificial market, Plaintiffs nowhere plead any impact on competition because they admit (as they must) that this "policy" or "protocol" did not stop Brand Defendants

and other luxury retailers from hiring Saks employees, did not stop Saks from hiring Brand Defendant employees, and did not stop Brand Defendants from hiring each other's employees. And conspicuously absent from the pleading is any market share or market power allegations represented by this sliver of luxury retailers.

These pleading deficiencies are fundamental and, as demonstrated by Plaintiffs' decision to not amend when they were previously given the opportunity, any further amendment would be futile. Accordingly, for all of these reasons, Defendants respectfully submit that Plaintiffs' CAC should be dismissed with prejudice.

Dated: November 16, 2020                              Respectfully submitted,

ATTORNEYS FOR SAKS                          ATTORNEYS FOR LOUIS VUITTON USA
INCORPORATED, SAKS & COMPANY                 INC.
LLC, SAKS FIFTH AVENUE LLC
                                            By:  /s/ Robert E. Shapiro
By:  /s/ Eric S. Hochstadt                   Robert E. Shapiro
David Lender                                 Maile H. Solís
Eric S. Hochstadt                            Owen H. Smith
WEIL, GOTSHAL & MANGES LLP                   BARACK FERRAZZANO KIRSCHBAUM
767 Fifth Avenue                             & NAGELBERG LLP
New York, NY 10153                           200 W. Madison St., Ste. 3900
212-310-8000                                 Chicago, IL 60606
david.lender@weil.com                        312-984-3118
eric.hochstadt@weil.com                      312-629-5185
                                            rob.shapiro@bfkn.com
                                            maile.solis@bfkn.com
ATTORNEYS FOR LORO PIANA & C.                owen.smith@bfkn.com
INC.
                                            Eva W. Cole
By:  /s/ Eva W. Cole                         Kevin B. Goldstein
Eva W. Cole                                  WINSTON & STRAWN LLP
Kevin B. Goldstein                           200 Park Avenue
WINSTON & STRAWN LLP                         New York, NY 10166
200 Park Avenue                              212-294-6700
New York, NY 10166                           EWCole@winston.com
212-294-6700                                 KBGoldstein@winston.com

EWCole@winston.com
KBGoldstein@winston.com

Robert E. Shapiro
Maile H. Solís
Owen H. Smith
BARACK FERRAZZANO KIRSCHBAUM
& NAGELBERG LLP
200 W. Madison St., Ste. 3900
Chicago, IL 60606
312-984-3118
312-629-5185
rob.shapiro@bfkn.com
maile.solis@bfkn.com
owen.smith@bfkn.com

ATTORNEYS FOR PRADA USA CORP.

By: /s/ *Mark H. Hamer*
Mark H. Hamer
Kristen E. Lloyd
BAKER & MCKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
202-452-7077
mark.hamer@bakermckenzie.com
202-835-6298
kristen.lloyd@bakermckenzie.com

ATTORNEYS FOR BRUNELLO
CUCINELLI, USA, INC.

By: /s/ *Richard Brosnick*
Richard Brosnick
Jeffrey Kimmel
AKERMAN LLP
666 Fifth Avenue
20th Floor
New York, NY 10103
212-880-3834
richard.brosnick@akerman.com
212-259-6435
jeffrey.kimmel@akerman.com

ATTORNEYS FOR GUCCI AMERICA,
INC.

By: /s/ *Corey Roush*
Corey Roush
Nathan Oleson
AKIN GUMP STRAUSS HAUER & FELD
LLP
2001 K Street, NW
202-887-4115
croush@akingump.com
202-887-4425
noleson@akingump.com

# ARGUMENT APPENDIX

Defendants believe that the Court should rule in their favor based on the motion filed on behalf of all Defendants, and need look no further. Nonetheless, without in any way suggesting that the remaining Defendants did not have the same or similar arguments, Brunello Cucinelli and Loro Piana want to emphasize how the Plaintiffs' CAC fails to state any factual allegations that could plausibly infer either of their respective individual participation in any alleged conspiracy or unlawful agreement.

