**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSAN GIORDANO, ANGELENE HAYES, YING-LIANG WANG, and ANJA BEACHUM, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAKS INCORPORATED, SAKS & COMPANY LLC, SAKS FIFTH AVENUE LLC, LOUIS VUITTON USA INC., LORO PIANA & C. INC., GUCCI AMERICA, INC., PRADA USA CORP., and BRUNELLO CUCINELLI, USA, INC.,<br><br>Defendants. | Civil Action No.: 1:20-cv-00833-MKB-CLP |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    LEGAL STANDARD........................................................................................... 5

III.   FACTUAL BACKGROUND................................................................................ 6

IV.   ARGUMENT ...................................................................................................... 9

     A.     Plaintiffs Plead A Plausible Conspiracy ................................................. 9

          1.     Plaintiffs plausibly allege naked no-hire agreements between horizontal competitors as part of a conspiracy to suppress LRE mobility and pay ................................................................................... 10

          2.     The Conspiracy is *per se* illegal.............................................. 21

          3.     Defendants' arguments that the rule of reason applies are wrong ........... 26

                a.     The no-hire agreements are not ancillary. .................................... 26

                b.     Defendants' other rule of reason arguments fail........................... 32

     B.     Even If *Per Se* Did Not Apply, Plaintiffs' Allegations Would Suffice ............... 33

          1.     Plaintiffs' allegations suffice under a "quick look" analysis ................... 33

          2.     Plaintiffs' allegations also satisfy the rule of reason ............................... 34

     C.     Plaintiffs' Claims Are Not Time-Barred............................................. 40

V.     CONCLUSION.................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Aggrenox Antitrust Litigation*
  94 F. Supp. 3d 224 (D. Conn. 2015) ..................................................................................46

*Agnew v. NCAA,*
  683 F.3d 328 (7th Cir. 2012) ...........................................................................................34

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
  2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ...............................................................15

*Aluminum Warehousing Antitrust Litigation,*
  2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ..................................................................19

*American Medical Association v. United Healthcare Corp.,*
  2006 WL 3833440 (S.D.N.Y. Dec. 29, 2006) ..................................................................50

*Anderson News, L.L.C. v. Am. Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012)......................................................................................5, 6, 9

*In re Animation Workers Antitrust Litig.,*
  87 F. Supp. 3d 1175 (N.D. Cal. 2015) .............................................................................45

*In re Animation Workers Antitrust Litig.,*
  123 F. Supp. 3d 1175 (N.D. Cal. 2015) ..........................................................2, 11, 22, 23

*Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.,*
  688 F.2d 689 (9th Cir. 1982) ...........................................................................................46

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
  2018 WL 3032552 (S.D. Cal. June 19, 2018)...............................................................4, 28

*Barry's Cut Rate Stores Inc. v. Visa, Inc.,*
  2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019).............................................................14, 21

*Belfiore v. New York Times Co.,*
  826 F.2d 177 (2d Cir. 1987)..............................................................................................25

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................................................5

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
  603 F.2d 263 (2d Cir. 1979)........................................................................................41, 43

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,*
  142 F. Supp. 2d 296 (E.D.N.Y. 2001) ..............................................................................12

*Blackburn v. Sweeney*,
  53 F.3d 825 (7th Cir. 1995) ........................................................28

*Blanton v. Domino's Pizza Franchising LLC*,
  2019 WL 2247731 (E.D. Mich. May 24, 2019)..............................32

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982).......................................................................24

*Bogan v. Hodgkins*,
  166 F.3d 509 (2d Cir. 1999)....................................................25, 26

*In re Broiler Chicken Grower Litig.*,
  No. 6:17-cv-33, ECF No. 268 (E.D. Okla. Jan. 8, 2020)................16

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002)....................................43, 46

*Butler v. Jimmy John's Franchise, LLC*,
  331 F. Supp. 3d 786 (S.D. Ill. 2018)..........................................32

*California Dental Ass'n v. F.T.C.*,
  526 U.S. 756 (1999).......................................................................33

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .....................................................19

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) .....................................40, 46

*Concord Associates, L.P. v. Entertainment Properties Trust*,
  2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014).................................14

*Concord Associates, L.P. v. Entertainment Properties Trust*,
  817 F.3d 46 (2d Cir. 2016).........................................................38

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*,
  40 F. Supp. 2d 109 (E.D.N.Y. 1999) .........................................25

*Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH*,
  150 F. Supp. 2d 566 (S.D.N.Y. 2001).......................................48

*In re Delta Dental Antitrust Litig.*,
  2020 WL 5296996 (N.D. Ill. Sept. 4, 2020) ..............................28

*In re Dental Supplies Antitrust Litig.*,
  2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ......................16, 38

iv

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
  136 F.3d 554 (8th Cir. 1998) ...................................................38

*DXS, Inc. v. Siemens Medical Systems, Inc.*,
  100 F.3d 462, 465 (6th Cir. 1996) ..........................................46, 47

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)............................................................37, 38

*Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*,
  129 F.3d 240 (2d Cir. 1997)......................................................33

*In re Elevator Antitrust Litigation*,
  502 F.3d 47 (2d Cir. 2007)........................................................12

*Eli Lilly and Co. v. Zenith Goldline Pharms., Inc.*,
  172 F. Supp. 2d 1060 (S.D. Ind. 2001) .....................................30

*Erickson v. Pardus*,
  551 U.S. 89 (2007).....................................................................5

*In re European Rail Pass Antitrust Litig.*,
  166 F. Supp. 2d 836 (S.D.N.Y. 2001).......................................25

*F.T.C. v. Ind. Federation of Dentists*,
  476 U.S. 447 (1986)..................................................................33

*Fargas v. Cincinnati Mach., LLC*,
  986 F. Supp. 2d 420 (S.D.N.Y. 2013)........................................48

*Fonseca v. Hewlett-Packard Co.*,
  2020 WL 4596758 (S.D. Cal. Aug. 11, 2020) ...........................17

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)............................40

*Freudenberg v. E*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).........................................5

*Frost v. LG Electronics Inc.*,
  2017 WL 1425919 (N.D. Cal. Apr. 21, 2017) ............................21

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013)..................................................................17

*Fuentes v. Royal Dutch Shell*,
  2019 WL 7584654 (E.D. Pa. Nov. 25, 2019) .........................33, 34

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................................................44, 45

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
    2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) ........................................33

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)........................................................................24, 26

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)........................................................................35

*H.L. Hayden Co. of N.Y. Inc. v. Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989)................................................................6, 12, 14

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968)....................................................................................41

*In re High-Tech Emp. Antitrust Litig*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..................................................18, 19, 20

*In re High-Tech Employee Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................................... *passim*

*Hinds County, Miss. v. Wachovia Bank, N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)........................................................15, 16

*Hinds County, Miss. v. Wachovia Bank N.A,*
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)........................................................16

*Hunter v. Booz Allen Hamilton, Inc.*,
    418 F. Supp. 3d 214 (S.D. Ohio 2019) ......................................................11

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)........................................................................34

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)....................................................41, 43, 46, 47, 50

*LaFaro v. New York Cardiothoracic Group, PLLC*,
    570 F.3d 471 (2d Cir. 2009)........................................................................6

*Matson v. Board of Educ. Of City Sch. Dist. of N.Y.*,
    631 F.3d 57 (2d Cir. 2011)..........................................................................5

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)........................................................................10, 21

*Meredith Corp. v. SESAC, LLC*,
    2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) .........................................................25

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ....................................................................47, 50

*MLB Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) (Sotomayor, C.J., concurring)...................................27

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) .....................................................................42

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ...............................................................................24

*Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc.*,
    614 F.2d 832 (2d Cir. 1980)........................................................................25

*Nitsch v. Dreamworks Animation SKG, Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016) .........................................................17, 18, 19

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958)..................................................................................22

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*,
    436 F. Supp. 3d 576 (E.D.N.Y. 2020) ...............................................................50

*Ogden v. Little Caesar's Entertainers, Inc.*,
    393 F. Supp. 3d 622 (E.D. Mich. 2019).............................................................32

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)..............................................................................35

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) .....................................................................42

*Ortho Diagnostic Systems Inc. v. Abbott Labs., Inc.*,
    822 F. Supp. 145 (S.D.N.Y. 1993) ...................................................................25

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990)..............................................................................30, 31

*In re Papa John's Employee and Franchisee Employee Antitrust Litig.*,
    2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) .....................................................11, 33

*In re Parcel Tanker Shipping Services Antitrust Litigation*,
    541 F. Supp. 2d 487 (D. Conn. 2008) ..............................................................12

*Pearce v. Manhattan Ensemble Theater, Inc.*,
528 F. Supp. 2d 175 (S.D.N.Y. 2007) ............................................................48, 49

*Peck v. General Motors Corp.*,
894 F.2d 844 (6th Cir. 1990) ........................................................................46

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
998 F.2d 1224 (3d Cir. 1993) ........................................................................15

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
2015 WL 5710645 (S.D.N.Y. Sept. 29, 2015) ............................................5

*In re Platinum-Beechwood Litig.*,
2019 WL 1570808 (S.D.N.Y. Apr. 11, 2019) ............................................5

*Polk Bros. Inc. v. Forest City Enterprises, Inc.*,
776 F.2d 185 (7th Cir. 1985) ........................................................27, 28, 30

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) ..............................................42, 47, 50

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) ........................................................................37

*Robb v. Connecticut Board of Veterinary Medicine*,
157 F. Supp. 3d 130 (D. Conn. 2016) ........................................................12

*Royal Park Investments SA/NV v. Bank of N.Y. Mellon*,
2016 WL 899320 (S.D.N.Y. Mar. 2, 2016) ............................................5

*In re Ry. Indus. Employee No-Poach Antitrust Litig.*,
395 F. Supp. 3d 464 (W.D. Pa. 2019) ................................................ *passim*

*Ryan v. Microsoft Corp.*,
147 F. Supp. 3d 868 (N.D. Cal. 2015) ............................................44, 45

*Seaman v. Duke Univ.*,
2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ............................................11, 12, 19

*N.Y. ex rel. Spitzer v. Saint Francis Hosp.*,
94 F. Supp. 2d 399 (S.D.N.Y. 2000) ........................................................22

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ........................................................................5

*Stouter v. Smithtown Cent. Sch. Dist.*,
687 F. Supp. 2d 224 (E.D.N.Y. 2010) ........................................................40

*Tera Group., Inc. v. Citigroup, Inc.*,
2019 WL 3457242 (S.D.N.Y. July 30, 2019) ...............................................16, 17

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006)..........................................................................................27

*Thrane v. Metropolitan Transp. Auth.*,
2018 WL 840043 (E.D.N.Y. Feb. 12, 2018)..........................................................5

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)...................................................................... *passim*

*Tops Mkts. Inc. v. Quality Mkts. Inc.*,
142 F.3d 90 (2d Cir. 1998)............................................................................35, 36

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
952 F.2d 715 (3d Cir. 1991).................................................................................39

*Turner v. McDonald's USA, LLC*,
2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) .............................................11, 42, 46

*U.S. v. Addyston Pipe & Steel Co.*,
85 F. 271 (6th Cir. 1898) .....................................................................................30

*U.S. v. Apple*,
791 F.3d 290 (2d Cir. 2015)....................................................................... *passim*

*U.S. v. eBay, Inc.*,
968 F. Supp. 2d 1030 (N.D. Cal. 2013) ...............................................4, 22, 28, 43

*U.S. v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973)..............................................................................................6

*U.S. v. Grinnell Corp.*,
384 U.S. 563 (1966)............................................................................................39

*Ulrich v. Moody's Corp.*,
2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) .............................................21, 22

*United States v. Mfrs. Hanover Trust Co.*,
240 F. Supp. 867 (S.D.N.Y. 1965) .....................................................................26

*United States v. Topco Assocs., Inc.*,
319 F. Supp. 1031 (N.D. Ill. 1970) .....................................................................31

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972)..............................................................................22, 31, 32

*US Airways, Inc. v. Sabre Holdings, Corp.*,
    2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) ........................................37

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)..................................................41, 42, 45, 50

*US Airways v. Sabre Holdings Corp.*,
    105 F. Supp. 3d 265 (S.D.N.Y. 2015)..................................................45

*Vitale v. Marlborough Gallery*,
    1994 WL 654494 (S.D.N.Y. July 5, 1994) ..........................................40

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007)..................................................19

*W. Penn Allegheny Heath Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)..................................................10, 42, 46, 50

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) ..................................................42, 43, 44

*Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages, Co.*,
    2001 WL 1468168 (S.D.N.Y. Nov. 19, 2001) ......................................12

*Z Technologies Corp. v. Lubrizol Corp.*
    753 F.3d 594 (6th Cir. 2014) ..............................................................47

## Other Authorities

Phillip E. Areeda (late) & Herbert Hovenkamp,
    *Antitrust Law: An Analysis of Antitrust Principles and Their Application*
    (4th & 5th Eds. 2013-2020) .......................................................... *passim*

Antitrust Guidance for Human Resource Professionals (Oct. 2016)......................................23, 28

# I. INTRODUCTION

The Consolidated Amended Complaint ("CAC") plausibly alleges that starting at least by 2014, and continuing through the present, each Brand Defendant[1] agreed with Saks[2] not to hire Saks's Luxury Retail Employees ("LREs")[3] as part of an overarching nationwide conspiracy to inhibit LRE mobility and suppress LRE compensation ("Conspiracy") in violation of Section 1 of the Sherman Act ("Section 1").

Plaintiffs plead the Conspiracy with particularity and support it with ample factual detail rendering Plaintiffs' Section 1 claim sufficiently pled and plausible. Saks's Human Resources Director specifically admitted its no-hire agreement with Gucci and confirmed that Saks had similar no-hire agreements with other Brand Conspirators.[4] CAC ¶¶ 116-20. Louis Vuitton admitted to its no-hire agreement with Saks in writing. *Id.* ¶¶ 123, 131-32; *id.* at Exs. A & B. Gucci, Prada, and LP managers admitted to Plaintiffs the existence of their respective no-hire agreements with Saks. *Id.* ¶¶ 113-15, 143-149, 160-61.

Indeed, Defendants' Memorandum of Law in Support of Defendants' Joint Motion to Dismiss ("Mot." or "Motion") leans into these admissions. Far from denying them, Defendants admit them—as they must—and instead attempt to justify them with fact-specific explanations. For example, Defendants raise an affirmative defense—based on their own factual assertions found nowhere in the CAC—that the Conspiracy not to hire Saks's LREs is "reasonably

---

[1] The Brand Defendants are Louis Vuitton USA Inc. ("Louis Vuitton"), Loro Piana & C. Inc. ("LP"), Gucci America, Inc. ("Gucci"), Prada USA Corp. ("Prada"), and Brunello Cucinelli USA, Inc. ("BC").

[2] "Saks" refers to Defendants Saks Incorporated, Saks & Company LLC, and Saks Fifth Avenue LLC.

[3] Luxury Retail Employees ("LREs") are highly skilled and well-trained salespersons who work in Defendants' stores and/or boutiques and sell and/or manage the sale of luxury goods to consumers. CAC ¶¶ 1, 31-38.