## I. Brunello Cucinelli Individual Section

In addition to failing to plead any claim generally for the reasons already stated, Plaintiffs' CAC also fails to factually allege any conduct specifically by Brunello Cucinelli that could plausibly infer that Brunello Cucinelli agreed to or participated in any alleged conspiracy or other unlawful agreement. *See supra*, pp. 21-22 (stating relevant legal standard required to allege participation or agreement by an individual defendant). In fact, other than identifying Brunello Cucinelli as a Brand Defendant and alleging the unremarkable fact that it is a supplier of luxury goods sold to and through Saks, the CAC includes only two allegations specifically related to Brunello Cucinelli that could be considered remotely factual.

First, Plaintiff Giordano alleges that she was told by two third-party, anonymous recruiters that certain unattributed "policies" prevented them from placing her "with any brand carried by Saks," and that "she would have to leave Saks 'for a couple of months' before the agency could place her" at certain Brand Defendants, including Brunello Cucinelli. (CAC ¶¶ 173-81). However, Plaintiffs do not allege facts to infer that Brunello Cucinelli even knew about such a "policy" – much less that it endorsed, directed or entered into any supposed agreement regarding it. Moreover, such vague hearsay allegations of unattributed "policies" cannot plausibly allege Brunello Cucinelli's participation in any unlawful agreement. Indeed, the Ninth Circuit recently affirmed

the dismissal of a "no poach" claim not coincidentally filed by Plaintiffs' same counsel based on nearly the same vague "anonymous recruiter" allegation. *See Frost*, 2018 WL 6256790 at 6-7; *see also Ulrich,* 2014 WL 4977562, at *18 (dismissing Section 1 "no poach" claim as implausible where alleged conduct was equally, if not more consistent with unilateral business action).

Second, Plaintiff Giordano also alleges that she applied online for a job with Brunello Cucinelli while she was employed by Saks, and then spoke with an unidentified Brunello Cucinelli store manager, who agreed that she "was indeed qualified for various positions at Brunello Cucinelli and accepted her resume for employment," but "she never heard back from the manager or from Brunello Cucinelli." (CAC ¶¶ 165-70). Initially, a Brunello Cucinelli store manager allegedly accepting Giordano's resume and being open to the possibility of her applying for a job could not logically, much less plausibly, infer its participation in a conspiracy to not hire Saks' retail employees. If anything, Brunello Cucinelli's store manager who knew Giordano was a Saks employee at the time and nevertheless accepted her resume would infer the exact opposite – that Giordano was eligible to seek a job at Brunello Cucinelli regardless of her employment by Saks. *See Fonseca v. Hewlett-Packard Co.*, No. 19CV1748-GPC-MSB, 2020 WL 4596758, at *8 (S.D. Cal. Aug. 11, 2020) (dismissing "no poach" claims where plaintiff's factual allegations logically undercut the feasibility of plaintiff's assertion that he was not hired by a defendant as the result of its participation in a conspiracy); *Wellnx Life Scis. Inc.*, 516 F. Supp. 2d at 294–95 (*supra*, p. 23).

Moreover, the mere fact that Brunello Cucinelli did not respond to Plaintiff Giordano's unsolicited job application cannot plausibly infer that Brunello Cucinelli participated in any "overarching conspiracy" not to hire her because she worked at Saks. *See e.g., Charych v. Siriusware, Inc.*, CV 17-468 (JS) (GRB), 2018 WL 4870906, at *4, 7 (E.D.N.Y. July 30, 2018) (dismissing conspiracy claim where, as here, there was no factual allegation to infer participation

in an agreement and the conduct alleged was equally consistent with independent business actions); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc*., 661 F. Supp. 2d 218, 231–32 (E.D.N.Y. 2009), *aff'd sub nom.* 391 F. App'x 59 (2d Cir. 2010) ("claim that Plaintiff solicited each of the [defendants] asking to become its authorized distributor and was either met with a written refusal or no response at all cannot, without more, give rise to an inference of conspiracy").[25]

In sum, Plaintiffs' CAC is devoid of any factual allegation specific to Brunello Cucinelli that could possibly, much less plausibly, infer its participation in any alleged "overarching conspiracy" or other unlawful agreement. As a result, independent of its other general insufficiencies, Plaintiffs' claim should at least be dismissed as to Brunello Cucinelli.

## II. Loro Piana Individual Section

The sole factual allegation of any conduct by Loro Piana whatsoever is a single conversation that an unnamed store manager at one Loro Piana boutique in New York purportedly had with Plaintiff Giordano in approximately 2013. (CAC ¶¶ 159-61.) As an initial matter, there can be no timely claim against Loro Piana because there is no allegation of any additional conduct by Loro Piana after 2013, let alone any overt act within the four-year limitations period sufficient to create a new violation or continue an existing one. *See supra* Argument sec. I.