[4] "Brand Conspirators" refers to the Brand Defendants and other unnamed companies that sell their goods at Saks and which also have no-hire agreements with Saks.

necessary" to the Brand Defendants' lease and distribution agreements with Saks relating to their distribution and sale of their goods at Saks's stores. Mot. at 28-30. According to Defendants, the no-hire agreements are a *necessary* part of Saks's distribution relationships with the other Defendants because, by Defendants' reasoning (based on purported evidence outside of the CAC), Saks would not have agreed to lease space to and/or sell the Brand Defendants' products absent assurances that the Brand Defendants would not hire Saks's LREs. This attempted justification is an admission not only about the existence of the Conspiracy, but also one of its intended anticompetitive effects: limiting LRE mobility. *Id.* There is no reason for a lease and distribution arrangement to require an explicit agreement to limit hiring or compensation. Putting aside the illogic of this position, and the fact that Defendants have the burden of proving an affirmative defense, this claim at most frames a factual dispute to be addressed after discovery and at trial.

Multiple courts in analogous cases have held that similarly alleged conspiracies, between horizontal competitors for labor, to impose no-poach/no-hire agreements have constituted plausible *per se* violations of Section 1. *In re Ry. Indus. Employee No-Poach Antitrust Litig.* (*"Railway No-Poach"*), 395 F. Supp. 3d 464, 471, 481-82 (W.D. Pa. 2019) ("The court agrees with plaintiffs that the no-poach agreements as plead in the consolidated complaint, . . . may be considered per se violations of § 1"); *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1110, 1122 (N.D. Cal. 2012) ("Plaintiffs have successfully pled a per se violation of the Sherman Act" through bilateral non-solicitation agreements between horizontal competitors); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1182, 1213 (N.D. Cal. 2015) ("[T]he Court concludes that Plaintiffs have alleged sufficient facts to support a plausible *per se* claim that Defendants allegedly conspired to suppress the compensation of the putative class"

based in part on non-solicitation agreements).[5]

Defendants nonetheless attack the CAC on three incorrect grounds. First, Defendants argue that Plaintiffs fail to allege sufficient factual detail to render the existence of the Conspiracy plausible. Putting aside the incongruity of Defendants' arguments that the no-hire agreements are both "necessary" *and* non-existent, they are factually wrong. The CAC's allegations are more than sufficient to render plausible the existence of the individual no-hire agreements, as well as the overarching Conspiracy of which the agreements were the central component. The alleged no-hire agreements all contain identical restrictions (*i.e.*, an agreement not to hire Saks's LREs without either six months passing after the LRE leaves Saks or approval from a Saks manager allowing a Brand Defendant to hire the LRE), a common party (Saks), and common goals (inhibiting LRE mobility and suppressing LRE compensation).

Courts confronting similarly specific allegations in analogous no-poach, no-hire cases have routinely rejected the same arguments Defendants are making here. *E.g., supra* at 2. Each of the identical no-hire agreements is supported by specific allegations of direct evidence—either in the form of admissions by the companies or by statements of third-party recruiters acknowledging the existence of the agreements. Such factual detail—in which Defendants admit the existence of the agreements—requires no inferences to plead a conspiracy. Plaintiffs' allegations more than suffice to carry Plaintiffs' burden here.

Second, Defendants assert that Plaintiffs' Section 1 claim should be analyzed under the "rule of reason," and that Plaintiffs fail to allege sufficient facts under that rule. Defendants are

_____

[5] The no-hire agreements alleged here are more pernicious and anticompetitive than non-solicitation/no-poach agreements at issue in these other cases, because the parties to those restrictive agreements may still hire another party's employee. The no-hire agreements at issue here, by contrast, make employee mobility even more difficult and put additional downward pressure on compensation for all employees covered by the Conspiracy.

wrong. As a threshold matter, the determination of whether Plaintiffs' claims should be analyzed under a standard other than the *per se* rule should not be resolved at the pleading stage. *See, e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2018 WL 3032552, at *14-15 (S.D. Cal. June 19, 2018); *U.S. v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2013). Moreover, the Conspiracy and its component bilateral agreements are *per se* violations of Section 1.

It is well established that agreements not to compete among horizontal competitors are *per se* anticompetitive and illegal. *Infra* at Sec. IV.A.2. In *per se* cases, plaintiffs need not prove or allege substantial market power (or facts in support of proof of market power such as the relevant market and/or market share). Nevertheless, Plaintiffs here have pleaded, in the alternative, sufficient facts to support Plaintiffs' allegation that Defendants' Conspiracy produced anticompetitive effects in a relevant market where Defendants possess substantial market power. Plaintiffs do so by pleading facts showing market power directly and through circumstantial evidence.

Third, and finally, Defendants argue that Plaintiffs' claims are untimely because Plaintiffs commenced their Saks employment more than four years prior to filing the initial complaint in this action. However, because the Conspiracy is a continuing violation—supported by alleged overt acts and effects continuing through the present, including continually paying sub-competitive wages to Plaintiffs and all LREs and refusing to hire Saks's LREs due to the Conspiracy—Plaintiffs' claims are within the antitrust law's four-year statute of limitations.

In sum, Defendants' Motion should be denied.[6]

---

[6] Defendants LP and BC submit separate addenda to Defendants' Motion. LP offers no arguments that distinguish it from the other Brand Defendants. LP's store manager (like the store managers at Louis Vuitton, Gucci, and Prada) admitted to LP's no-hire agreement with Saks. CAC ¶¶ 159-61. Thus, Plaintiffs need not separately respond. BC complains that Plaintiffs' only allegations as to it

## II.     LEGAL STANDARD

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In fact, Rule 8(a)(2) requires only a short and plain statement of a claim for relief; "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555). This pleading burden is a "low bar." *In re Platinum-Beechwood Litig.*, 2019 WL 1570808, at *15 (S.D.N.Y. Apr. 11, 2019).[7] "Motions to dismiss are generally viewed with disfavor," *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 178 (S.D.N.Y. 2010), and should be granted only in the exceptional case where "it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Matson v. Board of Educ. Of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011).

For a Section 1 Sherman Act claim, "a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotations omitted). The "plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action . . ." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). The Court must accept all factual statements as true and draw all reasonable

--------

concern multiple independent recruiting agencies that place employees with BC telling Plaintiff Giordano that BC had an agreement not to hire Saks's LREs, and that Plaintiff Giordano unsuccessfully applied to BC. As set forth herein, such allegations are sufficient when taken together with the detailed allegations concerning the Conspiracy. *Infra* n.11.

[7] *See also Thrane v. Metropolitan Transp. Auth.*, 2018 WL 840043, at *2 (E.D.N.Y. Feb. 12, 2018); *Royal Park Investments SA/NV v. Bank of N.Y. Mellon*, 2016 WL 899320, at *5 (S.D.N.Y. Mar. 2, 2016); *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2015 WL 5710645, at *4 (S.D.N.Y. Sept. 29, 2015).

inferences in Plaintiffs' favor. *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Further, because plausibility "is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible . . . The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 184-85.[8] Moreover, courts "must accord plaintiffs the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *H.L. Hayden Co. of N.Y. Inc.*, 879 F.2d at 1012 (internal quotations omitted); *see also U.S. v. Apple*, 791 F.3d 290, 319 (2d Cir. 2015) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing it as its separate parts, but only by looking at it as a whole." (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

## III.    FACTUAL BACKGROUND

LREs are skilled salespeople who are well trained at selling high-end luxury brands for Defendants. CAC ¶¶ 1, 31-38. Plaintiffs allege that Defendants conspired to suppress the job mobility and total compensation paid to LREs through agreements not to hire Saks's LREs. CAC

---

[8] Drawing such inferences is particularly appropriate in antitrust conspiracy cases because conspirators do not collude in plain view, and thus, "antitrust conspiracies 'are rarely evidenced by explicit agreements, but must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators.'" *H.L. Hayden Co. of N.Y. Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989) (quoting *Schwimmer v. Sony Corp. of Am.*, 677 F.2d 946, 953 (2d Cir. 1982)); *see also Anderson News*, 680 F.3d at 183 ("conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision" and conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("[E]ven in the absence of direct 'smoking gun' evidence, a horizontal price-fixing agreement may be inferred . . . [through] circumstantial evidence . . . ."). Indeed, "circumstantial evidence is the lifeblood of antitrust law." *U.S. v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973). Thus, while this is a rare case with substantial *direct* evidence of the conspiracy, from the mouths of the cartelists, the Court should nevertheless draw reasonable inferences as to the scope and effect of the Conspiracy from the totality of the factual allegations.

¶¶ 1-2, 20, 81, 88-89, 91-94, 99-105, 210. Defendants are the "dominant employers of [LREs] in the United States[,]" (*id.* ¶¶ 40-51), who—but for the Conspiracy—would compete for LREs in a competitive LRE labor market. CAC ¶¶ 29-30, 39-40, 53, 55-57. Plaintiffs are LREs who formerly worked in Saks stores in New York, Michigan, and Ohio, and who were injured because Saks paid artificially low compensation to them due to the Conspiracy. *Id.* ¶¶ 8-11, 106, 140, 155, 187, 192-96. Plaintiffs bring this action on behalf of themselves and a proposed Class of similarly situated LREs nationwide. *Id.* ¶ 197.[9]

The Conspiracy is evidenced by a series of bilateral no-hire agreements between Saks and each Brand Conspirator (including each Brand Defendant), that were entered into at least as early as 2014 and continue to this day. *See, e.g., id.* ¶¶ 1-2, 20, 81, 89-94, 100-02, 118. Pursuant to these agreements, the Brand Defendants agreed not to hire Saks's LREs without the permission of Saks's management, or until the LRE separates from Saks for at least six months. *Id.* ¶¶ 89-94, 119, 210; *see also id.* at Ex. B. Saks is the ringleader of the Conspiracy, and each illegal agreement contains common restrictions with the purpose and effect of restricting LRE mobility and compensation. *Id.* ¶¶ 90, 92, 119.

During the Conspiracy, Defendants admitted to the existence and terms of the no-hire agreements. For instance, Saks's Human Resources Director confirmed the existence of such agreements. *Id.* ¶¶ 116-20. In response to Plaintiffs' employment inquiries, Prada, Gucci, Louis Vuitton, and LP's store managers stated they could not hire Saks's LREs unless the LREs left

---

[9] The "Class" is defined as "All persons in the United States employed by at least one of Defendants at any time from September 30, 2015 until the effects of Defendants' conduct ceases (the "Class Period") who: (i) work in any of Defendants' respective stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers. Excluded from the Class are each of Defendants' officers and directors, as well as employees in roles where they purchase luxury retail goods on behalf of any Defendant to display and sell in the Defendant's stores and/or on its website(s)." *Id.* ¶ 197.

Saks for six months, which precisely reflect the terms of the alleged no-hire agreements. *Id.* ¶¶ 114-26, 140-50, 155-61; *see also id.* at Ex. A. Louis Vuitton's in-house counsel specifically confirmed its no-hire agreement with Saks in a position statement submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") in response to a Charge of Discrimination filed by Plaintiff Hayes, defending Louis Vuitton's refusal to consider Ms. Hayes for employment on the ground that it was restricted from hiring her under its no-hire agreement with Saks. *Id.* ¶¶ 130-33; *id.* at Ex. B.

Further, the no-hire agreements were well known among Saks's LREs and others in the industry. *Id.* ¶¶ 173-81, 188. As an example, beginning in 2017, Plaintiff Giordano spoke with two prominent recruitment agencies with experience placing candidates within the luxury retail industry, including with LP, BC, and Louis Vuitton. *Id.* ¶¶ 173-81. Representatives from both agencies confirmed that "despite Ms. Giordano's experience, they would be unable to place her with any brand carried by Saks" and that Ms. Giordano "would have to leave Saks 'for a couple of months' before the agency could place her" with LP, BC, and Louis Vuitton. *Id.* ¶¶ 175-76.

The Conspiracy is directed at, and affects, LREs at Defendants nationwide. Defendants have retail operations and employ LREs from coast to coast. *See id.* ¶¶ 39-51. The terms of the no-hire agreements are substantially identical as applied to each Brand Conspirator regardless of location. *E.g., id.* ¶ 100. Indeed, the Conspiracy is composed of at least five substantively identical bilateral no-hire agreements, involving the same ringleader (Saks) across all Brand Defendants and geographic locations. *Id.* ¶¶ 99-100, 106, 118, 140, 155, 187. The no-hire agreements each allow the very same narrowly limited exceptions where a Brand Defendant may hire a current or former Saks's LRE "only if: (i) managers from both co-conspirators (*i.e.,* Saks and the given Brand Defendant) agree to allow the [LRE] to transfer; or (ii) if more than six (6)

months have passed since the [LRE] was last employed by Saks." *Id.* ¶ 92. Plaintiffs encountered these exact same no-hire agreements with similar terms as between different Brand Defendants and Saks locations across Ohio, Michigan, and New York. *Id.* ¶¶ 106, 140, 155, 187. Nowhere did Defendants' admissions about the no-hire agreements or the third-party recruiters' corroborating statements suggest that the hiring restrictions were limited in geographic scope. Moreover, Defendants' Motion suggests that these no-hire agreements were "necessary" to the companies' business relationships, Mot. at 28-30, without regard to geographic location.

The Conspiracy commenced no later than 2014 (*id.* ¶¶ 91, 210), and Defendants performed numerous overt acts in furtherance of the Conspiracy continuing through the present. *Id.* ¶¶ 8-11, 99-104, 138, 147-52, 171-81, 186, 190-91. For example, Saks repeatedly paid each Plaintiff artificially suppressed compensation as a result of the unlawful scheme during the limitations period. *Id.* ¶¶ 8-11, 137, 139, 151-54, 185-187, 191. Further, the Brand Defendants repeatedly enforced the terms of the no-hire agreements by, *e.g.*, refusing to consider or hire each Plaintiff (and other members of the proposed Class) for positions to which they applied within the last four years. *Id.* ¶¶ 139, 147-50, 171-91, 190.

## IV. ARGUMENT

### A. Plaintiffs Plead A Plausible Conspiracy

Plaintiffs' detailed allegations about Defendants' conduct—including, among other things, Defendants' acknowledgment of the no-hire agreements—are more than sufficient to render the Conspiracy plausible. "In order to establish a conspiracy in violation of Section 1 of the Sherman Act, whether horizontal, vertical, or both, proof of joint or concerted action is required . . ." *Anderson News*, 680 F.3d at 183. "Circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.* (internal quotations omitted). "A plaintiff may plead an agreement [*i.e.*, joint or concerted action]

by alleging direct or circumstantial evidence, or a combination of the two. If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question of whether an agreement has been adequately pled." *W. Penn Allegheny Heath Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010); *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (a plaintiff may overcome a motion to dismiss by asserting *either* direct evidence or circumstantial evidence or both).

### 1. Plaintiffs plausibly allege naked no-hire agreements between horizontal competitors as part of a conspiracy to suppress LRE mobility and pay.