But, leaving that aside, nothing in Giordano's alleged conversation with the store manager suggests any antitrust violation at all. The conversation is not alleged to refer to any agreement,

---

[25] In their pre-motion letter, Plaintiffs miscite *In re Dental Suppliers Antitrust Litig*., 16 Civ. 696 (BMC), 2016 WL 5415681, at *3 (E.D.N.Y. Sept 28, 2016) for the proposition that the "choice between two plausible inferences that may be drawn from factual allegations is not a choice for the Court to make on a Rule 12(b)(6) motion." (ECF No. 60, at 3, n. 5). While true as a general proposition, it is inapposite here because it presupposes that participation in the alleged "overarching conspiracy" could actually be a plausible inference based just on Brunello Cucinelli allegedly not responding to Plaintiff Giordano's unsolicited job application, which it plainly is not. *See Concord*, 817 F.3d at 52 (plausibility requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable," which requires "more than a sheer possibility that a defendant acted unlawfully" (internal quotation omitted)).

arrangement, or even policy between Loro Piana and Saks (*id.* ¶¶ 160-61). Nor is there any allegation anywhere in the CAC of any specific conduct by Saks relating to or even referencing Loro Piana. *See Concord*, 2014 WL 1396524, at *23, *aff'd*, 817 F.3d 46 (to survive a motion to dismiss, Plaintiffs must allege facts that show each individual defendant "purposefully joined and participated in the conspiracy"); *see also supra* Argument sec. II.A.

Moreover, the allegations relate solely to a single Loro Piana boutique in New York and thus do not plausibly support that Loro Piana had any overall policy or practice of not hiring from Saks,[26] let alone adequately plead that such policy was the result of a nationwide agreement between Saks and Loro Piana. Indeed, even assuming *arguendo* that there were allegations that Loro Piana had a general policy or practice not to hire from Saks and advised its store managers and recruiters accordingly, so what? – that would all be totally consistent with a unilateral, economically rational decision not to hire away from a major wholesale customer and would not plausibly support an alleged illegal agreement. *Cf. Ulrich*, 2014 WL 4977562, at *18 (dismissing Sherman Act § 1 "no poach" claim as implausible where alleged conduct was equally, if not more consistent with unilateral business action).

Nor do the allegations that Plaintiff Giordano was told by two third-party, anonymous recruiters that they would not be able to place her at Loro Piana (among other brands) unless she first left Saks and waited before seeking employment again (CAC ¶¶ 173-81) suggest that this was the result of an illegal agreement between Saks and Loro Piana. In fact, there are no allegations that suggest that Loro Piana even knew what the recruiting agencies told Giordano, let alone that Loro Piana directed their conduct based on an illegal agreement between Loro Piana and Saks.

---

[26] Likewise, the allegation that Ms. Giordano contacted unnamed third-party recruiters (CAC ¶¶ 173-81) does not allege that she was seeking employment anywhere beyond New York.

*Ulrich*, 2014 WL 4977562, at *17 (dismissing Sherman Act § 1 claim, finding that statement by one manager of "informal agreement not to hire or poach" and by others of "unspoken rule" do not plausibly allege an agreement, and "rational explanation" existed for not hiring).

Further, the allegation that Loro Piana pays its employees "considerably higher wages" than Saks employees (CAC ¶ 158) makes Loro Piana's alleged participation in the purported conspiracy all the more implausible. It either suggests that Loro Piana is in a different market from Saks altogether (*Geneva Pharm*, 386 F.3d at 496-97 (finding substantial gap in pricing indicative of separate markets)), or makes no economic sense as described above (*see supra* Argument sec. II.A.1).

Finally, the complaint gives no explanation at all as to how Loro Piana employees could have suffered any injury, let alone an "antitrust injury," despite these allegations that they were paid "considerably higher wages" than Saks Employees. (CAC ¶ 158). Absent plausible allegations of injury, there can be no basis for a claim on behalf of Loro Piana employees. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (affirming Rule 12(b)(6) dismissal for failure to plead antitrust standing or injury, and summarizing legal standard)

Accordingly, the claim against Loro Piana is implausible and should be dismissed.