Plaintiffs' Conspiracy allegations are specific and plausible. The Brand Conspirators and Saks are horizontal competitors for LRE services, who entered into a series of bilateral agreements with a unity of purpose (inhibit LRE mobility and suppress LRE compensation), common terms (not to hire Saks's LREs for at least several months after they leave Saks absent Saks's approval), common participants (each Brand Conspirator entering into an agreement with Saks), and a common duration (perpetual beginning at least by 2014 and extending through the present). CAC ¶¶ 1, 20, 81, 89-93, 100, 118-19. In short, the Conspiracy involves a ringleader, Saks, and co-conspirators agreeing to common restrictions with the purpose and effect of restricting LRE mobility and compensation. *Id.* ¶¶ 90, 92, 119. Such alleged congruity has been held sufficient to allege an overarching conspiracy even in no-hire/no-poach antitrust cases where, unlike here, there was no common ringleader. *E.g.*, *In re High-Tech*, 856 F. Supp. 2d at 1120; *Railway No-Poach*, 395 F. Supp. 3d at 488.

The no-hire agreements here, and the larger Conspiracy, restrict LRE mobility and

thereby suppress LRE compensation. CAC ¶¶ 1, 20, 81, 89, 93, 118.[10] Those are classic anticompetitive effects and precisely the type of injury the antitrust laws were designed to prevent. *See, e.g.*, *In re High-Tech*, 856 F. Supp. 2d at 1121 (upholding allegations that non-solicitation agreements limit employee mobility and suppress compensation regardless whether the employee would have received employment solicitations absent the agreements); *In re Animation Workers*, 123 F. Supp. 3d at 1213-14 (upholding allegations that non-solicitation agreements can form a conspiracy to suppress compensation to animation studio employees).

Moreover, Plaintiffs' allegations are not only detailed, but include allegations constituting *direct* evidence of the existence and terms of the anticompetitive agreements comprising the Conspiracy. Specifically, a Saks's human resources director admitted to Plaintiff Hayes that Saks had no-hire agreements with Gucci and other Brand Conspirators. CAC ¶¶ 116-20. Louis Vuitton's store manager admitted to its agreement with Saks in writing, and Louis Vuitton's in-house corporate counsel affirmed the store manager's account. *Id.* ¶¶ 123, 131-32; *id.* at Exs. A & B. Gucci, Prada, and LP managers admitted their agreements with Saks to Plaintiffs. *Id.* ¶¶ 113-15, 143-149, 160-61. Collectively, these allegations reflect Saks's admissions that it had agreements with the Brand Defendants, and the Brand Defendants' admissions that they had

_____

[10] It is well established that restricting employee mobility through no-hire/no-poach agreements has the effect of suppressing compensation. *See, e.g., Seaman v. Duke Univ.*, 2018 WL 671239, at *4 (M.D.N.C. Feb. 1, 2018) (certifying class alleging that no-hire agreement had antitrust impact on all or nearly all class members because the agreement suppressed class members' compensation by restricting mobility); *see also Turner v. McDonald's USA,* LLC, 2020 WL 3044086, at *1-2 (N.D. Ill. Apr. 24, 2020) (accepting plaintiff's allegations that she suffered reduced wages due to a no-hire clause in franchise agreements); *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 222 (S.D. Ohio 2019) (finding plaintiffs' allegations that defendants entered no-poach agreements with the goal of suppressing compensation through mobility restrictions sufficient to overcome motion to dismiss); *In re Papa John's Employee and Franchisee Employee Antitrust Litig*., 2019 WL 5386484, at *9 (W.D. Ky. Oct. 21, 2019) (accepting allegations that no-hire provision had the purpose and effect of depressing wages in part due to mobility restrictions).

these agreements with Saks. Together, these party admissions are direct evidence of the Conspiracy, are admissible at trial, and are more than sufficient for pleading purposes. *See, e.g.*, *Seaman*, 2018 WL 671239, at *4 (admissions of a no-poach agreement are sufficient).

Plaintiffs also plead that independent recruiting agencies had knowledge of the agreements. For example, two prominent recruiting agencies confirmed that although they place candidates with brands carried by Saks, including LP, BC,[11] and Louis Vuitton, Saks's LREs would have to leave their positions with Saks "for a couple of months" before Saks's LREs could be placed with such brands. *Id.* ¶¶ 173-81.[12]

-----

[11] Defendant BC argues that the allegations concerning the statements of third-party recruiting agencies cannot raise the inference that "Brunello Cucinelli even knew about" the recruiting agencies' alleged inability to place Saks LREs due to BC's "policy" not to hire Saks LREs until they had been separated from Saks for "a couple months." Mot. at 45 (citing CAC ¶¶ 173-81). BC's argument requires the Court to make an implausible inference against Plaintiffs: that a policy the recruiting agencies had to follow—not placing Saks's LREs with Brand Defendants including BC—was imposed unbeknownst to BC. Further, BC's argument improperly requires the Court to "tightly compartmentalize" Plaintiffs' allegations and wipe the slate clean after reviewing all of the other allegations. *See H.L. Hayden*, 879 F.2d at 1012; *Apple*, 791 F.3d at 319. Indeed, in the context of the other allegations, it is reasonable to infer that BC had a no-hire agreement with Saks given the admissions of the other Defendants' employees, BC's refusal to hire Plaintiff Giordano after acknowledging her qualifications, and the recruiting agencies' statements.

[12] Defendants' repeated attempts to characterize the allegations as "bare," *e.g.*, Mot. at 1, 11, 21, 23, 28, do not make the allegations conclusory. The cases Defendants cite are inapt. The complaint in *In re Elevator Antitrust Litigation*, for example, "enumerate[d] basically every type of conspiratorial activity . . . in entirely general terms without any specification of any particular activity by any particular defendant." 502 F.3d 47, 50-51 (2d Cir. 2007) (internal quotations omitted). In *Robb v. Connecticut Board of Veterinary Medicine*, the plaintiff "d[id] not describe any action [evidencing an agreement] engaged in by any of the Individual Defendants[,] … refer[ring] to the alleged conspirators by name only once, and then only to identify the parties to the litigation." 157 F. Supp. 3d 130, 144 (D. Conn. 2016). In *In re Parcel Tanker Shipping Services Antitrust Litigation*, the plaintiffs rotely alleged a list of general anticompetitive activity (*i.e.,* "customer allocation, the division of markets, the adjustment of capacity bid rigging, elimination of competitors, predatory pricing, non-competition, and monopolization"), but provided no specifics, such as examples of the defendants' conduct or how the agreements were applied or enforced. 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008). In *Beyer Farms, Inc. v. Elmhurst Dairy, Inc*., the court faulted the plaintiffs for only alleging unilateral conduct of one defendant, while just providing "bare bones" allegations of the existence of an agreement. 142 F. Supp. 2d 296, 301 (E.D.N.Y. 2001). In *Yellow Page Solutions, Inc.*

The CAC further explains *why* Defendants entered into the Conspiracy: to suppress LRE mobility and therefore wages.[13] Defendants' attempts to deflect and evade these allegations fail. First, Defendants argue that Plaintiffs do not plead facts supporting "any agreements whatsoever," mischaracterizing Plaintiffs' allegations as referring only to unilateral "policies." Mot. at 22, 24-26. Not so. Saks *admitted* it has *agreements* with Gucci and other Brand Conspirators, and the Brand Defendants *admitted* to "policies" not to hire Saks's LREs. CAC ¶¶ 114-27, 143-49, 159-61 & Exs. A, B. Thus, one party to the no-hire agreements admits there are agreements (Saks) and the other parties (the Brand Defendants) admit to "policies" that all too coincidentally comply with those agreements (and which would be contrary to the Brand Defendants' interests absent the no-hire agreements).[14] *See* CAC ¶¶ 52-64 (setting out benefits to employers of lateral hiring in competitive labor markets). At a minimum, such allegations raise

_____

*v. Bell Atlantic Yellow Pages, Co.*, the plaintiffs' complaint was "devoid of factual support for the existence of" an anticompetitive agreement, including that plaintiffs did not allege the purported agreement's "specific terms" or why the parties would even enter the agreement. 2001 WL 1468168, at *13-14 (S.D.N.Y. Nov. 19, 2001). By contrast, Plaintiffs here allege the specific terms of the agreements *based on admissions of Defendants' employees and statements by third-party recruiting agents*, reflecting identical agreements between each Brand Defendant and the Saks Defendants not to hire Saks's LREs. CAC ¶¶ 113-27, 143-149, 159-61, 166-71, 173-81 & Exs. A, B.

[13] *E.g.*, *id.* ¶¶ 65-76,81-84, 93-94, 100-04 (pleading industry-wide effects of lateral recruiting, including upward pressure on wages); *see also In re High-Tech*, 856 F. Supp. 2d at 1121 ("In light of Plaintiffs' specific allegations concerning the industry-wide procompetitive effects of cold calling recruiting practices, it is plausible to infer that even a single bilateral agreement [not to poach or cold call] would have the ripple effect of depressing the mobility and compensation of employees of companies that are not direct parties to the agreement."); *Railway No-Poach*, 395 F. Supp. 3d at 488 (same).

[14] In a competitive labor market, Defendants would compete for LRE services because laterally hiring LREs would save Defendants training costs and offer the immediate benefit of well-trained, motivated salespersons who will enhance the Defendant's brand, leading to increased sales and profitability. *See* CAC ¶ 53; *see also id.* ¶¶ 31-38 (describing the training and skills required of LREs). Indeed, Defendants' argument that Saks would not agree to lease space to the Brand Defendants or distribute their products unless the Brand Defendants' agreed not to hire Saks's LREs, Mot. at 28-30, implicitly concedes that it is in the Brand Defendants' economic interests to hire Saks's LREs and would have done so absent the Conspiracy.

the inference of agreement—and more appropriately constitute direct admissions of agreement.[15]

Moreover, crediting Defendants' argument requires the Court, improperly, to "tightly compartmentalize" Plaintiffs' allegations as to each Defendant, and ignore all the other allegations that buttress the plausibility of each Defendant's participation in the overarching conspiracy. *See H.L. Hayden*, 879 F.2d at 1012; *Apple*, 791 F.3d at 319.

Defendants further argue that Plaintiffs' allegations regarding the no-hire agreements are deficient because the CAC does not plead "a communication or meeting between or among Defendants." Mot. at 22. But Defendants offer no rationale or authority for their position that Plaintiffs must plead indirect evidence of agreement (namely communications) *when they have directly pleaded the existence of the agreements themselves*;[16] and indeed that is not the law. *See, e.g., Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *31 (E.D.N.Y. Nov. 20, 2019) (Brodie, J.) (contrasting the Ninth Circuit rule suggesting that a complaint "should answer the basic questions of who, did what, to whom (or with whom), where, and when" with the Second Circuit which "does not require such specificity" (internal quotations omitted). Moreover, Defendants not only admit Saks has distribution agreements with each Brand Defendant (which were necessarily preceded by communications), but as discussed below, Defendants say that the no-hire agreements were necessary to their lease agreements. *Infra* at

———————————————

[15] Further, the recruiting agencies' statements acknowledging the no-hire agreements buttresses the plausibility of the Conspiracy. *See* CAC ¶¶ 173-81. Such allegations raise the reasonable inference that Defendants entered into the no-hire agreements comprising the Conspiracy.

[16] Defendants cite *Concord Associates, L.P. v. Entertainment Properties Trust*, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014), for the proposition that Plaintiffs must raise the inference that each Defendant "purposefully joined the conspiracy." Mot. at 22. But the case does not stand for the proposition that Plaintiffs must plead the "who, what, when, [and] where" as Defendants demand because the *Concord* plaintiffs only alleged the defendants had a "motive" to conspire. 2014 WL 1396524, at *23. Here, by contrast, in addition to Defendants' motives, Plaintiffs allege that Defendants admitted their participation in the Conspiracy and/or that their involvement was common knowledge among recruiting agencies in the industry.

Sec. IV.A.3.a. Indeed, "opportunity to conspire" is a classic category of circumstantial evidence of a conspiracy,[17] and there is no question that Defendants had the opportunity to conspire in the course of their admitted business relationships.

Second, Defendants argue that Plaintiffs have not sufficiently alleged each Defendant's involvement in the Conspiracy. *See* Mot. at 21-22 & 45-49. As set forth above, Plaintiffs allege that each Brand Defendant either admitted to having a no-hire agreement with Saks, or that a third-party recruiting agency acknowledged the existence of that Defendant's no-hire agreement, or both. *Supra* at 1, 7-8, 11-12, 13-14. Additionally, Plaintiffs allege five nearly identical bilateral agreements involving the same ringleader (Saks) and same terms across all Brand Defendants. Taking Plaintiffs' allegations as a whole, *Apple*, 791 F.3d at 319, these factual allegations render Plaintiffs' allegation of an overarching conspiracy more than just plausible— indeed, it is improbable that these substantively identical agreements are all independent and not part of the overarching Conspiracy. Regardless, at the pleading stage, courts routinely find complaints with less direct evidence and uniformity sufficient to render an overarching agreement plausible. *See, e.g., In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *8 (E.D.N.Y. Sept. 22, 2010) ("No defendant goes unmentioned in the complaint. Each is alleged to have engaged in some specified conduct, even if in the defendants' eyes it amounts to very little. Thus, when the complaint is viewed as a whole, it states a plausible claim that there was a conspiracy, and that it was joined by all of the moving defendants." (citing *Continental Ore Co.*, 370 U.S. at 699); *Hinds County, Miss. v. Wachovia Bank, N.A. ("Hinds County II")*, 700 F. Supp. 2d 378, 397 (S.D.N.Y. 2010) ("That the allegation regarding [one

_____

[17] *See, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 (3d Cir. 1993) (citing William C. Holms, 1992 Antitrust Law Handbook § 1.03[3], at 154)).

defendant] is not pled with the same specificity as other Defendants does not undermine the plausibility of [that one defendant's] involvement and the 'reasonable expectation that discovery will reveal evidence of illegal agreement.'" (quoting *Twombly*, 550 U.S. at 556));[18] *In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681, at *4 (E.D.N.Y. Sept. 28, 2016) (allegations of agreement between two of three defendants sufficient to state overarching conspiracy because "every defendant need not have taken part in each aspect of the conspiracy for plaintiffs to allege an agreement");[19] *In re Broiler Chicken Grower Litig.*, No. 6:17-cv-33, ECF No. 268 at 38-40 (E.D. Okla. Jan. 8, 2020) (no-poach allegations analyzed individually would not be upheld but sufficed as evidence of overarching conspiracy).[20]

---

[18] Defendants cite an earlier *Hinds County, Miss. v. Wachovia Bank N.A.* decision ("*Hinds County I*"), 620 F. Supp. 2d 499 (S.D.N.Y. 2009), that dismissed the original complaint (with leave to replead) alleging an agreement was "made at some unidentified place and time are insufficient to establish a plausible inference of agreement." *See* Mot. at 23. The complaint that was the subject of that first decision "contain[ed] no factual averments as to the majority of the . . . Defendants . . ." *Hinds County I*, 620 F. Supp. 2d at 513. Following the plaintiffs' amendment, the defendants moved to dismiss again, arguing that "the allegations fail[ed] to specify the who, when or where of each allegation of conspiratorial conduct." *Hinds County II*, 700 F. Supp. 2d at 394. This time, the court upheld the allegations of the amended complaint, noting that "plaintiffs must allege simply a factual basis sufficient to establish a plausible inference of an anticompetitive agreement among defendants . . . [and the] complaint must adequately allege the plausible involvement of each defendant . . . but it need not be detailed with overt acts by each defendant." *Id.*

[19] BC attempts to distinguish *In re Dental Supplies* by arguing that Plaintiffs' claims against it "presupposes" that BC participated in the Conspiracy "based just on Brunello Cucinelli [] not responding to Plaintiff Giordano's unsolicited job application." Mot. at 47 n.25. But Plaintiffs' do not rely solely on BC's refusal to hire Plaintiff Giordano. *See, e.g.*, CAC ¶¶ 173-81 (describing statements of third-party recruiting agencies). Taken together with the other allegations as to the overarching conspiracy, Plaintiffs sufficiently plead BC's involvement.

[20] Defendants' reliance on *Tera Group., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *11 (S.D.N.Y. July 30, 2019), Mot. at 21, is misplaced. The *Tera* court found that "[w]hile collective allegations about 'Dealer Defendants' that lack allegations about a particular Defendant should be discount[ed] as worthy of less weight relative to detailed claims, they may nevertheless be taken into account, alongside more specific allegations, in determining whether Tera has pleaded a plausible Section 1 conspiracy." 2019 WL 3457242, at *11 (internal quotations omitted). The court then dismissed certain defendants only where there were no allegations that the individual defendant participated in the conspiracy. Here, Plaintiffs provide detailed allegations concerning each Defendant's

Third, Defendants argue that the Conspiracy "defies common sense"[21] because Plaintiffs allege only one-way restraints (*i.e.*, that Brand Defendants agreed not to hire Saks's LREs, but Saks was not restrained from hiring Brand Defendants' LREs). Mot. at 22-23.[22] Putting aside that Defendants invite the Court to make impermissible inferences against Plaintiffs, the CAC explains: (1) the benefits of lateral recruiting in a competitive labor market, CAC ¶¶ 52-64, and (2) how restricting LRE mobility suppresses compensation to *all* LREs. *E.g.*, *id.* ¶¶ 65-85, 94,

---

participation in the Conspiracy, as well as the specific terms of the no-hire agreements to which each Defendant agreed, and the common, unlawful goal (suppressing LRE mobility and compensation) of each no-hire agreement. *Tera* requires no more.

[21] BC cites *Fonseca v. Hewlett-Packard Co.*, 2020 WL 4596758 (S.D. Cal. Aug. 11, 2020), in arguing that Plaintiffs' allegation that BC's store manager accepted Plaintiff Giordano's application is logically inconsistent with BC's participation in the conspiracy. The *Fonseca* court found the plaintiff's allegations that two horizontal competitors (for both their products and labor) entered into a no-poach agreement were "conclusory" and based only on the bald assertions that the defendants ceased hiring each other's employees and that they shared pay scales (which the plaintiff alleged were publicly available). *Id.* at *8. Although the court emphasized that one defendant paid more than the other such that "it [was] not plausible that anyone would leave" the higher-paying defendant for the other, and thus the higher-paying defendant had no need to enter the no-poach agreement, the reasoning cannot overcome the Brand Defendants' (and recruiting agencies') admissions that the no-hire agreements exist here or Defendants' admission in the Motion that the Brand Defendants' and Saks's distribution agreements render the no-hire agreements "necessary."

[22] The fact that "a market restriction promise is unilateral rather than bilateral does not determine whether" the restriction violates the antitrust laws. *See* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ("Areeda & Hovenkamp") ¶ 2134d (4th & 5th Eds. 2013-2020). "For example, a firm might pay a rival money to exit from its territory or to stop selling a particular product or service. Or a potential rival might be paid to refrain from entering. In such case the payee's gain is of course the payment itself, but the payor's gain would be the higher prices or output that flow from the payee's lack of competition." Thus, regardless whether the Brand Defendants pay sub-competitive compensation due to the no-hire agreements—which economic theory suggests they do, *see, e.g.*, *Nitsch v. Dreamworks Animation SKG, Inc.*, 315 F.R.D. 270, 292-93 (N.D. Cal. 2016) (discussing plaintiffs' documentary and expert evidence showing that the absent the defendants' anti-solicitation agreements, there would be "widespread increases in employee compensation across the labor market")—the Brand Defendants receive the benefits from the Conspiracy that make it worth agreeing not to hire the Saks's LREs. Such arrangements violate the antitrust laws, just as a generic drug manufacturer who receives a payment to delay generic entry from a brand name drug manufacturer does. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) (pay-for-delay agreements can violate the antitrust laws where "the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market").

99-104. That Saks pays LREs less than the Brand Defendants pay LREs with the one-way restraints in place is evidence of their effectiveness: under the Conspiracy, Saks's LREs have less mobility than Brand Defendants' LREs. But the compensation effects are not limited to Saks: suppressing LRE compensation at a large LRE employer like Saks removes significant competitive pressure on the Brand Defendants' LRE pay as well. If Saks were a more desirable employer for Brand Defendants' LREs (because, for example, Saks paid more absent the Conspiracy), the Brand Defendants would need to raise their own wages to prevent Saks from poaching or hiring their LREs.[23]

Absent the Conspiracy's restraint on hiring, Saks *and* the Brand Defendants would compete for LREs and would both raise wages closer to competitive levels. CAC ¶¶ 65-85; *e.g.*, *In re High-Tech Emp. Antitrust Litig*, 985 F. Supp. 2d 1167, 1201-05 (N.D. Cal. 2013) (holding anti-solicitation agreements "reached beyond individual" employees who would have been solicited and "affected the compensation of the . . . Class as a whole, including across Defendant firms"); *Nitsch*, 315 F.R.D. at 293 (absent anti-solicitation agreements, compensation would have increased "within a firm and beyond"). Thus, if Saks raised wages to compete with the Brand Defendants (which Saks would need to do to retain employees absent the Conspiracy

---

[23] LP argues that the difference in compensation evidences LP being in a different market from Saks. Mot. at 49. Not so, and LP misstates the market analysis. First, as Plaintiffs have just observed, the wage difference is likely *caused by the Conspiracy*: the no-hire agreements prevent the Brand Defendants from hiring Saks's LREs, thereby artificially deflating Saks's LRE wages even more than it artificially deflates the Brand Defendant LRE wages. Second, *as Plaintiffs allege*, even with the Conspiracy there is some minor level of mobility between Saks and the Brand Defendants, Mot. at 22-23 (citing CAC ¶¶ 108, 129, 185), so it follows that even more Saks's LREs would take jobs at the Brand Defendants absent the Conspiracy, in part in search of the relatively higher wages. And, third, if the Defendants did not compete for LREs in the same market, the no-hire agreements that they claim are necessary to their lease and distribution agreements would not be "necessary" as they all claim they are.

here), the Brand Defendants would have to preemptively raise wages to retain LREs. CAC ¶¶ 65-85. *See, e.g.*, *Seaman*, 2018 WL 671239, at *5 (accepting expert opinions that lateral hiring competition would encourage defendants to "preemptively increase compensation to retain faculty").[24] And these compensation effects apply to all LREs irrespective of whether the Brand Defendants (or Saks) would hire any particular LRE absent the agreements. *See, e.g.*, *In re High-Tech*, 985 F. Supp. 2d at 1205; *Nitsch*, 315 F.R.D. at 293.

---

[24] Defendants cite a series of inapposite cases that dismiss claims courts found to be economically implausible. Mot. at 23, 46. In *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, the plaintiff bodybuilding vitamin supplement manufacturer alleged that a competitor entered into an exclusive agreement with the dominant bodybuilding magazine publisher pursuant to which the defendant manufacturer was the sole supplement manufacturer permitted to advertise in the magazine. 516 F. Supp. 2d 270, 281 (S.D.N.Y. 2007). The plaintiff alleged that the agreement enabled the manufacturer defendant to maintain supracompetitive prices for supplements, while also alleging that the market for supplements was "highly competitive." *Id.* at 294-95. The court reasoned that "a highly competitive market with reasonably interchangeable products is not one where supracompetitive pricing can be easily maintained." *Id.* at 295. The agreements at issue in *Wellnx* were vertical, not horizontal like the ones in this case, and thus the court was correct to inquire into the economic theory of harm to competition. Here, the horizontal agreements are comparable to (and indeed more restrictive than) to those repeatedly found to be per se illegal and capable of harming competition in the manner alleged here. *E.g.*, *In re High-Tech*, 856 F. Supp. 2d 1103; *Railway No-Poach*, 395 F. Supp. 3d 464. Defendants also cite the *Aluminum Warehousing Antitrust Litigation*, in which the plaintiffs alleged that the defendants had stockpiled aluminum to drive up prices. 2014 WL 4277510, at *29 (S.D.N.Y. Aug. 29, 2014). The court found that "the allegations tell a story consistent with market-driven behavior by traders and warehouses," and that "it [did] not make economic sense . . . for defendants to have conspired to achieve an end that the law of supply and demand, combined with the passage of time, would have itself achieved in the absence of a conspiracy." *Id.* By contrast, here, the allegations are that the Brand Defendants refused to hire Saks's LREs due to the no-hire agreements, hiring that would have occurred absent the illegal agreements. *See, e.g.*, CAC ¶ 62. Indeed, Defendants argue not only that such hiring would logically and naturally occur absent the challenged conspiracy, but also that preventing the flow of employees from Saks to the Brand Defendants was so important that Saks would not distribute or allow the Brand Defendants to distribute their goods in Saks stores without having such assurances. *See infra* at Sec. IV.A.3.a. Defendants further cite *Car Carriers, Inc. v. Ford Motor Co.*, in which a car transport company sued manufacturer which had terminated the transport company's contract in favor of another transport company. 745 F.2d 1101 (7th Cir. 1984). The court found that it was implausible that the manufacturer would conspire to eliminate a transport service provider with the goal of allowing another transport service provider to charge noncompetitive prices. *Id.* at 1109. Here, Plaintiffs allege that the Defendants entered into horizontal agreements to limit LRE mobility and suppress LRE wages, anticompetitive restraints that benefit the Defendants and are not obtainable through competition.

Fourth, Defendants argue the Conspiracy is implausible because the CAC alleges some employee mobility notwithstanding the Conspiracy, pointing to allegations that LREs "were hired by Saks from Brand Defendants," LREs were "hired by Brand Defendants from Saks," and LREs "left Saks to go to luxury retailers other than the Brand Defendants." Mot. at 22-23 (citing CAC ¶¶ 108, 129, 185) (emphasis omitted). No reasonable reading of the CAC suggests substantial LRE mobility, and in any event, the relevant question is not the degree of mobility in the actual world, but instead whether the degree of mobility was materially reduced relative to a world without the Conspiracy. Contrary to Defendants' suggestion, that a Plaintiff worked at a Brand Defendant and then moved to Saks is consistent with the allegations of the CAC—which allege one-way restraints. The lone allegation concerning a Saks's LRE who was hired by a Brand Defendant concerned an LRE who followed the process the no-hire agreements required: obtaining permission of the Saks LRE's manager. CAC ¶ 129 & Ex. B. Such permission provisions were part of the illicit agreements in *In re High-Tech* and thus do not "def[y] common sense." *See* 985 F. Supp. 2d at 1188 (referring to Pixar agreeing to seek Apple's permission before making offers to Apple employees). Further, it is irrelevant to the plausibility of the alleged Conspiracy that one Plaintiff managed to obtain employment with a non-conspirator luxury brand. *See* CAC ¶ 185. Indeed, the allegation is consistent with the existence of the Conspiracy—*i.e.*, it might be why that employee had to seek employment outside of the cartelists. Regardless, none of the allegations cited by Defendants is inconsistent with Plaintiffs' alleged Conspiracy.

Fifth, Defendants argue that Plaintiffs' CAC is insufficient because it does not include specific statements of thousands of employees across hundreds of stores. There is no such requirement at the pleading stage, and Defendants cite no case requiring that level of detail.

Indeed, direct evidence is not even required to *prove* a conspiracy, let alone plausibly allege one. *Mayor and City Council of Baltimore*, 709 F.3d at 136. The question at the pleading stage is whether the alleged nationwide scheme is plausible, and Plaintiffs' allegations of direct evidence, from three stores in different areas of the country, as well as two recruiting firms, all involving the same parties and identical terms with no geographic limitations, are more than sufficient to plausibly allege a nationwide conspiracy. Indeed, Defendants argue that they entered into these agreements as part of nationwide business arrangements, *infra* at Sec. IV.A.3.a., which *supports* Plaintiffs' allegations.[25]

### 2. The Conspiracy is *per se* illegal.

Consistent with decisions of multiple courts addressing similar or even less restrictive no-hire or no-poach agreements, Defendants' naked no-hire agreements, and corresponding overarching Conspiracy of which they are a part, constitute a *per se* violation of the Sherman

---

[25] Defendants' cited cases are inapposite. Defendants argue that this case "resembles" *Frost v. LG Electronics Inc.*, 2017 WL 1425919 (N.D. Cal. Apr. 21, 2017). Mot. at 27, 45. Not so. In *Frost*, the court found that "the complaint fails to adequately allege an actionable conspiracy at least because the allegations are vague and lodged against all Defendants as a group." *Id.* at *1. In *Frost*, the "facts" upon which the claim was based included anonymous unattributed guesses that the conspiracy existed, vague assertions of Korean corporate culture, and a newspaper article from India. *Id.* at *1-2. Here, by contrast, Plaintiffs have specific allegations as to each Defendant, including specific bases upon which the Court can conclude there is a plausible case that each Brand Defendant entered into a no-hire agreement with Saks—and as discussed *infra*, Defendants admit that they believe (erroneously) these no-hire agreements are "reasonably necessary" to their business relationship. Further, the *Frost* court faulted the plaintiffs for not alleging the "who, did what, to whom . . . where, and when," a standard applicable in the Ninth Circuit, but not here. *See, e.g.*, *Barry's Cut Rate Stores*, 2019 WL 7584728, at *31. Defendants further argue that the *pro se* case *Ulrich v. Moody's Corp.*, 2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014), compels dismissal here. Also wrong. The basis of the *Ulrich* plaintiff's allegations of a no-poach agreement was "an informal investigation" he performed that searched online job advertisements for analytical positions from two competitors (Moody's and S&P). The plaintiff reasoned that because (1) none of the listings mentioned prior work experience at a rating agency as a qualification, and (2) Moody's re-hired employees who had left the company only to re-join it later, coupled with hearsay from a former Moody's executive in New York and an external recruiter in Hong Kong, a no-poach agreement existed.

Act.[26] "There are certain agreements . . . which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Such violations are called "*per se*" violations. *Id.* Under the *per se* mode of analysis, courts can "avoid[] the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable . . . ." *Id.*

The Supreme Court has explained that "[o]ne of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition," *i.e.*, a "market division" or "market allocation" agreement.[27] "Antitrust law does not treat employment markets differently from other markets." *eBay*, 968 F. Supp. 2d at 1039. "An agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a

---

[26] Defendants cite *Ulrich* for its discussion distinguishing "no-hire"/"no-switching" agreements from agreements that receive *per se* treatment. Mot. at 29. But *Ulrich* analyzes the alleged no-hire agreements as a "subset of covenants not to compete," (relying on cases concerning ancillary agreements relating to business unit sales—distinguishable for the reasons discussed *supra*—and decades-old cases analyzing "no-switching" agreements as "group boycotts") rather than as a market division. The cases (and Guidance) over the last ten years have predominantly viewed no-hire/no-poach agreements between independent, horizontal competitors in the labor market as market divisions subject to *per se* treatment. *E.g.*, *Railway No-Poach*, 395 F. Supp. 3d at 481-82; *In re High-Tech*, 856 F. Supp. 2d 1103; *In re Animation Workers*, 123 F. Supp. 3d 1175; *eBay*, 968 F. Supp. 2d 1030. Further, because the *pro se Ulrich* plaintiff lacked standing to challenge the alleged no-poach agreement (and had also failed to allege sufficient facts that the agreement even existed), the *Ulrich* commentary on whether no-hire agreements are subject to *per se* treatment is unpersuasive *dicta*.

[27] *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *see also N.Y. ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 415 (S.D.N.Y. 2000) ("Defendants' agreement to allocate patients among themselves and divide the market for hospital services is the paradigm of the horizontal market division that the Supreme Court has deemed per se illegal.").

market-division agreement." Areeda & Hovenkamp ¶ 2013b. "If such agreements are horizontal, naked, and among independent firms, they are unlawful per se." *Id.*[28]

In October 2016, the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") released "Antitrust Guidance for Human Resource Professionals," which provided that "[a]n agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to . . . job opportunities." *See* Antitrust Guidance for Human Resource Professionals (the "Guidance") (Oct. 2016), *available at* https://www.justice.gov/atr/file/ 903511/download. More specifically, "firms that compete to hire or retain employees are competitors in the marketplace, regardless of whether the firms make the same products or compete to provide the same services" and thus "[i]t is unlawful for competitors to expressly or implicitly agree not to compete with one another . . . ." *Id.* at 2.[29] The Guidance further explicitly recognizes that "[e]ven if an individual does not agree orally or in writing to limit employee … recruiting, other circumstances – such as evidence of discussions and parallel behavior – may lead to an inference that the individual has agreed to do so." *Id.* at 3. The Guidance then makes clear that these "[n]aked . . . no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws." *Id.*[30]

---

[28] *See also, e.g.*, *Railway No-Poach*, 395 F. Supp. 3d at 481-82; *In re High-Tech*, 856 F. Supp. 2d at 1122; *In re Animation Workers*, 123 F. Supp. 3d at 1202.

[29] *See also id.* at 3 ("An individual is likely breaking the antitrust laws if he or she: . . . agrees with individual(s) at another company to refuse to solicit or hire that other company's employees (so-called 'no poaching' agreements).").

[30] Defendants cite the Guidance only to argue that if Defendants' no-hire agreements are ancillary to a "larger legitimate collaboration between the employers," then the no-hire agreements must be analyzed under the rule of reason. But (1) the no-hire agreements are not ancillary to the distribution relationships, (2) Defendants have failed to identify the facts necessary for the Court to conclude

Defendants' Conspiracy is a *per se* violation of the Sherman Act, and thus Plaintiffs need not prove market power or harm to competition. Indeed, a plaintiff "need not prove an actual lessening of competition in order to recover" for a *per se* claim under the antitrust laws.[31] As the Second Circuit has accordingly recognized, "[i]f *proof* of harm to competition is not a prerequisite for recovery, it follows that *allegations* pleading harm to competition are not required to withstand a motion to dismiss when the conduct challenged is a *per se* violation." *Gelboim v. Bank of Am. Corp.,* 823 F.3d 759, 776 (2d Cir. 2016) (emphasis original). The Second Circuit in *Gelboim* then proceeded to adopt the Third Circuit's holding that relevant market analyses are not required in *per se* cases:

> [W]e believe that requiring a plaintiff to demonstrate that an injury stemming from a per se violation of the antitrust laws caused an actual adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a per se violation into a case to be judged under the rule of reason.... Implicit in the [Supreme] Court's approach is that a plaintiff who had suffered loss as a result of an anticompetitive aspect of a per se restraint of trade agreement would have suffered antitrust injury without demonstrating that the challenged practice had an actual, adverse economic effect on a relevant market.

*Id.* (quoting *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123-24 (3d Cir. 2000); *see also* Areeda & Hovenkamp ¶ 1511b ("In most per se cases a relevant market need not be defined or proven . . . .")). Plaintiffs allege a conspiracy consisting of bilateral no-hire agreements between Saks and the Brand Defendants (horizontal competitors for LRE services), which is a *per se* violation of the Sherman Act and requires no pleading (or, ultimately, proof) of a relevant

---

otherwise, and (3) such determinations should not be made at the pleadings stage even if Defendants were correct. *See infra* at Sec. IV.A.3.a.

[31] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984) ("As a matter of law, the absence of proof of market power does not justify a naked restraint on price or output . . . [N]o elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." (internal quotations omitted)).

market or anticompetitive effects.[32]

Defendants argue that under "either the rule of reason or the *per se* standard, a plaintiff must plausibly allege . . . the relevant market where that agreement has anticompetitive effects." Mot. at 20. Defendants rely on a single case for the proposition, *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999), which held that "it is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur." Mot. at 20.[33] Defendants overread *Hodgkins*, which merely stands for the proposition that for a court to determine that an alleged agreement is a *per se* violation, the plaintiff must "describe the market." Without a description of the market, the court cannot, for example, determine that the defendants

―――――――――――――――

[32] *See also Meredith Corp. v. SESAC, LLC*, 2011 WL 856266, at *12 n.13 (S.D.N.Y. Mar. 9, 2011) ("In antitrust cases governed by a per se analysis, 'it is well settled that plaintiff is excused from defining the relevant product market.'"); *In re European Rail Pass Antitrust Litig.*, 166 F. Supp. 2d 836, 844 (S.D.N.Y. 2001) ("Because this case is one of alleged horizontal price-fixing and therefore governed by the *per se* analysis, it is well settled that 'plaintiff is excused from defining the relevant product market.'"); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 40 F. Supp. 2d 109, 116 (E.D.N.Y. 1999) ("In contrast [to rule of reason], under the *per se* rule the plaintiff is excused from defining the relevant product market."); *Ortho Diagnostic Systems Inc. v. Abbott Labs., Inc.*, 822 F. Supp. 145, 157 (S.D.N.Y. 1993) ("The basic difference between the [per se and rule of reason] approaches lies into the extent to which a court must examine the actual effect on competition which an allegedly anti-competitive business practice has. Under the rule of reason test, the court must determine the competitive impact of a particular practice in the context of a relevant market. Under the per se rule, a court does not conduct this extensive inquiry, because the practice in question has been held to be manifestly anti-competitive."); Areeda & Hovenkamp ¶ 1910a ("Courts often say that a 'naked' horizontal restraint is illegal 'per se.' What this label means in practice is that [] neither a relevant market nor an estimate of the defendants' market power must be established in order to prove that the restraint is unlawful…."); *id.* ¶ 1910c1 ("[A]n important advantage of the per se inquiry is that it dispenses with the need to define a relevant market . . .").

[33] The *Hodgkins* statement concerning relevant markets relies solely on two prior Second Circuit decisions concerning monopolization claims under Section 2 of the Sherman Act. *See Hodgkins*, 166 F.3d at 515 (citing *Belfiore v. New York Times Co.*, 826 F.2d 177, 180-81 (2d Cir. 1987); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 840 (2d Cir. 1980)). It is well established that Section 2 monopolization claims require the plaintiff to define a relevant market and thus have nothing to do with the *per se* analysis under Section 1 of the Sherman Act. *See, e.g., Belfiore*, 826 F.3d at 180 ("Monopolization . . . requires a showing of two elements: (1) the possession of monopoly power **in the relevant market** and (2) the willful acquisition or maintenance of that power . . ." (emphasis added) (internal quotations omitted)).

are horizontal competitors for labor. But this is separate from the exercise of "defining" a relevant market for purposes of establishing market power, which detailed exercise is required for non-*per se* claims to evaluate the impact of the defendants' conduct on competition—*i.e.*, to evaluate anticompetitive effects.[34] Further, *Hodgkins* recognizes that in a *per se* case, anticompetitive effects are "presume[d]," 166 F.3d at 515, and thus there is no need to plead or prove market power. This is because horizontal agreements not to compete, which is what Plaintiffs allege here, are deemed to be *per se* anticompetitive, and thus, the inquiry into the relevant market definition as a means to determine market power and anticompetitive effects is unnecessary. *See Gelboim*, 823 F.3d at 776. Here, Plaintiffs more than meet their *Hodgkins* burden by "describing" the market sufficiently to evaluate the participants' relationships, *i.e.*, that they are horizontal competitors in the labor market for LREs. *See* CAC ¶¶ 39-40, 94, 100, 102, 105, 194.

### 3. Defendants' arguments that the rule of reason applies are wrong.

Defendants argue that *per se* treatment is inappropriate and that the Court should, instead, apply the rule of reason as a matter of law.[35] Specifically, Defendants argue their no-hire agreements are "ancillary" to the Brand Defendants' distribution and lease arrangements with Saks, and even if the no-hire agreements are not ancillary, the distribution arrangements between Defendants warrant application of the rule of reason. These arguments are without merit.

### a. The no-hire agreements are not ancillary.

The Conspiracy consists of naked no-hire agreements between horizontal competitors for LRE services; the agreements are not ancillary to a legitimate procompetitive collaboration. The

---

[34] *See, e.g., United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 896 (S.D.N.Y. 1965) (citing *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586, 592 (1957)).

[35] As set forth *infra* at Sec. IV.B.2, Plaintiffs meet the rule of reason standard anyway.

so-called ancillary restraints doctrine "governs the validity of restrictions imposed by a business

collaboration . . . on nonventure activities." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006). "Under

the doctrine, courts must determine whether the nonventure restriction is a naked restraint on

trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the

business [collaboration]." *Id.* To be "ancillary" the challenged restraint must be "reasonably

necessary to achieve any of the efficiency-enhancing purposes" of the collaboration. *MLB

Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, C.J., concurring).[36]

Defendants cannot not meet these requirements, and certainly not on a motion to dismiss.

Defendants assert that the "lease, concession and/or distribution relationship[s]" that Saks

has with the Brand Defendants (together, "distribution relationships") constitute legitimate,

*nationwide*, business collaborations to which their no-hire agreements are necessary to achieve

the distribution relationships' efficiency-enhancing purposes. *See* Mot. at 28.[37] Defendants'

---

[36] As the seminal antitrust treatise articulates the test: "Determining ancillarity requires the tribunal to consider *first*, whether any aspect of the defendants' association contains a significant promise of integration or cooperation yielding an increase in output[, and *s]econd*, some determination must be made whether the challenged agreement is an essential part of this arrangement, whether it is important but perhaps not essential, or whether it is completely unnecessary." Areeda & Hovenkamp ¶ 1908b (emphasis original). But "the 'essentiality' query made at this early stage considers [only] whether the challenged restraint is an inherent feature of the joint venture at all, or simply an unnecessary output-limiting appendage." *Id.*

[37] Defendants rely on *Polk Bros. Inc. v. Forest City Enterprises, Inc.*, Mot. at 28, a case in which two retailers agreed to sell their products in a *single store* with an ancillary agreement (that they entered into contemporaneously with commencing the venture) not to compete with each other's products within the joint store. 776 F.2d 185, 188-89 (7th Cir. 1985). The no-hire agreements here are much broader than a single store and apply not only within Saks stores but also at the Brand Defendants' standalone stores. CAC ¶¶ 106-191, 197-207. Further, unlike *Polk Bros.*'s single location agreement, the no-hire agreements here apply to all stores nationwide and therefore having a greater likelihood of substantial anticompetitive effects. To the extent *Polk Bros.* is relevant at all here, it is to identify the type of agreement that could be ancillary to the Brand Defendants' distribution relationships. Specifically, under *Polk Bros.*, ancillary agreements must be entered into at the same time as the principal agreement. *Id.* at 189. There is no basis in the CAC on to conclude that the no-hire agreements were consummated at the same time as the initial distribution relationships—nor have

ancillarity argument fails for four reasons.

First, the argument improperly relies almost entirely upon facts that outside of the CAC and on arguments that require the Court to resolve conflicting inferences. Courts routinely deny motions to dismiss based on the ancillary restraints doctrine because they require the court to go beyond the question of whether the claim is plausible. *See, e.g.*, *eBay*, 968 F. Supp. 2d at 1039-40 (holding that "[t]aking the allegations in the Complaint as true, the court cannot determine as a matter of law that per se treatment will be inappropriate [due to the ancillary restraints doctrine]" in no-poach case); *see also Aya Healthcare*, 2018 WL 3032552, at *17 (declining to determine whether an agreement is ancillary at the pleadings stage in no-hire case);[38] *In re Delta Dental*, 2020 WL 5296996, at *5 (declining to apply ancillary restraints doctrine because it is

---

Defendants argued that to be the case. Further, subsequent Seventh Circuit law makes clear that *Polk Bros.* does not apply if the no-hire agreements were not contemporaneous with the initial distribution relationships. *See Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (holding market allocation agreement entered into by former law firm partners after dissolution of their partnership was distinguished from *Polk Bros.*, because (1) "at the time [the agreement] was entered it was not necessary for the dissolution of the partnership," and (2) the agreement's "infinite duration" undermines any claim that the agreement was ancillary to the dissolution). In any event, *Polk Bros.* was decided after a bench trial and Seventh Circuit courts decline to apply it at the pleadings stage. *See, e.g.*, *In re Delta Dental Antitrust Litig.*, 2020 WL 5296996 (N.D. Ill. Sept. 4, 2020).

[38] Defendants attempt to distinguish *Aya Healthcare* by arguing that the agreements had a longer term (in perpetuity) than Defendants' agreements here. Mot. at 28 n.18. First, Defendants no-hire agreements are perpetual in the same sense referred to by *Aya Healthcare*. Defendants' no-hire agreements are in place in that so long as the LRE is employed by Saks, the LRE cannot be hired by a Brand Defendant. It does not matter whether the LRE has worked at Saks for six months or 30 years: the no-hire agreements prohibit the Brand Defendants from hiring the Saks LRE. The six-month limitation to which Defendants refer concerns the length of time the Saks LRE must have been separated from employment at Saks to be eligible to work at a Brand Defendant. In *Aya Healthcare* the restraints at issue did not apply after a subject employee left its employment. Defendants further imply that *Aya Healthcare* is distinguishable because it involved horizontal competitors. Mot. at 28 n.18. But the *Aya* defendants like Defendants here are horizontal competitors in the labor market. *See, e.g.*, *eBay*, 968 F. Supp. 2d at 1039 (finding government sufficiently alleged horizontal market allocation agreement when it alleged a no-poach agreement between two employers); Guidance at 2 ("firms that compete to hire or retain employees are competitors in the marketplace, regardless of whether the firms make the same products or compete to provide the same services").

"difficult[ to] answer[ ] this question at the pleadings stage").

Second, there is no basis in the CAC on which the Court could conclude that the no-hire agreements are ancillary to the distribution relationships between Saks and each of the Brand Defendants. The closest Defendants come to articulating such basis is by arguing:

> Inside a department store, a Brand Defendant is able to take advantage of the efforts [Saks] has expended in soliciting interviewing, and training skilled labor, while simultaneously inflicting a cost on [Saks] by removing an employee on whom [it] may depend. To address this inefficiency, Plaintiffs themselves allege that Defendants adopted narrowly tailored agreements that allow for hiring at any time by any Brand Defendant if they obtain approval from Saks… or after [after the Saks employee leaves Saks's employ for] six months.

Mot. at 30 (citing CAC ¶¶ 62-63, 75, 132) (internal quotations omitted). Defendants' suggestion that the distribution relationships create this "inefficiency" is merely a rationale for no-hire agreements across the board. Embedded in this argument is a key admission that each Brand Defendant has a distribution relationship with Saks that purportedly would not exist absent an "ancillary" no-hire agreement. Given that the distribution relationships exist, then, so must the no-hire agreements by Defendants' own logic. Indeed, Defendants' professed belief that the no-hire agreements are *necessary* for the Brand Defendants to distribute their products through retail outlets is a concession not only that the agreements exist, but also that such agreements must be systematic across every retail outlet. The logic of Defendants' argument is that they would not, and could not, collaborate on distribution *anywhere* absent the no-hire agreements that are at the heart of this case. The argument further implicitly concedes that LREs have leverage absent the no-hire agreements; in other words, by arguing that Defendants' no-hire agreements are *necessary* to distribution relationships, Defendants concede that the agreements impair LRE mobility (because the "necessary" agreements must prevent Saks's LREs from moving to the Brand Defendants). By admitting that they have these agreements, that they are consistent across the country, and that they have the alleged anticompetitive effects on mobility, Defendants

concede the plausibility of Plaintiffs' claim.[39]

Third, the no-hire agreements are much broader than the limited justification Defendants proffer. Specifically, the no-hire agreements as described by Defendants and independent recruiters are not restricted to the Brand Defendants' operations in the particular stores in which the Saks's LREs work. CAC ¶¶ 106-191, 197-207. Such broad restraints are not narrowly tailored to the purported "inefficiency" Defendants identify (with facts outside of the CAC). *See, e.g.*, *Eli Lilly and Co. v. Zenith Goldline Pharms., Inc.*, 172 F. Supp. 2d 1060, 1072 n.14 (S.D. Ind. 2001) (rejecting ancillarity of agreement that broadly applied to all sales was not "well-tailored to the task" like the agreement in *Polk Bros.*, which did not limit sales at locations in which the retailers were not collaborating); *see also U.S. v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898) ("[I]f the restraint exceeds the necessity presented by the main purpose of the contract, it is void . . . .").

Fourth, even if the Court were to accept as true Defendants' contention that the Conspiracy is necessary to their distribution relationships, that justification is invalid under longstanding Supreme Court precedent which holds that horizontal market divisions like these are *per se* violations irrespective of any legitimate collaboration. For example, in *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), two competing providers of bar review courses entered into an agreement whereby one sold the other an exclusive license to market the seller's materials in Georgia. The two further entered into a territorial market division, agreeing that the licensee

---

[39] And in fact, if the Court credits Defendants' assertion that the no-hire agreements are "necessary" to distribution relationships—thus finding that the Brand Defendants and every other luxury brand must have similar relationships with each retail outlet (*e.g.*, Bloomingdale's, Nordstrom's, Neiman Marcus)—Defendants' argument that the no-hire agreements cannot possibly restrain competition in a broad luxury retail market (discussed *infra*) cannot be credible.

would sell bar review services only in Georgia and the licensor would sell such services only outside of Georgia. *Id.* at 49. The Supreme Court found that the market division was a naked restraint subject to *per se* treatment notwithstanding the legitimate license agreement to which the territorial division was related. *Id.* Unlike *Palmer*, Defendants here offer no direct connection between the business collaboration's purpose (sale of Brand Defendants' products) and the no-hire agreements, which affects LRE services, because there is no such connection.

In *Topco*, the Supreme Court addressed a cooperative buying association ("Topco") formed by a group of small and medium sized regional supermarket chains to allow them to better compete with larger supermarket chains. 405 U.S. at 598. Topco's "basic function [wa]s to serve as a purchasing agent for its members," "procur[ing] and distribut[ing] to the members . . . different food and related nonfood items, most of which [were] distributed under brand names owned by Topco . . . ." *Id.* The government sued, alleging that the chains' entered into a naked market division agreement pursuant to which participating chains would not to sell Topco-controlled brands outside of the marketing territory allocated to each chain. *Id.* at 601-02. Topco argued that its brands were necessary for small and midsize supermarket chains to compete with larger regional and national chains, and that the market allocation was necessary to procuring the products for its private brands. *Id.* at 605. In other words, Topco had argued that it "actually increases competition by enabling its members to compete successfully with larger regional and national chains."[40] *Id.* The Supreme Court rejected the chains arguments and found the market

---

[40] Based on these arguments, the district court concluded that the restraints were "ancillary and subordinate to the fulfillment of the legitimate, procompetitive purpose of the Topco cooperative…." and dismissed the case. *United States v. Topco Assocs., Inc.*, 319 F. Supp. 1031, 1038 (N.D. Ill. 1970). The Supreme Court disagreed, finding the market allocation was a "horizontal territorial limitation[]" which is a "naked restraint[] of trade with no purpose except stifling of competition." *Topco*, 405 U.S. at 608. The Court faulted the District Court for "fail[ing] to make any determination

division agreement was *per se* illegal. *Id.* Unlike in *Topco*, Defendants have not argued that their

Conspiracy allows them to compete more vigorously with anyone in any way by suppressing the

mobility and pay of their employees. And even if Defendants could make such an argument, the

Conspiracy here, like the *Topco* market allocation agreement, is a naked restraint that is *per se*

anticompetitive.

### b. Defendants' other rule of reason arguments fail.

Defendants also argue that the rule of reason applies, even if the anticompetitive restraint

is not ancillary, "so long as the agreement is between companies that have both vertical and

horizontal aspects to their relationship." Mot. at 29. Not so. Defendants rely on irrelevant cases

involving "dual distribution" arrangements,[41] where the conspiring parties are horizontal

———————————

as to whether there were per se horizontal territorial restraints in this case and simply appl[ying] a rule of reason in reaching its conclusions that the restraints were not illegal." *Id.* "In applying these rigid rules [concerning per se violations], the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition." *Id.* at 610.

[41] Defendants also rely on *Ogden v. Little Caesar's Entertainers, Inc.*, 393 F. Supp. 3d 622, 640 (E.D. Mich. 2019), which concerns a particular "genre" of no-poach cases in which franchisors include "no-hire" agreements in their franchise agreements. Courts and antitrust regulators have struggled with how to analyze these cases because the agreements are vertical (between the franchisor and franchisee), restrain competition between otherwise horizontal competitors for labor (franchisees at the same level), yet involve a single brand. As a result, these circumstances have caused some courts to view the claims as relating only to intrabrand competition, and thus not *per se* claims. Here, the Brand Defendants and Saks are independent horizontal competitors (unlike franchisors-franchisees). But even if the franchisor no-poach agreements were analogous to the no-hire agreements between here, numerous courts in franchise no-poach cases have not followed *Ogden*'s approach. *See, e.g., Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 796 (S.D. Ill. 2018) ("*[T]he franchise agreements give the franchisees a contractual right to enforce the no-hire agreements directly against each other through the third-party beneficiary provision.* That is a horizontal agreement . . . And the effect of the scheme is two-fold: (1) a horizontal boycott of certain employees; and (2) a horizontal price-fixing scheme to suppress the price of labor for said employees . . ." (emphasis original)); *Blanton v. Domino's Pizza Franchising LLC*, 2019 WL 2247731, at *4-5 (E.D. Mich. May 24, 2019) (noting *per se*, quick look, or rule of reason could apply depending on factual development); *In re Papa John's*, 2019 WL 5386484, at * 9 (same); *Fuentes v. Royal Dutch Shell*, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019) (same).

competitors at the retail level, and also have a vertical supplier relationship (*e.g.*, where one defendant is both a retailer and a manufacturer that supplies the other defendant with products).[42]

Here, whether Defendants have a dual distribution arrangement—*i.e.*, whether Saks both sells the Brand Defendants products (a vertical relationship) and competes directly with them at retail—is irrelevant because the alleged Conspiracy does not cover the products sold by the Defendants. Rather, the Conspiracy covers LRE services, and there is no "dual distribution" relationship among the Defendants for LRE services—it is *only* a horizontal relationship.[43]

**B.      Even If *Per Se* Did Not Apply, Plaintiffs' Allegations Would Suffice**

**1.      Plaintiffs' allegations suffice under a "quick look" analysis.**

Were the Court not to determine the agreement to be a *per se* violation, the Court should evaluate the Plaintiffs' claims under the "quick look" approach. Under the quick look, the Court determines that a defendant's conduct is of the type that, while not *per se* illegal, appears so likely to have anticompetitive effects that it is unnecessary for a court to go through the full analysis.[44]  Here, the "inherently suspect nature of the restraint obviates the sort of elaborate

---

[42] *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC,* 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011) (defendants were both competing retail distributors of at-issue products and one defendant was the manufacturer-retailer's representative in dealing with other retailers); *Elecs. Commc'ns Corp. v. Toshiba Consumer Prods., Inc.*, 129 F.3d 240, 244 n.1 (2d Cir. 1997) ("The allegations in the complaint establish that [defendants'] relationship was essentially the same as the dual distribution relationships that have repeatedly been analyzed as vertical.").

[43] Further, cases involving competitors for labor that have other vertical relationships have applied the *per se* rule, not the rule of reason. *See, e.g., In re High Tech*, 856 F. Supp. 2d at 1122 (holding plaintiffs pled a *per se* violation based on horizontal agreements restraining employee mobility between tech companies that had vertical relationships, *e.g.*, Google distributed apps through the Apple App Store and paid Apple significant sums to make Google Search the default search engine on iPhones).

[44] *See California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) ("[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets"); *F.T.C. v. Ind. Federation of Dentists*, 476 U.S. 447, 459 (1986) (although the horizontal agreement to withhold a service from customers was not a per se violation, "no elaborate industry analysis is required to determine the anticompetitive

industry analysis required by the traditional rule-of-reason standard." *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) (internal quotation marks and citation omitted). Proof of market power is not required in the quick look analysis. *See Agnew v. NCAA*, 683 F.3d 328, 336 (7th Cir. 2012); Areeda & Hovenkamp ¶ 1914d1.

The restraints here, to the extent not deemed *per se* illegal (which they are), should be subject to the quick look approach. Some courts have deemed no-hire agreements imposed by franchisors on franchisees subject to quick look, whereas others have deemed the agreements *per se*. *See Fuentes*, 2019 WL 7584654 (discussing franchise cases and finding the cases suggesting *per se* (else quick look) is appropriate); *see also* discussion *supra* at n.41 concerning why Defendants' horizontal agreements are distinguishable from these vertical franchisor-franchisee restraints. Thus, at a minimum, if Defendants' no-hire agreements are not per se unlawful, they should be subject to quick look.

### 2. Plaintiffs' allegations also satisfy the rule of reason.

Were the Court to require that Plaintiffs' claims by analyzed under the "rule of reason"—it should not—Plaintiffs' CAC would still be sufficiently alleged.

Rule of reason analysis includes a three-step burden shifting approach. *Apple*, 791 F.3d at 329. The plaintiff first must show that the unlawful agreement produces anticompetitive effects. "The plaintiffs can make this showing directly or indirectly. Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 138 S.

---

nature of such an agreement"); *see also* Areeda & Hovenkamp ¶ 1911a ("What [the 'quick-look'] term is intended to connote is that a certain class of restraints, while not unambiguously in the per se category, may require no more than cursory examination to establish that their principal or only effect is anticompetitive.").

Ct. 2274, 2284 (2018) (citations omitted). The plaintiff may establish anticompetitive effects indirectly by showing that the defendant has "sufficient market power to cause an adverse effect on competition." *Tops Mkts. Inc. v. Quality Mkts. Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). "[A] threshold showing of market share is not a prerequisite for bringing a [Section] 1 claim[:] If a plaintiff can show actual adverse effect on competition, . . . we do not require a further showing of market power." *Todd*, 275 F.3d at 207.

Once the plaintiff establishes anticompetitive effects, the burden shifts to the defendant to offer evidence of any procompetitive effects of the challenged restraint. *See Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004). If the defendant can prove procompetitive benefits, then "the burden shifts back to the plaintiff[ ] to prove that any legitimate competitive benefits offered by defendant[ ] could have been achieved through less restrictive means." *Id.* (citing *Capital Imaging Assocs. V. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).[45] At the pleading stage, however, it is typically sufficient that the plaintiff plausibly allege anticompetitive effects, and the existence of procompetitive benefits, if any, is typically not an appropriate consideration at the pleading stage. *See id.* at 506-07.

Plaintiffs plead direct evidence of anticompetitive effects sufficient to satisfy their prima facie burden under the rule of reason. Defendants' no-hire agreements reduce LRE mobility and suppress LRE compensation. CAC ¶¶ 89-105. On their face, by preventing Saks's LREs from gaining employment with Brand Defendants, the Conspiracy necessarily impairs Saks's LREs' mobility—direct evidence of anticompetitive effects standing alone. But further, the CAC pleads that Saks pays LREs less than Brand Defendants do, which necessarily pleads that the one-way

---

[45] Because Defendants have the burden of supplying facts supporting purported procompetitive benefits of the restraint, rule of reason cases typically raise questions of fact requiring discovery.

no-hire restraint has an actual adverse effect on Saks's LREs' compensation.[46] This is direct

evidence of market power. *See Tops Mkts.*, 142 F.3d at 98 (market power "may be proven

directly by evidence of the control of prices"). Plaintiffs thus plead a prima facie case under the

rule of reason. *Todd*, 275 F.3d at 207. At the pleadings, the inquiry stops there.  *Id.*

Defendants ignore the applicable legal standard, including that allegations of

anticompetitive effects are the gold standard evidence under the rule of reason, and instead assert

that Plaintiffs cannot meet their burden under the rule of reason because Plaintiffs purportedly

fail to define the relevant market. Mot. at 30-36. This is incorrect both because Plaintiffs

specifically allege the relevant product market, CAC ¶¶ 1, 197 (defining the relevant market as

the market for LRE services), and also because the presence of well-pled anticompetitive effects

is sufficient at the pleadings stage in a rule of reason case.[47]

Defendants also assert that Plaintiffs do not sufficiently allege a relevant market because

Plaintiffs purportedly "do not plead facts addressing cross-elasticity of demand or the

interchangeability of these employees with one another, with other skilled luxury retail labor,

with other skilled retail labor, or even with other labor generally" and therefore, do not plead a

---

[46] As set forth *supra* at 17-20, the no-hire agreements also suppress Brand Defendants' LRE wages by removing Saks as a competitor for Brand Defendants' LREs' services.

[47] Defendants complain that Plaintiffs' alternately refer to the relevant market as a "labor market" and a market for "LRE services." *See* Mot. at 32 & n.21. Defendants argue that a "labor market" for LREs is limited to those persons who are already LREs, whereas the latter would include everyone who could provide the relevant services. Defendants misapply the relevant market inquiry. Specifically, as Defendants later recognize, the scope of the relevant market is, from the perspective of the LREs, those employers they deem reasonably interchangeable to maximize their skills and experience and thus pay. *See* Mot. at 34 (citing *Todd*, 275 F.3d at 202); *see also Todd*, 275 F.3d at 201-02 ("[c]ritically, in a buyer-side conspiracy case, seller rather than consumer or purchaser behavior is the focus"). But in any event, as a practical matter, to sell LRE services and to be in an LRE labor market means the same thing: LREs are the sellers of services in the LRE labor market. Defendants have it backwards.

plausible relevant market. Mot. at 31-32.[48] That is wrong, too. Plaintiffs specifically allege

examples of the training that skilled LREs undergo. CAC ¶¶ 31-38. The specialized training and

institutional knowledge that an LRE acquires by virtue of his or her job and related training

makes it unlikely for an LRE to view jobs at non-luxury retailers (or for that matter at

pharmaceutical companies or law firms) as viable substitutes. Plaintiffs properly explain the

training an LRE might undergo to develop his or her skill set that is specific to luxury retail, and

that an LRE would want to use as a tool to negotiate a higher salary from a suitable buyer for

their skills. CAC ¶¶ 81-88. Like the *Todd* plaintiffs, LRE's "accumulate industry-specific

knowledge that renders [the LRE's] more valuable to employers in the [luxury retail industry]

than to employers in other industries." *Todd*, 275 F.3d at 203.[49]

---

[48] Defendants rely on a franchise case, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), to argue that Plaintiffs failed to allege a valid relevant market. Mot. at 31-32. *Queen City Pizza* is inapposite. The *Queen City* plaintiffs contractually agreed to the restraints at issue and then attempted to allege a narrow intrabrand relevant market defined by the terms of that contractual agreement. *Id.* The Third Circuit rejected the plaintiffs' definition. *Id.* at 438; *see also US Airways, Inc. v. Sabre Holdings, Corp.*, 2017 WL 1064709, at *6 (S.D.N.Y. Mar. 21, 2017) ("*Queen City* thus prohibits a market definition narrowed by contractual restraints that a counterparty willingly assumes in a competitive market." (citing *Queen City Pizza*, Inc., 124 F.3d at 440)). Here, by contrast, Plaintiffs do not limit the market to a single brand defined by a distribution agreement, and Plaintiffs are not parties to the no-hire agreements, which Defendants entered solely for their own benefit. *Queen City* is inapposite.

[49] Defendants claim that because the Conspiracy only restricts Saks's LREs' mobility, the claims only affect that "single brand" of employees. Mot. at 33. This is incorrect. As discussed *supra* at 17-20, the Conspiracy also suppresses compensation to the Brand Defendants' LREs. And the market is not a single brand anyway: the Brand Defendants are purchasers in the market and constitute discrete brands. That all Defendants conspired to limit Saks's LREs to employment at Saks does not transform the market into a single brand market (and certainly the fact that Defendants conspired to limit Saks LREs to a single employer in the market cannot absolve Defendants of their antitrust violations). Further, even if the Plaintiffs did plead a single brand product market—they did not—a relevant product market may consist of "a single brand of product or service" if supported by facts plausibly suggesting market power. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481–82, (1992) (rejecting argument that "a single brand of a product or service can never be a relevant market under the Sherman Act" because "[t]he relevant market . . . is determined by the choices available to Kodak equipment owners.").

Importantly, intensive analysis of the relevant market definition is inappropriate at the pleadings stage, and instead must be determined after the development of the factual record. "[T]o survive a Rule 12(b)(6) motion to dismiss, the product market must: "bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand,' and it must be 'plausible.'" *Todd*, 275 F.3d at 200 (internal citations omitted). In *Todd*, the Second Circuit reiterated that, at the motion to dismiss stage, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" 275 F.3d at 198 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Judge Sotomayor concluded that since "market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Id.* at 199-200.[50]

Defendants also assert that Plaintiffs fail to allege a plausible nationwide geographic market of luxury retail employers. Defendants are wrong.[51] "'The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she

---

[50] *See also Kodak*, 504 U.S. at 482 ("Market definition in this case can be determined only after a factual inquiry"); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("[C]ourts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); *In re Dental Supplies*, 2016 WL 5415681, at *4("[No poach] allegation has minimal detail,[] . . . Nonetheless, the allegations [] in its entirety are enough to merit further exploration through discovery.").

[51] Defendants' reliance on *Concord Associates, L.P. v. Entertainment Properties Trust*, 817 F.3d 46 (2d Cir. 2016), Mot. at 36-37, is misplaced. *Concord Assocs.* is about seven plaintiffs that intended to build casinos in the Catskills but were allegedly prevented by the defendant developers from doing so through anticompetitive conduct. The plaintiffs defined an extremely limited relevant geographic market that excluded locations just 25 miles from the plaintiffs' proposed location. The court found the plaintiffs failed to provide a "plausible basis for explaining why an additional twenty-five miles made the difference." *Id.* at 54. In other words, *Concord Assocs.* is a case where the plaintiffs pled a narrow market—the opposite of what Plaintiffs claim here. In contrast, Plaintiffs here explain the nature of market for highly skilled luxury retail labor, and one that Brand Defendants should have competed for across the country, but for Defendants' conduct.

seeks[.]"' *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (quoting *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984)). Here, in a buyers' conspiracy, the relevant geographic market is the inverse: the area in which a potential seller may rationally look to sell her services.

When considering the appropriate scope of the market in Section 1 cases, the court should look to the geographic scope of the challenged agreements. *See, e.g., U.S. v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966) (holding the geographic market was national because, notwithstanding that "[t]he activities of an individual station are in a sense local," "the broader national market [] reflects the reality of the way in which [defendants] built and conduct their business" because, *inter alia*, the agreements covered multi-state activities, and there was a "national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions"). Thus, here, the Defendants entered into nationwide horizontal no-hire agreements, thereby affecting LREs *throughout* the United States. CAC ¶¶ 116-20, 123, 131-32 & Exs. A & B. Managers for Defendants Gucci, Prada, and LP likewise admitted the existence of the no-hire agreements. *Id.* ¶¶ 113-15, 143-49, 160-61. Thus, the geographic market is based on Plaintiffs' understanding of Defendants' own unlawful agreements. The competitive restraints stated in Defendants' anticompetitive agreements prevent Saks employees from obtaining employment at the Brand Defendants anywhere in the nation—within the same shopping mall, down the street, in another city, in another state, or across the country. The nationwide scope of Defendants anticompetitive agreements themselves reflect Defendants' own comprehension of the relevant market. The No-Hire agreements applied **to all employees of Saks**, plausibly, throughout the

United States. CAC ¶¶ 131-32.[52]

### C.     Plaintiffs' Claims Are Not Time-Barred

Defendants' Conspiracy constitutes a continuing violation of the Sherman Act, commencing no later than 2014 and continuing through the present. Throughout the four-year statute of limitations period (the "statutory period"), Defendants impaired LRE mobility (by refusing to hire Saks LREs pursuant to the no-hire agreements) and repeatedly paid LREs artificially suppressed compensation. Saks paid each Plaintiff (and member of the proposed Class) suppressed compensation during the statutory period and Plaintiffs Wang, Giordano, and Beachum recounted unsuccessful efforts to obtain employment with Brand Defendants during the statutory period. *E.g.*, CAC ¶¶ 147-150, 171, 173-81, 190. The CAC thus demonstrates that Plaintiffs' claims are timely.[53]

Regardless, at the pleading stage, Defendants bear the burden of showing the claims are untimely, and must do so using only the allegations of the CAC: "On a motion to dismiss, a claim may be dismissed as time-barred 'only if a complaint clearly shows the claim is out of time.'" *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *15

———————————————

[52] Even if Defendants are correct that the market should be more localized, that would not help Defendants because if Defendants have substantial market power in a nationwide market, then *a fortiori* Defendants have substantial market power in a narrower, local market. Thus, Defendants' arguments would not warrant dismissal, but rather factual development in discovery as to whether the market is national or more localized.

[53] Defendants cite numerous opinions asserting that "courts within the Second Circuit consistently have looked unfavorably on continuing violation arguments," and "compelling circumstances must exist before the limitations period will be extended." Mot. at 10-11 (citing *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) ("*Cipro*")). Yet these opinions do not require any more compelling circumstances than those Plaintiffs have alleged, they merely outline the requirement within the Second Circuit that plaintiff not just be injured within the limitations period, but that "the defendant commit an overt anticompetitive act" within the limitations period. *Id.* at 228; *Vitale v. Marlborough Gallery*, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994) (same); *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010) (requiring that an act contributing to a hostile work environment claim occur within the limitations period).

(S.D.N.Y. Sept. 20, 2016) (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)). Defendants contend that Plaintiffs' claim is untimely because (1) Plaintiffs filed their claim more than four years after Saks first paid each of them suppressed compensation, (2) Plaintiffs have not adequately pleaded an overt act that would restart the limitations period under the continuing violation doctrine, and (3) Plaintiffs had knowledge of the alleged Conspiracy more than four years prior to filing suit. Defendants are wrong on all counts.

Because Plaintiffs allege that Defendants committed overt acts that injured Plaintiffs—by paying subcompetitive compensation to LREs and enforcing the anticompetitive no-hire agreements by refusing to hire Saks LREs on a continuous basis up to and throughout the statutory period—Defendants committed a continuing violation. Continuing anticompetitive conduct that injures plaintiffs restarts the statute of limitations with each new injury. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502, n.15 (1968); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-91 (1997) (The statute of limitations begins anew each time a defendant takes an "overt act" that injures a plaintiff); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) ("*Sabre*") (an overt act (1) "must be a new and independent act that is not merely a reaffirmation of a previous act" and; (2) "must inflict new and accumulating injury on the plaintiff.") (quotations omitted).

In *Klehr*, the Supreme Court explained that, in "a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years . . . each sale to the plaintiff [is an overt act that] starts the statutory period running again . . ." 521 U.S. at 189 (quotation omitted).[54] *Klehr*'s reasoning has been extended to antitrust actions that allege the payment of

––––––––––––––––––––––––

[54] *See also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979) ("a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct

suppressed compensation to a seller for services, including underpayments to employees. *See, e.g.*, *W. Penn Allegheny Health Sys.*, 627 F.3d at 106 ("refus[als] to increase [plaintiff's] reimbursement rates" were "injurious acts in furtherance of the conspiracy within the limitations period"); *Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) ("each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began").

Here, Plaintiffs allege an overarching agreement amongst Defendants to prohibit Brand Conspirators from hiring Saks's LREs with the purpose and effect of restricting LRE mobility and suppressing compensation to LREs. *See*, *e.g.*, CAC ¶¶ 90, 92, 94, 104, 119. The CAC details continued acts in furtherance of this agreement within the limitations period in the form of (1) under-compensation of Defendants' LREs, *id.* ¶¶ 99-104, 139, 151-52, 186, 191, and (2) repeated decisions not to consider or hire Plaintiffs Wang, Giordano, and Beachum for positions to which they applied, *id.* ¶¶ 147-150, 171, 173-81, 190. The continuing violations doctrine applies, and Plaintiffs' claims are timely.

Defendants assert that Plaintiffs' claims are untimely and do not constitute continuing violations because Defendants' payments of artificially suppressed compensation are purportedly not overt acts, but rather mere "reaffirmations" or "effects" of Defendants' no-hire agreements entered prior to the statutory period. Mot. at 14-15. That is wrong. First, the law in the context of overcharge cases (*i.e.*, where the conspirators raise sale prices, the related, inverse of this case

_____

prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."); *Sabre*, 938 F.3d at 67-68 (quoting *Klehr* 521 U.S. at 189); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1065 (8th Cir. 2017); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *In re Wholesale Grocery Prod. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014) ("*Wholesale Grocery*"); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999).

where the conspirators suppressed wage payments) states "if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within four years prior to their filings." *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002);[55] *see also Klehr*, 521 U.S. at 189 ("each [unlawfully high priced] sale to the plaintiff [is an overt act that] starts the statutory period running again . . ."). And because "[a]ntitrust law does not treat employment markets differently from other markets," *eBay*, 968 F. Supp. 2d at 1039, the law of overcharges applies equally to suppressed compensation payments: employees "maintain a right of action for any [suppressed compensation payments] paid within four years prior to their filings." *See Buspirone*, 185 F. Supp. 2d at 378.

Defendants endeavor to dodge this clear precedent by arguing that Defendants' actions taken in furtherance of the conspiracy (underpayments and refusals to hire) are merely reaffirmations of the initial agreement to conspire. Such a position is not only contrary to binding Supreme Court precedent (*e.g.*, *Klehr*) and unsupported by caselaw, but it would effectively eliminate the continuing violations doctrine. The Eighth Circuit illustrated the dangers of such a result, explaining that:

> If [such] logic were accepted, two parties could agree to divide markets for the purpose of raising prices, wait four years to raise prices, then reap the profits of their illegal agreement with impunity because any antitrust claims would be time barred. That is not the law. Under *Klehr,* a monopolist commits an overt act each time he uses unlawfully acquired market power to charge an elevated price.

*Wholesale Grocery*, 752 F.3d at 736; *see also Berkey Photo, Inc.*, 603 F.2d at 296 ("there can be

---

[55] *Buspirone* was a section 2 case in which there was no explicit agreement to charge a fixed price, but rather unilateral conduct by a monopolist to exclude a competitor, which allowed the defendant to continue to charge the same price it had charged before.

no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price"). The same is true where Defendants use their monopoly power to purchase at an artificially suppressed price.

Defendants attempt to distinguish the settled precedent of price fixing cases like *Klehr* by arguing that, "a price-fixing conspiracy is, as its name implies, an agreement *to charge a fixed price*. Each fixed-price sale is not merely an *effect* of the conspiracy; it *is* the conspiracy." Mot. at 15 (emphasis original). Defendants contend that Plaintiffs' claim is only a no-hire conspiracy, not a conspiracy to underpay a "fixed price." *Id.* Defendants' argument mischaracterizes the nature of price-fixing conspiracies, which often do not take the form of explicit agreements to impose a fixed price but can be, *e.g.*, agreements to divide territories. *See, e.g., Wholesale Grocery*, 752 F.3d at 736 (rejecting argument that parties to market allocation agreement avoid the continuing violations doctrine arising out of their pricing actions after striking a market allocation agreement). Further, Defendants read the CAC too narrowly: the CAC asserts that Defendants conspired to suppress LRE wages. *See, e.g.*, CAC ¶ 94.

Nor have courts, as Defendants claim, "repeatedly held that the continuing violation doctrine does not apply to alleged ongoing conspiracies involving 'no-hire' or 'no poach' agreements." Mot. at 15. Instead, the opinions Defendants cite involve significant pleading inadequacies, which are not present here, and none articulated a general rule against applying the continuing violation doctrine.[56] Indeed, the case that Defendants contend is "identical" to

------

[56] *See Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071-72 (N.D. Cal. 2016) (plaintiff did not allege payments of suppressed wages as overt acts to support a continuing violation theory, and the court granted a motion to dismiss, finding that plaintiffs insufficiently alleged a continuing violation where plaintiffs did not plead "any specific conduct by [defendant] during the limitations period" such as acts of "enforcement, renewal, or expansion" of the alleged conspiracy); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884-85 (N.D. Cal. 2015) (plaintiffs did not allege payments of

Plaintiffs allegations, *In re Animation Workers*, expressly acknowledged that the plaintiffs in that case may have adequately pleaded an overt act had they alleged either "that their compensation was permanently depressed or otherwise continued to be affected by [d]efendants' wrongful conduct, which allegedly took place" outside the limitations period, or that "[d]efendants continued to abide by or enforce the anti-solicitation scheme . . . such that compensation continued to be artificially low." 87 F. Supp. 3d at 1212–14.

Defendants' other authorities do not save their arguments. Defendants misapply *Sabre* to assert that "Plaintiffs' 'diminished wage' theory fails to plead any 'overt act' because it posits no 'new and independent act' within the limitations period, but rather the mere *effects* of alleged acts – the 'No Hire Agreements' – that occurred beforehand." Mot. at 14 (citing *Sabre*, 938 F.3d at 69). But *Sabre* was confined to claims stemming from challenged anticompetitive agreements to which (a) the plaintiff and defendant were parties, *and* (b) involved defendant's mere passive receipt of payments stemming from the challenged agreements between the parties. 938 F.3d at 68-69.[57] Here, by contrast, the anticompetitive agreements include the no-hire agreements as between Defendants comprising the Conspiracy, not Plaintiffs' employment with Saks. Thus,

———————————

suppressed wages as overt acts to support a continuing violation theory, and the court granted a motion to dismiss, finding that plaintiffs' allegations of other overt acts were insufficient because they were "merely conclusory," failed to allege any "new and independent act" during the limitations period that was not compelled by a "final, binding decision," or concerned actions by entities that were not Defendants to the complaint); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1212–13 (N.D. Cal. 2015) (granting motion to dismiss on grounds that the plaintiffs failed to adequately plead that the allegedly suppressed compensation was a result of defendants' conduct). Nor does *Garrison* or *Ryan* mandate, as Defendants claim, that the alleged overt act must be committed by all Defendants; they simply note that acts by third parties who were not named as Defendants are not sufficient to support a continuing violation theory. *Garrison*, 159 F. Supp. 3d at 1072; *Ryan*, 147 F. Supp. 3d at 885.

[57] Moreover, the *Sabre* district court explicitly distinguished claims, like the *Sabre* plaintiff's ("a purchaser alleging its own contract was anticompetitive") and those of purchasers (and thus necessarily sellers like Plaintiffs here) of allegedly anticompetitively priced products (or services). *US Airways v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 278 (S.D.N.Y. 2015).

*Sabre* does not supplant the prevailing law on conspirators' agreements causing overcharges (or underpayments) constituting overt acts that restart the statute of limitations.[58] *See, e.g.*, *Klehr*, 521 U.S. at 189; *W. Penn Allegheny Health Sys.*, 627 F.3d at 106; *Turner*, 2020 WL 3044086, at *4; *Buspirone*, 185 F. Supp. 2d at 378.

Defendants further rely on other distinguishable cases. In *Peck v. General Motors Corp.*, the plaintiff former owner of a bankrupt auto dealership sued alleging that GMC conspired with others to force the plaintiff to lose his job at the dealership. 894 F.2d 844, 846-47 (6th Cir. 1990). GMC argued that any antitrust conspiracy would have been directed at the dealership and that the plaintiff, as an individual lacked antitrust standing. *Id.* The discussion of timeliness concerned whether the plaintiff's lost employment—which occurred during the statutory period—was an overt act given that the plaintiff lacked antitrust standing for such claim. *Id.* at 849. The court ruled against the plaintiff on the point. In *DXS, Inc. v. Siemens Medical Systems, Inc.*, on which Defendants rely for the proposition that "an act that 'simply reflect[s] or implement[s] a prior refusal to deal' is not an 'overt act,'" Mot. at 15, the Sixth Circuit considered a case where a manufacturer and aftermarket service provider (Siemens) announced new policies concerning warranties and parts sales that would effectively freeze out the aftermarket service provider plaintiff from the service aftermarket. 100 F.3d 462, 465 (6th Cir.

_____

[58] Defendants' reliance on *Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*, 688 F.2d 689, 693 (9th Cir. 1982), presents the same issue. In *Aurora*, the Ninth Circuit found that the continuing violation doctrine did not reach royalty payments arising out of a binding contract plaintiffs and defendant entered outside the limitations period was not enough to restart the statute of limitations. *Id.* Defendants' reliance on *Cipro*, 261 F. Supp. 2d 188, Mot. at 11, 14, 17, fares no better. As the court in *In re Aggrenox Antitrust Litigation*, ruled, *Cipro* did "not examine the issue . . . of purchasers alleging ongoing overcharges." 94 F. Supp. 3d 224, 238 (D. Conn. 2015). *Cipro* merely stands for the proposition that "the performance of an allegedly anti-competitive, pre-existing contract" such as the one between the plaintiff and defendant in *Sabre*, "is not a new predicate act."

1996). The court rejected Siemens' argument that the announced policy change triggered the running of the statute of limitations based on the fact that Siemens did not implement the policy changes for several years after the announcement. *Id.* But more importantly, *DXS* is neither an overcharge case nor a market division case. Instead, *DXS* concerned a policy change that was designed to exclude a competitor. *Id.* Here, by contrast, Defendants conspired to divide the market which has the purpose and effect of suppressing compensation. Each refusal to hire LREs and each underpayment Defendants made were overt acts in furtherance of the Conspiracy that injured Plaintiffs. *See, e.g.*, *Klehr*, 521 U.S. at 189. *DXS* is inapposite.[59]

In sum, none of Defendants' citations mandates dismissal based on the facts alleged here. Defendants' continued payments of artificially suppressed wages were not mandated by contract or otherwise compelled by the fact that Defendants entered into the Conspiracy. Nor were they a mere "ripple" or "unabated inertial consequence" of Defendant's Conspiracy. Mot. at 15 (quoting *DXS*, 100 F.3d at 462; *Lubrizol*, 753 F.3d at 600). Plaintiffs' complaint outlines, in detail, how Defendants' original Conspiracy, pursuant to which the Brand Defendants would not poach employees from Saks, was designed to reduce mobility of employees such that competitive pressure to increase wages was eliminated. *See*, *e.g.*, CAC ¶¶ 94, 99-101, 103-04. Each payment

---

[59] Finally, Defendants rely on *Z Technologies Corp. v. Lubrizol Corp.* 753 F.3d 594 (6th Cir. 2014) ("*Lubrizol*") and *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004), Mot. at 12, 14-15, but each case was confined to the context of merger-monopolies. In *Lubrizol*, for example, the Sixth Circuit explained that "price increases in the merger-monopolization context are not 'overt acts' extending the statute of limitations." 753 F.3d at 600. The court then distinguished overcharge (and thus underpayment) cases, explaining that, while courts ruling on conspiracy allegations have held that each price increase is an overt act in furtherance of the conspiracy, "in a merger-acquisition case . . . the cause of harm is the merger itself" and "subsequent price increases do not further the company's monopoly because the company has already obtained the monopoly." *Id.* at 589-99. *Midwestern Machinery* also distinguished conspiracy cases: "Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme." 392 F.3d at 271. And the Eighth Circuit later explicitly rejected applying *Midwestern Machinery* to price-fixing cases. *See In re Pre-Filled Propane*, 860 F.3d at 1067-68.

to Plaintiffs of suppressed wages was a new and independent action that furthered Defendants' Conspiracy to suppress employee wages and inflicted injury on Plaintiffs.

Defendants also argue that Plaintiffs' allegations of overt acts are insufficient to invoke the continuing violation doctrine because the allegations identify a date range during which alleged overt acts occurred that does not clearly render those acts timely. Mot. at 17-18 (criticizing allegations that overt acts of enforcement occurred in "February 2016,"[60] "in or around 2016,"[61] and "[f]rom 2014 to 2017,"[62] instead of specifically noting that these acts occurred after February 14, 2016). This argument, however, attempts to impose a heightened pleading standard that is contradicted by precedent. Plaintiffs "need not allege a specific . . . date to survive a motion to dismiss because Defendants, not Plaintiff[s], bear the burden of proof on the affirmative defense of the statute of limitations." *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 182 (S.D.N.Y. 2007); *Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH,* 150 F. Supp. 2d 566, 572 (S.D.N.Y. 2001). Indeed, even if a complaint alleges "no information as to the date" of the act that starts the limitations period, "a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013). None of Plaintiffs' allegations makes it clear on the face of the complaint that these actions occurred outside the limitations period and dismissal accordingly is

---

[60] CAC ¶¶ 147-50 (describing a Prada manager's refusal to consider Plaintiff Wang in "February 2016," due to Prada's no-hire agreement with Saks).

[61] *Id.* ¶¶ 169-70 (describing Plaintiff Giordano's 2016 contacts with a BC store manager).

[62] *Id.* ¶¶ 171-72 (describing Plaintiff Giordano's unsuccessful efforts to obtain employment with other Brand Defendants and Brand Conspirators from "2014-2017" but was not hired).

inappropriate on these grounds. *See Pearce*, 528 F. Supp. 2d at 182 (denying motion to dismiss where plaintiff alleged a date range in which "[i]t is possible that the allegedly unlawful [act] occurred" during the limitations period).

Defendants then argue that "Plaintiffs fail to plausibly allege any acts of enforcement in [their Complaint] that might qualify as overt acts," arguing that Plaintiffs did not plead that the Brand Defendants were hiring, and thus the failure to hire would be an overt act. Mot. at 18. Defendants further argue that the recruiters' statements cannot be overt acts by a *Defendant*. Mot. at 18. Defendants mischaracterize the CAC and fail to meet their burden here. The CAC alleges Defendants had no-hire agreements that prevented the Brand Defendants from hiring Plaintiffs. *See supra* at Sec. IV.A.1. The CAC further alleges that Plaintiffs each unsuccessfully sought employment with various Brand Defendants during the statutory period. *See* CAC ¶¶ 147-150, 171, 173-81, 190. These allegations, together, create a reasonable inference that the Brand Defendants did not hire Plaintiffs because of the no-hire agreements, thus constituting timely overt acts. Defendants' argument seeks to bootstrap its contention that Plaintiffs fail to plead the no-hire agreements—but Plaintiffs do sufficiently allege those agreements as discussed *supra* at Sec. IV.A.1. If the Court accepts Plaintiffs' allegations that the no-hire agreements were in place when Plaintiffs' applied for positions with the Brand Defendants, it is a reasonable inference that Plaintiffs were denied employment (and/or ignored by the Brand Defendants) because of the no-hire agreements. Thus, Plaintiffs adequately allege timely overt acts arising out of the Brand Defendants' enforcement of the Conspiracy during the statutory period. As such, whether based on Defendants' continued payments to Plaintiffs of artificially suppressed wages, Defendants' acts enforcing the no-hire agreement, or a combination of the two, Plaintiffs have adequately pleaded overt acts that restart the statute of limitations under the continuing violations doctrine.

Defendants also attack Plaintiffs' claims as untimely because Plaintiffs purportedly knew of the alleged no-hire agreements before the limitations period but did not bring suit until more than four years later, thus making them ineligible for application of the continuing violations doctrine.[63] Mot. at 11-12. The Supreme Court's decision in *Klehr* defeats that argument:[64] each overt act "starts the statutory period running again, regardless *of the plaintiff's knowledge of the alleged illegality at much earlier times.*" 521 U.S. at 189 (emphasis added).[65]

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.

---

[63] Despite their failure to point to any authority on this point from this Circuit, Defendants warn that allowing the continuing violations doctrine to operate despite Plaintiffs' prior knowledge would undermine the policy considerations underlying statutes of limitations, such as providing potential defendants with repose and avoiding prejudice due to faded memories, lost documents, and unavailable witnesses. Mot. at 12. But the continuing violations doctrine was established precisely because a policy "to pull the blanket of peace over acts and events which have themselves already slept from the statutory period" does not apply where Defendants have continued to engage in recent violations and caused damage thereby. *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 107–08 (quotations omitted). Further, Defendants are "hardly in a position to argue for" the avoidance of prejudice "when it is the [D]efendants' own recent conduct that results in a finding of a newly accruing cause of action." *Id.* (quotations omitted).

[64] Second Circuit courts follow *Klehr*: *American Medical Association v. United Healthcare Corp.*, 2006 WL 3833440, at *8 (S.D.N.Y. Dec. 29, 2006) ("[w]hether a plaintiff knew or should have known of an alleged antitrust injury therefore does not affect the commencement of the statute of limitations period under antitrust law: the limitations period begins afresh with "each overt act that is part of the violation and that injures the plaintiff.") (quoting *Klehr*, 521 U.S. at 189); *Sabre*, 938 F.3d at 67–68 (quoting *Klehr*, 521 U.S. at 189); *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 589 (E.D.N.Y. 2020) (same).

[65] Defendants cite *Midwestern Machinery* to argue that "where the plaintiff had actual knowledge of the initial violation and suffered sufficient injury, courts generally do not toll the statute of limitations." Mot. at 11 (quoting *Midwestern Mach.*, 392 F.3d at 272). But *Midwestern Machinery* was not a Section 1 case and the Eighth Circuit subsequently rejected applying *Midwestern Machinery* in the Section 1 context. *See In re Pre-Filled Propane*, 860 F.3d at 1067-68. The Eighth Circuit held that adopting the rule that Defendants push here concerning Plaintiffs' knowledge would conflict with binding Supreme Court precedent (from *Klehr*). *Id.* at 1068. Thus, the "rule" Defendants push for this Court to adopt from the Eighth Circuit is not even the law in the Eighth Circuit. The Court should reject the argument.

Dated: December 16, 2020          **FARUQI & FARUQI, LLP**

By:    */s/ Innessa M. Huot*
          Innessa M. Huot
          Alex J. Hartzband
          Patrick J. Collopy

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com
ahartzband@faruqilaw.com
pcollopy@faruqilaw.com

Joseph R. Saveri*
Steven N. Williams*
Kevin E. Rayhill*
Keydon Levy*
Anupama K. Reddy*
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swillliams@saverilawfirm.com
krayhill@saverilawfirm.com
klevy@saverilawfirm.com
areddy@saverilawfirm.com

Eric L. Cramer*
Sarah Schalman-Bergen
Patrick F. Madden*
Michaela Wallin*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ecramer@bm.net
Email: sschalman-bergen@bm.net
Email: pmadden@bm.net
Email: mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Tel: (202) 559-9745
Email: dwalker@bm.net

John D. Radice
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Email: jradice@radicelawfirm.com

Michael K. Yarnoff
**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Tel: (215) 792-6676
Email: myarnoff@kehoelawfirm.com

*\* admitted pro hac vice*

*Attorneys for Plaintiffs and the Class*