UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

SUSAN GIORDANO, ANGELENE HAYES,
YING-LIANG WANG, and ANJA BEACHUM, *on
behalf of themselves and others similarly situated*,

                              Plaintiffs,

                    v.

SAKS INCOPORATED, SAKS & COMPANY
LLC, SAKS FIFTH AVENUE LLC, LOUIS
VUITTON USA LLC, LORO PIANA & C. INC.,
GUCCI AMERICA, INC., PRADA USA CORP.,
and BRUNELLO CUCCINELLI USA, INC.,

                            Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-833 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Susan Giordano, Angelene Hayes, Ying-Liang Wang, and Anja Beachum

commenced the above-captioned putative class action on February 14, 2020 and filed an

Amended Complaint on May 1, 2020, against Saks Incorporated, Saks & Company LLC, and

Saks Fifth Avenue LLC (collectively, "Saks"), and against Louis Vuitton USA Inc. ("Louis

Vuitton"), Loro Piana & C. Inc. ("Loro Piana"), Gucci America, Inc. ("Gucci"), Prada USA

Corp. ("Prada"), and Brunello Cucinelli USA, Inc. ("Brunello Cucinelli") (collectively, the

"Brand Defendants"), alleging violations of the Sherman Act, 15 U.S.C. § 1.[1]  (Compl., Docket

Entry No. 1; Am. Compl., Docket Entry No. 44.)  In the Amended Complaint, Plaintiffs allege

that Saks and the Brand Defendants have agreed not to compete for employees in the luxury

---

[1] Plaintiffs named Fendi North America, Inc. ("Fendi") in the Complaint but not in the Amended Complaint.  (Compl. 1, ¶ 67; *see generally* Am. Compl.)

retail industry by not hiring luxury retail employees ("LREs") who have worked at Saks within six months of such employment unless managers of both companies agree to an exception, resulting in depressed compensation for luxury retail employees and preventing Plaintiffs from changing jobs, advancing their careers, and seeking better compensation in the industry. (Am. Compl. ¶¶ 1–3.)

Defendants move to dismiss the Amended Complaint as time-barred and meritless, and Plaintiffs oppose the motion.[2] For the reasons set forth below, the Court grants Defendants' motion to dismiss and grants Beachum leave to file a second amended complaint within thirty days from the date of this Memorandum and Order.

## I.    Background

Plaintiffs worked as skilled luxury retail employees at Saks.[3] (Am. Compl. ¶¶ 8–11.) They received "extensive training on service, selling, and product-knowledge" and helped to maintain the image of the brand by creating "an atmosphere of exclusivity and opulence." (*Id.* ¶¶ 1, 32–34.) Plaintiffs allege that Saks and the Brand Defendants have entered into express agreements to suppress luxury retail employees' compensation, (*id.* ¶¶ 2, 94), and further contend that these agreements artificially suppress their pay and decrease worker mobility in violation of Section 1 of the Sherman Act, (*id.* ¶ 3).

---

[2] (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 95; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 95-1; Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.' Mem."), Docket Entry No. 96.)

[3] The Court assumes the truth of the factual allegations in the Amended Complaint for the purposes of this Memorandum and Order.

### a.   Defendants' operations

Luxury brands portray themselves as distinct by "cast[ing] themselves as shaped by cultural and historical heritage, and market[ing] their luxury brands as rooted in longer-term traditions rather than constantly-changing fashions." (*Id.* ¶¶ 22–24.)  Defendants use "the customer service their sales staff supplies" to help make that impression.  (*Id.* ¶¶ 27–28.)  Luxury retail employees have "substantial skill and training" and are essential to maintaining the "aura of authenticity" necessary to luxury brands' identity.  (*Id.* ¶¶ 27–30.)  They are "knowledgeable about the particular products each Defendant manufactures and/or sells, as well as current trends," (*id.* ¶ 34), and they form personal relationships with repeat customers, (*id.* ¶ 35). Because luxury retail employees are essential to luxury brands, Defendants make significant efforts to provide them with specialized training.  (*Id.* ¶ 32.)  For example, Prada teaches employees about the brand and trains them in salesmanship at its "Prada Academy," and Saks "has robust employee training and emphasizes customer relationships with its employees."  (*Id.* ¶¶ 36, 38.)

Defendants compete with each other for luxury retail employees and are "the dominant employers" of such employees.  (*Id.* ¶¶ 39–51.)  Saks "is part of a retail conglomerate that employs approximately 40,000 employees worldwide"; LVMH (the parent company of Louis Vuitton and Loro Piana) "has more than 32,000 employees in the United States, including thousands of Luxury Retail Employees who sell luxury retail goods to consumers at Louis Vuitton and Loro Piana"; Gucci "employs more than 14,000 employees worldwide," including hundreds of luxury retail employees in the United States; Prada employs "more than 13,000

employees worldwide," including hundreds of luxury retail employees;[4] and Brunello Cucinelli

"employs more than 1,800 employees worldwide," including hundreds of luxury retail

employees in the United States.  (*Id.* ¶¶ 42–49.)

In a properly functioning market, Defendants would compete for luxury retail employees.

(*Id.* ¶ 53.)  Defendants "would save on training costs and receive the immediate benefit of a well-

trained, motivated salesperson who knows how to cultivate relationships with customers and

enhance the Defendant's brand."  (*Id.*)  Luxury retail employees would also benefit from the

ability to move to luxury retailers with a more attractive compensation package.  (*Id.* ¶¶ 52–64.)

In addition, Defendants would be motivated to improve Plaintiffs' compensation and benefits if

employees could freely leave for desirable positions.  (*Id.* ¶¶ 65–76.)  Because Defendants

"carefully monitor and manage their respective internal compensation levels" to "[m]aintain[]

approximate compensation parity" among employees with the same job titles and to maintain

fixed compensation relationships between job titles, (*id.* ¶ 77–79), Defendants would hire skilled

employees from their competitors with the effect of increasing overall compensation.  (*Id.* ¶ 80.)

### b.  Allegations of no-hire agreements

The Brand Defendants maintain "no-hire" agreements with Saks, in which they agree not

to cold-call Saks employees and offer to hire them.  (*Id.* ¶¶ 80–85.)  Plaintiffs contend that these

no-hire agreements, which "have been in place since at least 2014," are "an unreasonable

restraint of trade," and benefit Defendants at the expense of luxury retail employees.  (*Id.* ¶¶ 86–

91.)  These agreements only permit a Brand Defendant to hire a current or former Saks employee

---

[4]  Plaintiffs allege that Prada operates about fifty-two stores in the United States but do not specify how many of Prada's luxury retail employees work in the United States.  (Am. Compl. ¶¶ 47–48.)

if (1) managers from both companies agree, or (2) the employee left Saks at least six months

prior.  (*Id.* ¶¶ 89–92.)

     **c.   Plaintiffs' employment and attempts to work for the Brand Defendants**

     Giordano worked for Saks from November of 2012 until March of 2019, Hayes from

August of 2013 until July 27, 2016, Wang from October of 2014 until April of 2016, and

Beachum from February of 2016 until September of 2016 and from the summer of 2018 until

December of 2019.  (*Id.* ¶¶ 8–11.)

     **i.   Giordano**

     In 2012, Saks hired Giordano as a sales associate in one of its New York stores.  (*Id.*

¶ 155.)  Giordano spent the first eighteen months of her employment working at the Loro Piana

boutique within that store, and then sought employment at the standalone Loro Piana boutique on

Madison Avenue, which paid "considerably higher wages."  (*Id.* ¶¶ 156–158.)  The manager at

the Loro Piana boutique "noted that [Giordano] would surely be an asset" to the store because of

her knowledge of the brand but told Giordano that she could not hire her "because she was a

current employee of Saks."  (*Id.* ¶ 160.)  The manager added that "Loro Piana is never going to

take you, and Saks is never going to let you go."  (*Id.* ¶ 161.)

     Giordano continued to work at Saks, Saks promoted her, and she gained experience with

additional luxury brands such as Brunello Cucinelli but remained unhappy with her

compensation.  (*Id.* ¶¶ 162–164.)  She applied online for an open sales position at the Brunello

Cucinelli boutique "in or around 2016," and when she did not receive a response, met with a

store manager "who agreed that [she] was indeed qualified" and accepted her resume.  (*Id.*

¶¶ 165–169.)  Giordano "never heard back from the manager or from Brunello Cucinelli."  (*Id.*

¶ 170.)  Between 2014 and 2017, Giordano "sent dozens of resumes and job applications to the

other Brand Defendants and numerous other unnamed co-conspirators," but was unable "to secure even an interview with the Brand Defendants." (*Id.* ¶¶ 170–171.) Giordano sought the help of two recruitment agencies that specialized in the luxury retail industry, and they explained that she was qualified but "they would be unable to place her with any brand carried by Saks" unless she resigned her position at Saks and then waited several months. (*Id.* ¶¶ 173–183.) Giordano eventually obtained a position at a smaller luxury retailer not carried by Saks, but her compensation and her opportunities for upward mobility were affected by her inability to obtain employment at the Brand Defendants. (*Id.* ¶¶ 184–186.)

### ii. **Hayes**

On August 3, 2013, Saks hired Hayes to work at its Beachwood, Ohio store, where she earned seventeen dollars an hour. (*Id.* ¶¶ 106, 109.) She had previously held positions at Gucci and Louis Vuitton and knew that she was qualified to earn a higher salary as well as commission. (*Id.* ¶¶ 108–110.) Hayes also believed that she was qualified for a promotion to management at either of those companies. (*Id.* ¶¶ 111–112.) "Shortly after" Hayes was hired by Saks, she applied to work at Gucci. (*Id.* ¶ 113.) A store manager at Gucci told her that the company was "not allowed to hire Saks employees." (*Id.* ¶ 115.) In December of 2014, Hayes asked the director of human resources at Saks whether she was free to seek a position with Louis Vuitton or other Brand Defendants. (*Id.* ¶¶ 116–117.) The director told Hayes she could not and explained that under no-hire agreements between Saks and the Brand Defendants, Hayes "must first resign from Saks and wait six months before the Brand Defendants would be allowed to hire [her]," unless Saks and a Brand Defendant mutually agreed to allow her to be hired earlier. (*Id.* ¶¶ 118–120.)

On June 24, 2015, Hayes applied by email to work at Louis Vuitton, and a store manager told her via email that "we have an agreement with Saks that we cannot take their employees and have to wait [six] months before hiring." (*Id.* ¶¶ 121–123; Emails between Store Manager Hope Frate and Hayes 2–3, annexed to Am. Compl. as Ex. A, Docket Entry No. 44-1.) Hayes spoke to a Prada store manager "[s]hortly thereafter," who also explained that she "could not be considered for employment until she [left] Saks and wait[ed] for a period of six . . . months" and confirmed that all the Brand Defendants followed this policy. (Am. Compl. ¶¶ 126–127.)

Hayes continued to work at Saks, (*id.* ¶ 128), and in or around November of 2015, learned that Louis Vuitton had hired a former coworker less than six months after that coworker left Saks. (*Id.* ¶¶ 128–129.) Hayes filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging failure to hire on the basis of race and sex. (*Id.* ¶ 130; Letter dated July 12, 2016 in response to EEOC Charge, at 4 ("Louis Vuitton Letter"), annexed to Am. Compl. as Ex. B, Docket Entry No. 44-2.)[5] Louis Vuitton submitted a statement to the EEOC confirming the existence of the no-hire agreement, and stating that the other employee in question "followed the proper protocol" by seeking managers' approval before applying to work at Louis Vuitton. (Louis Vuitton Letter 3; *see also* Am. Compl. ¶¶ 132–133.) Hayes remained in her role at Saks and continued to earn seventeen dollars an hour until on or around July 27, 2016, when her employment "was terminated." (Am. Compl. ¶¶ 134–137.) After her termination, Hayes could not find employment in the luxury retail sector and, due to the no-hire agreements, was forced to accept an entry-level position that did not use her skills. (*Id.* ¶¶ 138–139.)

---

[5] Hayes did not attach the EEOC charge to the Complaint.

### iii.  Wang

In October of 2014, Saks hired Wang to work at its Beachwood, Ohio store, where she proved to be a top salesperson in the shoe department.  (*Id.* ¶¶ 140–142.)  Wang had multiple conversations with a Gucci store manager who wanted to recruit her.  (*Id.* ¶ 143.)  In January of 2015, the store manager told Wang that she could not "technically recruit" Wang, a Saks employee, but believed that she was a "perfect fit."  (*Id.* ¶¶ 144–145.)  The store manager informed Wang "that she would have to wait a 'six-month cooling off period' after leaving Saks in order to be hired by Gucci."  (*Id.* ¶ 146.)  In February of 2015, Wang spoke with a Prada store manager who told her "Prada has an agreement with Saks not to recruit Saks [l]uxury [r]etail [e]mployees," and nobody with hiring authority at Prada could "initiate contact" with Wang.  (*Id.* ¶¶ 148–149.)  Because the no-hire agreements prohibited interested Brand Defendants from hiring Wang, her salary "stagnated" for the remainder of her time at Saks.  (*Id.* ¶¶ 150–154.)

### iv.  Beachum

Saks hired Beachum to work at its Troy, Michigan stores during two periods: from February to September of 2016, and from the summer of 2018 to December of 2019.  (*Id.* ¶ 187.)  While employed at Saks, Beachum sold brands including Chanel and Prada and developed some knowledge of other brands sold at the store.  (*Id.* ¶ 189.)  Beachum wanted to seek employment at Louis Vuitton, but it was "common knowledge" at Saks that the Louis Vuitton concession within the Troy, Michigan Saks would not hire Saks employees, therefore she "did not even bother" to apply to the concession.  (*Id.* ¶¶ 188, 190.)  However, she left her resume at a Louis Vuitton boutique "in the same Troy, Michigan mall in which her Saks store was located" and did not hear back.  (*Id.* ¶ 190.)  Beachum left the luxury retail field "[b]ecause she was unable to obtain other employment as a [l]uxury [r]etail [e]mployee."  (*Id.* ¶ 191.)

### d.   Plaintiffs' antitrust allegations

Plaintiffs allege that the no-hire agreements between Saks and the Brand Defendants decreased their compensation and mobility and violate Section 1 of the Sherman Act whether viewed as *per se* illegal horizontal restraints on competition, analyzed under the "quick look" test, or examined under the full rule of reason analysis.[6]  (*Id.* ¶¶ 192–194, 208–220.)  Plaintiffs seek damages, an injunction preventing Defendants from enforcing the no-hire agreements or similar agreements, equitable relief, and costs.  (*Id.* at 36–37.)

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N. Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citation omitted); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d

---

[6]  Plaintiffs allege that they represent a class defined as:

> All persons in the United States employed by at least one of Defendants at any time from September 30, 2015 until the effects of Defendants' conduct ceases (the "Class Period") who: (i) work in any of Defendants' respective stores and/or boutiques; and (ii) sell and/or manage the sale of luxury goods to consumers.  Excluded from the Class are each of Defendants' officers and directors, as well as employees in roles where they purchase luxury retail goods on behalf of any Defendant to display and sell in the Defendant's stores and/or on its website(s).

(*Id.* ¶ 197.)  They contend that class certification is warranted because the class is numerous, their claims are typical, and they can ably litigate questions of law common to the class.  (*Id.* ¶¶ 198–207.)

533, 540 (2d Cir. 2020) (quoting *Bell Atl. Corp.*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

> **b.  Claims by Giordano, Hayes, and Wang are barred by the statute of limitations**

Defendants argue that claims by Giordano, Hayes, and Wang are barred by the Sherman Act's four-year statute of limitations.  (Defs.' Mem. in Supp. 9–19 ("Defs.' Mem.")).  They argue that the "continuing violation" exception to the statute of limitations does not apply since Plaintiffs fail to allege an "overt act" within the limitations period.  (Defs.' Reply in Supp. 4–5 ("Defs.' Reply")).

Plaintiffs argue that the "continuing violation" doctrine applies to their claims.  (Pls.' Mem. in Opp'n 40–50 ("Pls.' Mem.")).  They contend that Defendants engaged in ongoing misconduct beginning in at least 2014 and that each time Defendants (1) paid Plaintiffs "subcompetitive compensation" or (2) "enforce[ed] the anticompetitive no-hire agreements by refusing to hire [Saks employees]," Defendants "committed overt acts that injured Plaintiffs" and that restart the limitations clock.  (*Id.* 41.)  Plaintiffs maintain that since Defendants took both these actions within four years of the date they filed their Complaint, their claims are timely.

"The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is commenced within four years after the cause of action accrued."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (internal quotation marks omitted).  An

antitrust cause of action accrues, and the limitations period begins to run, "when a defendant commits an act that causes injury to the plaintiff." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 218 (E.D.N.Y. 2003); *see also Zenith*, 401 U.S. at 338 ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."). "Because a statute of limitations is an affirmative defense, [a defendant] bears the burden of proof to show . . . the claims [are barred]." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 230 (2d Cir. 2014) (citations omitted). Once a defendant is able to make out a *prima facie* case that the claims are untimely, "[t]he burden then shifts to the plaintiff to establish that the limitations period should be tolled." *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995) (citations omitted); *see also Szymanski v. Local 3, IBEW*, 577 F. App'x 52, 53 (2d Cir. 2014) ("Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by *prima facie* proof that the limitations period has expired since the plaintiff's claims accrued." (citation omitted)); *Cesari S.R.L. v. Peju Province Winery L.P.*, No. 17-CV-873, 2022 WL 3082960, at *22 (S.D.N.Y. Aug. 3, 2022) (citation omitted) (same).

In the antitrust context, a "continuing violation" is one that "inflict[s] continuing and accumulating harm" on a plaintiff. *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968); *see also DXS, Inc. v. Siemens Med. Sys.*, 100 F.3d 462, 467 (6th Cir. 1996) ("A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded." (citation omitted)). In such a case, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles*

*and Their Application* ¶ 338b); *see also Zenith*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws . . . [a "continuing violation"] has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.").  In the Second Circuit, "[a]n overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff."  *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (quoting *DXS, Inc.*, 100 F.3d at 467); *see also O.E.M. Glass Network, Inc. v. Mygrant Glass Co.*, 436 F. Supp. 3d 576, 589 (E.D.N.Y. 2020) (citations omitted) (same).

      **i.**   **Plaintiffs Giordano, Hayes, and Wang's claims are *prima facie* untimely**

Plaintiffs Giordano, Hayes, and Wang filed their Complaint on February 14, 2020. (Compl.)  They contend that the conspiracy involving Defendants commenced in at least 2014, (Pls.' Mem. 40; Am. Compl. ¶ 93), and injured them in two ways: (1) it impaired their mobility by preventing them from working for a Brand Defendant within six months of termination from Saks and (2) it allowed Saks to pay them "artificially suppressed compensation."  (Pls.' Mem. 40.)  Plaintiffs argue that they were injured "on a continuous basis up to and throughout the statutory period, (*id.* at 41), but they concede that they were first injured by Defendants' actions at or around the time they began their employment with Saks.[7]  Since Giordano began working at

---

[7]  Plaintiffs contend that Defendants paid them "subcompetitive compensation . . . and enforce[ed] the anticompetitive no-hire agreements . . . on a continuous basis up to and throughout the statutory period."  (Pls.' Mem. 41.)  Giordano, Hayes, and Wang each allege that they suffered limited job mobility prior to the limitations period.  (*See* Am. Compl. ¶¶ 106, 113–

Saks in November of 2012, Hayes in August of 2013, and Wang in October of 2014, (Am.

Compl. ¶¶ 8–11), each *first* suffered injury under the conspiracy prior to the limitations period.

Thus, the Sherman Act's four-year statute of limitations bars them from raising claims that

accrued before February 14, 2016, unless the continuing violation doctrine applies to Plaintiffs'

claims.

Defendants appear not to challenge that the Amended Complaint alleges a continuing

injury to Plaintiffs' interests,[8] and accordingly the Court addresses only whether Plaintiffs have

committed an "overt act" within the limitations period.

---

14 (Hayes began working at Saks "[o]n or around August 3, 2013" and shortly thereafter
"contacted a Gucci Store Manager to seek employment at Gucci," but was informed that she
could not be considered for a position "because she was an employee of Saks"); *id.* ¶¶ 140–46
(Wang was told by a Gucci store manager in "approximately January 2015" that she "could not
'technically recruit' Ms. Wang" until Wang had left Saks for six months); *id.* ¶¶ 156–61
(Girodano was informed by a Loro Piana store manager "[i]n approximately 2013" that she
"could not be considered for employment at Loro Piana because she was a current employee of
Saks"). Plaintiffs allege that this limitation on their mobility allowed Saks to retain them as
employees at artificially-suppressed wages. *See, e.g.*, Am. Compl. ¶ 196 ("[T]he No-Hire
Agreements . . . prevent[ed] Plaintiffs . . . from obtaining employment and earning compensation
in a competitive market, reduce[d] compensation, and prevent[ed] or limit[ed] employment
opportunities . . . . ").

[8] Defendants do not appear to challenge that, if taken as true, the Amended Complaint
alleges a "continuing and accumulating harm" suffered by Plaintiffs. *Hanover Shoe*, 392 U.S. at
502 n.15. First, Defendants argue that courts in the Second Circuit apply the continuing
violation exception only in "compelling circumstances," (Defs.' Mem. 11), and contend that (1)
Plaintiffs' actual knowledge of the no-hire agreements, (2) finality considerations, and (3)
Congress's intention that suits under the Clayton Act be brought promptly, all counsel against
the Court applying the continuing violation exception, (*id.* at 10–13.) Second, Defendants argue
that Plaintiffs fail to sufficiently allege the "overt act" necessary to invoke the continuing
violation exception. (*Id.* at 13–19; Defs.' Reply 3–8.) Defendants also argue that the alleged
payment of reduced wages within the limitations period are "mere effects" of wrongful acts that
occurred pre-limitations. (Defs.' Mem. 13–15.) Defendants thus appear to concede that the
alleged conduct "repeatedly invaded," *DXS*, 100 F.3d at 467, Plaintiffs' interest on a continual
basis both before and during the limitations period. (Defs.' Mem. 13–15.)

ii.   **Plaintiffs Giordano, Hayes, and Wang fail to allege the "overt act" necessary to satisfy the "continuing violation" exception**

Prior to *US Airways*, courts in this Circuit took different approaches "as to whether and when the performance of a contract constitutes an overt act." *US Airways*, 938 F.3d at 68 (citation omitted); *see also Rite Aid Corp. v. Am. Express Travel Related Servs. Co., Inc.*, 708 F. Supp. 2d 257, 269 (E.D.N.Y. 2010) ("Performance during the limitations period pursuant to an illegal prelimitations contract can constitute an overt act if resulting damages were speculative [at the time of contracting]."); *In re Ciprofloxacin*, 261 F. Supp. 2d at 229 ("[T]he performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act.").[9]

In *US Airways*, the Second Circuit resolved these differences, holding that "performance of a contract [is] a manifestation of the . . . the decision to enter the contract, rather than an independent overt act of its own." 938 F.3d at 69. *US Airways* involved a Section 1 claim arising from two substantially similar contracts between US Airways and Sabre Holdings Corp., a company that offered a platform used by travel agents to book flights. *Id.* at 49–51. US

---

[9] Various Courts of Appeals have also taken different approaches in determining what is an overt act that restarts the statute of limitations. In *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, the Ninth Circuit stated that "[w]e have repeatedly held that acts taken to enforce a contract were overt acts that restarted the statute of limitations." 747 F.3d 1199, 1204 (9th Cir. 2014). In contrast, in *Z Technologies Corp. v. Lubrizol Corp.*, which involved a merger challenge, the Sixth Circuit declined to find that enforcement of a non-compete clause in a pre-limitations contract constituted a "new and independent act" sufficient to restart the statute of limitations, since this would mean "any contractual provision that was subsequently enforced would arguably restart the statute of limitations." 753 F.3d 594, 604 (6th Cir. 2014); *see also Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) ("Even if the payment agreement constituted a continuing violation . . . the individual payments . . . were only a manifestation of the previous agreement. The individual payments therefore do not constitute a 'new and independent act,' as required to restart the statute of limitations."); *see also Varner v. Peterson Farms*, 371 F.3d 1011, 1019–20 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." (citations omitted)).

Airways subsequently challenged as anticompetitive several of the provisions in these contracts, which it had entered in 2006 and 2011.  *Id.* at 51–52.  At trial, the jury found for US Airways and awarded the company treble damages.  *Id.* at 53.  On appeal by both parties, among other things, US Airways challenged the district court's decision not to award damages flowing from the 2006 contract on the grounds that it fell outside the Sherman Act's four-year statute of limitations.  *Id.* at 67.  US Airways argued that the district court incorrectly applied the "continuing violation" doctrine because, although US Airways had indeed *entered* into the 2006 contract prior to the statute of limitations, it had suffered injury flowing from that contract throughout the limitations period.  *Id.*  Relying on *Hanover Shoe*, 392 U.S. 481, US Airways argued that "an antitrust plaintiff may recover damages suffered during the limitations period as the result of an anticompetitive contract, regardless [of] when that contract first took effect, because conduct or forbearance from conduct pursuant to the terms of an anticompetitive contract is itself a continuing violation."  *Id.*

The Second Circuit disagreed.  It found no authority "to support the proposition that each act taken in performance of a contract necessarily constitutes an overt act for purposes of the continuing-violation rule."  *Id.* at 68.  The Court acknowledged the split among the district courts and among other Circuits as to when performance under a contract constitutes an "overt act" sufficient to reset the statute of limitations clock in the context of a "continuing violation."  *Id.* at 68–69.  The Court concluded that performance under a contract is a "*manifestation* of the 'overt act,' the decision to enter the contract, rather than an independent overt act of its own."  *Id.* at 69 (emphasis added).

Consistent with the Second Circuit's decision in *US Airways*, Plaintiffs fail to allege a continuing violation exception to the statute of limitations.  "[T]he decision to enter the contract"

— the no-hire agreement — is the overt act that starts the limitations period.  Actions taken by Defendants in performance of the no-hire agreement — such as the Brand Defendants' alleged refusal to hire Plaintiffs within six months of their being employed by Saks — are "manifestation[s] of the 'overt act,' the decision to enter the contract, rather than . . . independent overt act[s] of [their] own."  *Id.* at 69.  Likewise, artificially suppressed wages paid by Defendants as a result of the no-hire agreement do not "constitute[] an overt act for purposes of the continuing-violation rule."  *Id.* at 68.  Accordingly, Giordano, Hayes, and Wang were first injured under the no-hire agreement at or around the time they were first employed by Saks — i.e. prior to the limitations period.[10]  Because they have not alleged an "overt act" within the limitations period — as such is defined under *US Airways* — Plaintiffs cannot rely on the continuing violation doctrine to make their otherwise untimely claims timely.

Plaintiffs unconvincingly argue that *US Airways* is not controlling because it applies only to cases where (1) "the plaintiff and defendant were parties" to the challenged agreement and (2) where defendants' performance is limited to "mere passive receipt of payments stemming from the challenged agreements between the parties."  (Pls.' Mem. 45.)  Plaintiffs argue that instead of relying on *US Airways*, the Court should apply the reasoning of *Klehr*, 521 U.S. 179, to conclude that their claims are timely.  (Pls.' Mem. 41–42.)  In *Klehr*, two dairy farmers commenced a civil RICO action against a business whom they alleged sold them a silo that was falsely represented to limit the amount of oxygen that would come into contact with grain, thus preventing mold and fermentation.  521 U.S. at 183–84.  The plaintiffs commenced the action twenty years after they first purchased the silo and defendants challenged the action as untimely.  *Id.* at 184.  The plaintiffs argued that the defendants had taken several steps to hide the flaws in the silo,

---

[10] *See supra* n.7 and accompanying text.

including installing a device to hide mold and providing false information indicating that any discoloration to the resulting feed did not indicate the presence of mold. *Id.* In determining whether the RICO claim was time-barred, the Supreme Court analogized to the Clayton Act. *Id.* at 189. The Court noted that in the context of a "price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years . . . each sale to the plaintiff [is an overt act that] starts the statutory period running again . . . . " *Id.* (internal citations omitted).

Plaintiffs argue that their claims are similar to the price-fixing or "overcharge" cases discussed in *Klehr* — cases where the defendants conspire to inflate prices to the detriment of competitors and consumers. (*See* Pls.' Mem. 41–42.) They argue that their claim is analogous to that of a plaintiff challenging a price-fixing scheme because just as each sale to a plaintiff under such a scheme constitutes an "overt act," each instance where Saks paid Plaintiffs an artificially suppressed wage constitutes an "overt act." (*See id.* ("*Klehr*'s reasoning has been extended to antitrust actions that allege the payment of suppressed compensation to a seller for services, including underpayments to employees.")[11] Plaintiffs argue that overcharge cases are the "inverse" of cases where conspirators collude to suppress wage payments, and accordingly the same rules should be applied. (*Id.* at 42–43.) In addition, Plaintiffs argue that "if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within four years prior to their filings." (*Id.* at 43 (quoting *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002)). Plaintiffs argue that "[e]ach refusal to

---

[11] Plaintiffs rely on *W. Penn Allegheny Heath Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) and *Turner v. McDonald's USA, LLC*, No. 19-CV-5524, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) to support this argument. However, both cases are (1) out of circuit and (2) predate *US Airways*, and therefore do not negate *US Airways*' binding precedent.

hire LREs and each underpayment Defendants made were overt acts in furtherance of the [c]onspiracy that injured Plaintiffs."  (Pls.' Mem. 47.)

Plaintiffs' reliance on *Klehr* and similar overcharge cases is misplaced.  First, *Klehr* involved a civil RICO claim.  521 U.S. at 183–84.  In analyzing defendants' statute of limitations challenge, the Supreme Court compared the RICO statute to the Clayton Act because of the similarity between the two statutes.  *See id.* at 188–90.  However, the Supreme Court did not specifically analyze the antitrust laws, nor were the specific facts of *Klehr* relevant to a Section 1 claim.  The Court is therefore not persuaded that it should rely on dicta from a factually distinguishable case, particularly in view of the Second Circuit's binding precedent that addresses a factually similar circumstance.  Moreover, price-fixing or "overcharge" cases are fundamentally conceptually different from the facts of this case.  As the Second Circuit noted in *Berkey Photo, Inc. v. Eastman Kodak Co.*, price-fixing conspiracies have two different accrual rules to account for the two classes of injured party: competitors and consumers.  603 F.2d 263, 295 (2d Cir. 1979).  "Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."  *Id.*  The Second Circuit noted that "at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future," *id.*, thus it makes sense to apply a rule where "a purchaser suing a monopolist for overcharges paid within the previous four years" may base their claim on "anticompetitive actions taken before the limitations period," *id.* at 296.  As the district court explained in *Rite Aid Corp.*: "[t]he purchaser-competitor distinction is based on differences in when a monopolization scheme injures each plaintiff."  708 F. Supp. 2d at 264 (discussing *Berkey Photo*).  While a price fixing consumer plaintiff may raise a claim

18

within four years of the date she made a purchase at an inflated price, even where a defendant's "anticompetitive actions [took place] before the limitations period," *Berkey Photo*, 603 F.2d at 296, the competitor plaintiff has four years from the moment of the defendant's initial anticompetitive conduct to bring a claim, *Rite Aid Corp.*, 708 F. Supp. 2d at 264.  The law is thus structured so that both classes of plaintiff — consumers and competitors — are provided with a four-year period during which they may bring their claims.  Plaintiffs, however, are neither consumers nor competitors and the price-fixing analogy is thus inapposite.

Moreover, other considerations weigh against applying the continuing violation doctrine in this case.  Courts within the Second Circuit "consistently have looked unfavorably on continuing violation arguments" and have found that "compelling circumstances must exist before the limitations period will be extended." *In re Ciprofloxacin*, 261 F. Supp. 2d at 228 (internal quotation marks and citation omitted).  Further, as the Supreme Court has noted, "[s]tatutes of limitations are designed to encourage plaintiffs to pursue diligent prosecution of known claims." *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (citations omitted).  This is especially true in cases — such as those that are brought under the Sherman Act — where Congress has provided for treble damages.  *See e.g.*, *Rotella v. Ward*, 528 U.S. 549, 557–58 (2000) (noting that the provision for treble damages is "justified by the expected benefit" of "encouraging civil litigation to supplement Government efforts to deter and penalize" activity prohibited by the Clayton Act); *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 155 (1987) (noting that a previous version of a treble damages bill did not include a statute of limitations since the earlier version "included no private treble-damages remedy, and thus obviously had no need for a limitations period").  The treble damages provision reflects the congressional objective of deputizing plaintiffs to serve as "private attorney

19

general[s]" in order to "vindicate the public interest in antitrust enforcement." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 80 (2d Cir. 2013) (quoting *Associated Gen. Contractors*, 459 U.S. at 542); *see also Malley-Duff & Assocs., Inc.*, 483 U.S. at 151 ("Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees. Both statutes bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages."). In similar cases, the Supreme Court has declined to extend the limitations period, noting that "[b]ecause the provision of treble damages is justified by the benefit of vindicating the public interest, it would be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit [the statute] might realize." *Rotella*, 528 U.S. at 558 (analogizing between the limitations period under the Clayton and Civil RICO acts and noting that the Clayton Act sets the limitations clock running at the moment the plaintiff is injured); *see also Klehr*, 521 U.S. at 187 (rejecting a Third Circuit rule under which an injured plaintiff could bring civil RICO claims four years from the last act the defendant committed as part of a violative conspiracy, since such a rule would "create[] a limitations period that is longer than Congress could have contemplated" and noting that such a rule conflicts with the goal of "encouraging potential private plaintiffs diligently to investigate"). If the Court were to accept Plaintiffs' theory, Plaintiffs could choose to bring identical claims against Defendants five or even ten years from now, provided that the no-hire agreements remained in effect. This approach is contrary to the Congressional intent that private plaintiffs be incentivized to promptly "vindicate the public interest." *Gatt*, 711 F.3d at 80 (quoting *Associated Gen. Contractors*, 459 U.S. at 542).

While *US Airways* is not a perfect fit for no-hire agreements like those alleged by Plaintiffs, it remains the controlling precedent in this Circuit and, based on its reasoning, the claims on behalf of Giordano, Hayes, and Wang are time-barred under the Sherman Act's four-year statute of limitations.

### c.   Beachum's timely claim

Plaintiffs named Beachum as a Plaintiff in the Amended Complaint that was filed on May 1, 2020.  (Am. Compl.)  Thus, the four-year antitrust limitations period for Beachum's claim begins on May 1, 2016.  Plaintiffs allege that Beachum "worked for Saks as a Luxury Retail Employee between approximately February 2016 and September 2016, and between the summer of 2018 and December 2019."  (Am. Compl. ¶ 11.)  The Court construes the Amended Complaint in the light most favorable to Plaintiffs to find that Beachum's February through September 2016 employment with Saks ("2016 Employment")[12] and the summer 2018 through December 2019 employment ("2018 Employment") constitute two distinct contractual periods of employment.  Because an antitrust plaintiff acquires a cause of action at the moment she is injured by a defendant's anticompetitive scheme, the Court construes Beachum as alleging two causes of action, each of which accrued at or around the time she began her respective periods of employment. The second of these — the 2018 Employment, which began in "the summer of 2018" — falls within the limitations period.  *See US Airways*, 938 F.3d  at 51, 69 (affirming the district court's award of damages flowing from only one of two "substantially similar" contracts

---

[12] The statute of limitations for the 2016 employment expired four years after Beachum was first injured.  Since she was first "cause[d] injury" by Defendants' actions at or around the time she began her employment with Saks, (*see supra* n. 7 and accompanying text), Beachum acquired a cause of action for the 2016 employment "at or around" February 2016.  This claim expired "at or around" February 2020 — prior to when she joined the Amended Complaint in May 2020.

entered five years apart on the grounds that only the second had been entered into during the limitations period); *Coffey v. Cushman & Wakefield, Inc.*, No. 01-CV-9447, 2002 WL 1610913, at *3 (S.D.N.Y. July 22, 2002) (where plaintiff was employed during two different periods separated by eight years, claims that accrued during the second period of employment were timely).  This claim is timely.

The Court therefore addresses below the merits of Beachum's claim.

**d.   The antitrust claim**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy" that *unreasonably* restrains trade or commerce.  15 U.S.C.A. § 1; *United States v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' [the Supreme] Court has long recognized that Congress intended to outlaw only unreasonable restraints." (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997))), *cert. denied*, 136 S. Ct. 1376 (2016); *see also Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir. 1995) (requiring "(1) a contract, combination, or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce").  Thus, to succeed on a Section 1 claim, "a plaintiff must prove that the common scheme designed by the conspirators 'constituted an unreasonable restraint of trade either per se or under the rule of reason.'"  *Apple*, 791 F.3d at 320–21 (citation omitted).  Courts presumptively apply the rule of reason which requires consideration of all of the circumstances of a case in deciding whether the challenged practice violates Section 1.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50 (1977).  "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive."  *Cont'l T.V.*, 433 U.S. at 49–50.  Courts may also apply a "quick look" or "truncated rule-of-reason analysis" to cases that fall between these two standards.  *Cal.*

*Dental Ass'n v. F.T.C.*, 526 U.S. 756, 764 (1999); *see also Nostalgic Partners, LLC v. Office of the Comm'r of* Baseball, No. 21-CV-10876, 2022 WL 14963876, at *5 ("Courts will evaluate conduct under a 'quick look' review when a full rule of reason analysis is unnecessary to show that any procompetitive benefit does not outweigh the anticompetitive effects." (citing *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984))).

The parties do not appear to dispute that Plaintiffs' allegations have an effect on interstate commerce. Accordingly, the Court addresses only (1) whether Beachum has plausibly alleged a contract, combination, or conspiracy, and (2) whether Beachum has sufficiently alleged that Defendants' conduct restrains trade.

### i. Beachum has plausibly alleged a contract, combination, or conspiracy between Saks and the Brand Defendants

"To allege an unlawful agreement" under Section 1 of the Sherman Act, "[p]laintiffs must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices)," *In re Commodity Exch.*, 213 F. Supp. 3d 631, 659 (S.D.N.Y. 2016) (quoting *Mayor & City Council of Baltimore (City of Baltimore) v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)), or "circumstantial facts supporting the inference that a conspiracy existed," *In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 32 (S.D.N.Y. 2022). "An agreement can be alleged through direct evidence; however, in most antitrust cases 'this type of "smoking gun" can be hard to come by, especially at the pleading stage.'" *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (quoting *City of Baltimore*, 709 F. 3d at 136); *see also Nastasi & Assocs., Inc. v Bloomberg, L.P.*, No. 20-CV-5428, 2022 WL 4448621, at *10 (S.D.N.Y. Sept. 23, 2022) (same). "Because unlawful conspiracies tend to form in secret, such proof will rarely consist of explicit agreements." *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *27 (E.D.N.Y. Nov. 20, 2019) (citation omitted). "Instead,

circumstantial facts supporting the inference that a conspiracy existed are sufficient." *Id.* (citation omitted); *see also In re Google Digital Advertising Antitrust Litig.*, -- F. Supp. 3d --, 2022 WL 4226932, at *12 (S.D.N.Y. 2022) ("There is no requirement that the terms of an unlawful agreement be expressed in any particular manner or in written form.  Conspiratorial agreements 'nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators.'" (quoting *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)).  Where no direct evidence exists, a plaintiff may support an inference that an anticompetitive agreement exists by alleging the existence of "circumstantial evidence and plus factors," *Gamm*, 944 F.3d at 465 (quoting *Todd*, 275 F.3d at 198), such as "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications," (*id.* at 465 (quoting *Twombly*, 425 F.3d at 114)).

The allegations in the Amended Complaint sufficiently support the existence of a plausible anticompetitive conspiracy.[13]  The Amended Complaint alleges that the director of human resources at Saks confirmed the existence of the no-hire agreements between Saks and each of the Brand Defendants and specified the key terms of the agreements.  (Am. Compl. ¶ 118.)  In addition, a store manager for Louis Vuitton and a store manager for Prada informed Hayes that they could not hire employees who had worked at Saks within the past six months,

---

[13]   On November 18, 2021, Plaintiffs submitted a letter notifying the Court of a decision in *In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*, No. 4:21-CV-00196 (M.D. Pa. Nov. 16, 2021), and submitting it as supplemental authority in support of their position.  (Pls.' Dec. 18, 2021 Letter, Docket Entry No. 114.)  In response, Defendants argued that *Geisinger* is not relevant to this case.  (Defs.' Nov. 22, 2022 Letter, Docket Entry No. 115.)  Because the Court finds Plaintiffs' allegations regarding the conspiracy sufficient under binding precedents, it does not address the relevance of *Geisinger*.

and the store manager for Prada confirmed that all the Brand Defendants were members of the agreements. (*Id.* ¶¶ 123, 126–127.)   Further, the store managers at Gucci and at Prada informed Wang of their adherence to the no-hire agreement, (*id.* ¶¶ 146–148), a Gucci store manager told Hayes that "[w]e're not allowed to hire Saks employees," (*id.* ¶ 115), and a Loro Piana store manager told Giordano "that because she was a current employee of Saks, 'Loro Piana is never going to take you, and Saks is never going to let you go,'" (*id.* ¶ 161).   Plaintiffs have therefore pled specific facts establishing that no-hire agreements exist between Saks and each of the Brand Defendants.[14]   *See Turner*, 2020 WL 3044086, at *1–2 (holding that the plaintiff stated a claim based on a no-hire agreement that pre-dated her employment, and not discussing any allegations about when or how the agreement was formed); *Seaman v. Duke Univ.*, No. 15-CV-462, 2018 WL 671239, at *4 (M.D.N.C. Feb. 1, 2018) (granting motion to certify class in relevant part

---

[14]   Defendants contend that statements from recruiters about the existence of no-hire agreements and statements that make no reference to any no-hire agreement do not support the existence of the alleged agreements. (Defs.' Mem. 24–25; Defs.' Reply 10).  Defendants also argue that "statements by local employees at one store" are insufficient support for the alleged nationwide conspiracy; they characterize the no-hire agreement as, at most, a "protocol" that employees are "requested to follow," and maintain that the agreement described in Louis Vuitton's response to Hayes' EEOC charge was "taken out of context."  (Defs.' Mem. 25–26; Defs.' Reply 10–11.)  They rely on *Frost* and *Ulrich* to support their argument that statements made by employees and third-party recruiters are insufficient to establish the existence of a conspiracy.  *See Frost v. LG Elecs. Inc.*, No. 16-CV-5206, 2018 WL 6256790, at *3–4 (N.D. Cal. July 9, 2018) (granting motion to dismiss antitrust action concerning purported no-hire agreement where the plaintiff alleged statements by a recruiter and by employees about a "gentleman's agreement" and an "understanding" not to hire another's employees), *aff'd*, *Frost v. LG Elecs., Inc.*, 801 F. App'x 496 (9th Cir. 2020); *Ulrich v. Moody's Corp.*, No. 13-CV-8, 2014 WL 4977562, at *17 (S.D.N.Y. Sept. 30, 2014) ("Proving that one manager for one of the companies made such a statement, or that two other executives sensed an 'unspoken rule,' fails to detail any particular action on the part of either company, or come close to outlining the plausibility of an agreement between the two companies.").  However, as discussed above, the Amended Complaint does more than allege that isolated employees and third-party recruiters confirmed the existence of these agreements.  Moreover, a Plaintiff is not required to identify the exact circumstances surrounding the creation of a conspiracy, but rather need only allege "enough factual matter (taken as true) to suggest that an agreement was made."  *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555).

where the defendant contested the existence of a no-hire agreement, but the named plaintiff presented an e-mail supporting the existence of the agreement).

Finally, Plaintiffs' allegations are economically plausible. The alleged no-hire agreements are similar in structure to no-hire agreements that other courts have found to plausibly give rise to a claim. *See Aya Healthcare Servs., Inc.*, 2018 WL 3032552, at *16 (denying motion to dismiss Sherman Act claim concerning unilateral no-hire agreements that two large employers of traveling nurses and medical technicians imposed on their subcontractors); *see also Turner*, 2020 WL 3044086, at *1–2 (explaining that no-hire agreements benefit employers at the expense of employees by lowering employee mobility and depressing wages); *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 222–23 (S.D. Ohio 2019) (denying motion to dismiss antitrust claim concerning no-poach agreements and concluding that the plaintiffs' argument that the agreements suppressed compensation "pleaded . . . an injury of the type the antitrust laws were intended to prevent"); *In re Papa John's Emp. and Franchisee Emp. Antitrust Litig.*, No. 18-CV-0825, 2019 WL 5386484, at *9 (W.D. Ky. Oct. 21, 2019) ("Plaintiffs contend that the [n]o-[h]ire provision is an agreement not to compete for labor and that the agreement had the purpose and effect of depressing wages and diminishing employment opportunities. Courts within the Sixth Circuit have found such allegations sufficient to satisfy the antitrust injury requirement.").

Nor does the fact that Plaintiffs allege instances of employee mobility in the Amended Complaint, (Am. Compl. ¶¶ 108, 129, 185), undermine Plaintiffs' argument that the no-hire agreements lower employee mobility by preventing Saks employees from working for the Brand Defendants. *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120–23 (N.D. Cal. 2012) (holding that even though bilateral "do not cold call" agreements covered just six of

twenty-one possible pairings between the defendants, the plaintiffs had sufficiently pled facts alleging a plausible anticompetitive conspiracy).  Indeed, as Plaintiffs note, the mobility they describe in the Complaint is entirely consistent with the no hire-agreement they allege.[15]

Plaintiffs have sufficiently alleged the existence of an anticompetitive agreement between Saks and the Brand Defendants.

### ii.    Restraint of trade

To successfully plead the second element of a Section 1 claim, "restraint of trade," a plaintiff must show that defendants restrained trade under one of three standards: the rule of reason, "quick look," or per se.  *See, e.g.*, *Cal. Dental*, 526 U.S. at 763 (1999); *Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 103–04; *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  Courts "presumptively" apply the rule of reason, which requires consideration of all of the circumstances of a case, *Dagher*, 547 U.S. at 5, including "specific information about the relevant business" and "the restraint's history, nature, and effect," in deciding whether the challenged restraint on trade violates the antitrust laws.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007) (citation omitted).  The Court considers below each standard.

### 1.    The per se standard is not applicable to Plaintiffs' allegations

---

[15]  Defendants contend that Plaintiffs' allegations describe "lots of employee mobility," pointing to three instances of mobility, which Defendants argue undermines the plausibility of the alleged conspiracy.  (Defs.' Mem. 22 (emphasis omitted)).  However, each instance is consistent with the no-hire agreements Plaintiffs allege.  First, Defendants point to Hayes' prior employment at Gucci and Louis Vuitton as an example of mobility.  (Am. Compl. ¶ 108.)  Plaintiffs allege that the no-hire agreement prevented Saks employees from moving to competitors, not the reverse.  Defendants also point to the fact that Hayes observed a former colleague at Saks move to Louis Vuitton, (*id.* ¶ 129), but the Amended Complaint indicates that Saks explicitly permitted this employee to leave, which is consistent with the alleged no-hire agreements, (*id.* ¶ 132).  Finally, Defendants point to the fact that Giordano was able to find a position with a luxury retailer not carried by Saks, (*id.* ¶ 185), but this too is consistent with the no-hire agreements, which are alleged to exist between Saks and the brands it carries.

Defendants argue that per se treatment is inappropriate in this case because per se treatment is appropriate in the "no poach" context "only if it is a 'naked' restraint." (Defs.' Mem. 28; Defs.' Rep. 8–12.)

Plaintiffs argue that their claim falls into that "limited class of cases" that are analyzed under the per se standard. *Cap. Imaging*, 996 F.2d at 542. They liken the alleged no-hire agreement to a "market division" or "market allocation" agreement and note that the Supreme Court has found such agreements to be per se violations. (Pls.' Mem. 22.) In support, Plaintiffs cite to recent guidance from the Department of Justice which states that "[a]n agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to . . . job opportunities."[16] (Pls.' Mem. 23.) Plaintiffs further rely on a leading antitrust treatise, which explains that "[a]n agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a market-division agreement and if such agreements are horizontal, naked, and among independent firms, they are unlawful per se." Areeda & Hovenkamp ¶ 2013c. Plaintiffs argue that because Saks and the Brand Defendants are competitors, the no-hire agreement is a horizontal restraint that should be accorded per se treatment. (Pls.' Mem. 10–26.)[17]

---

[16] *See also* Antitrust Guidance for Human Resource Professionals (the "Guidance") (Oct. 2016), *available at* https://www.justice.gov/atr/file/903511/download.

[17] On December 21, 2021, Plaintiffs submitted a letter notifying the Court of a Statement of Interest the Department of Justice filed in *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 21-CV-305, (N.D. Ill. Dec. 9, 2021), and submitting it as supplemental authority in support of their position. (Pls.' Dec. 22, 2021 Letter, Docket Entry No. 116.) In their December 27, 2021 response, Defendants argued that the Department of Justice Letter is not relevant to this case. (Defs.' Dec. 27, 2021 Letter, Docket Entry No. 117.) The Court agrees with Defendants: *Outpatient* involved a naked horizontal market allocation agreement, whereas Saks and the

"Conduct considered illegal per se is invoked only in a limited class of cases where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are 'conclusively presumed illegal without further examination.'" *Cap. Imaging*, 996 F.2d at 542 (citations omitted).  "Examples of per se illegal conduct include group boycotts, division of markets, and tying arrangements." *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 306–08 (2d Cir. 2008) ("For conduct to be illegal per se, it must fall within the narrow range of behavior that is considered so plainly anti-competitive and so lacking in redeeming pro-competitive value that it is presumed illegal without further examination. Restraints such as price fixing, market divisions, tying arrangements, and group boycotts have all been found to be unreasonable in and of themselves." (cleaned up)); *Singh v. Am. Racing-Tioga Downs Inc.*, No. 21-CV-947, 2021 WL 6125432, *4 (S.D.N.Y.  Dec. 28, 2021) ("Per se violations include, for example, horizontal and vertical price-fixing; division of a market into territories; certain tying arrangements; and some group boycotts involving concerted refusals to deal with a competitor." (citation omitted)).

"Before characterizing an arrangement as a per se price-fixing agreement meriting condemnation, a court should determine whether it is a naked restraint of trade with no purpose except stifling of competition." *Ariz. v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 362 (1982) (Powell, J., dissenting) (cleaned up); *see also Freedom Holdings, Inc. v. Spitzer*, 447 F. Supp. 2d 230, 249 (S.D.N.Y. 2004) ("[T]he per se rule should be 'carefully limited to "naked" restraints, which are restraints that lack redeeming social benefits'" (quoting Areeda & Hovenkamp

---

Brand Defendants are not "naked" horizontal competitors, as discussed *infra*.  The Department of Justice Letter is thus inapplicable to the facts of this case.

¶1509c)).  A "naked" restraint is one where "the restriction on competition is unaccompanied by new production or products."  *Major League Baseball Props.*, 542 F.3d at 339 (Sotomayor, J., concurring) (quoting *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345 (3d Cir. 2010) (explaining that a "naked" restraint is one "that is not an integral part of an arrangement with redeeming competitive virtues").  "Naked" restraints are contrasted with "ancillary restraints," which are "part of a larger endeavor whose success they promote."[18]  *Major League Baseball Props.*, 542 F.3d at 339 (Sotomayor, J., concurring) (citation omitted); *see also Dagher*, 547 U.S. at 6 (explaining that an "ancillary restraint" is one "imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities").  Ancillary restraints are "'exempt[ed] . . . from the per se rule,' such that the rule of reason applies." *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (citations omitted).  Accordingly, under the ancillary restraints doctrine, a court "must determine whether the nonventure restriction is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid."  (*Id.* at 115–16 (quoting *Dagher*, 547 U.S. at 7)).  *See also Major League Baseball Props.*, 542 F.3d at 339 ("A

---

[18] A leading antitrust treatise explains:

> The most useful classification scheme for antitrust analysis segregates so-called 'naked' and 'ancillary' agreements. This all-important classification largely determines the course of subsequent legal evaluation of any restraint. While not all naked restraints are unlawful, the presumption against them is very strong, and most are condemned either as illegal 'per se' or with only a truncated inquiry into power and effects. By contrast, while not all ancillary restraints are lawful, most are. More important, once a restraint is found to be ancillary, the court pursues its inquiry with a presumption of lawfulness and requires more elaborate proof of power and effects. The burden of proof is placed mainly on the plaintiff.

Areeda & Hovenkamp ¶ 1904.

court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote." (quoting *Polk Bros.*, 776 F.2d at 188–89)).

The no-hire agreements Plaintiffs allege are not "naked" agreements between independent firms.  Plaintiffs state that Saks and the Brand Defendants are competitors, (*see e.g.*, Am. Compl. ¶ 39), but they also acknowledge that Defendants collaborate, that the Brand Defendants "sell their goods and apparel through department stores (including Saks)" and through "concessions (including concessions at Saks stores)," (*id.* ¶ 21.)  Such a relationship is not the same as one between "naked" competitors.  Restraints that accompany such collaborative business relationships are generally not afforded per se treatment.[19]  *See Aiyer*, 33 F.4th at 115; *Dagher*, 547 U.S. at 6.

Plaintiffs rely on several "no-hire" cases to support their argument that per se (or "quick look") treatment is appropriate, but the Court is not persuaded by these cases.[20]  Most of the cases Plaintiffs cite involve horizontal competitors whose conduct did not involve any sort of collaborative relationship.  Moreover, in only two of the cases, *Ebay* and *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*, did the court address arguments that the challenged agreements were ancillary to a procompetitive business purpose.  *See Ebay*, 968 F. Supp. 2d 1030 (N.D. Cal.

---

[19]  Indeed, the DOJ Guidance cited by Plaintiffs clarifies that per se treatment is appropriate where "the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers."

[20]  Plaintiffs rely on the following no-hire/no-poach cases to support per se treatment: *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Penn. 2019); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175 (N.D. Cal. 2015); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013); *In re High-Tech Emple. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012).  All of these cases involve naked horizontal agreements between competitors and each is thus factually distinguishable.

2013); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Penn. 2019). However, in neither case did the pleadings include details of (1) a procompetitive collaboration between defendants *and* (2) details illustrating how the challenged agreement is related to that procompetitive collaboration.   In contrast, Plaintiffs allege in the Amended Complaint that (1) the Brand Defendants sell their products and have concessions in Saks stores, (Am. Compl. ¶ 21), and (2) absent the no-hire agreement, there would be a continual risk that the Brand Defendants would use their concessions in Saks stores to recruit employees, (*id.* ¶¶ 56–57, 83).[21] *Ebay* and *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*, as well as the other "no-hire" cases cited by Plaintiffs are thus distinguishable.

Accordingly, per se treatment is inappropriate for Beachum's claim.

## 2. The "quick look" standard is not applicable to Plaintiffs' allegations

Defendants argue that "quick look" is inappropriate for Beachum's claim and the Court should apply rule of reason analysis.  (Defs.' Mem. 30 n.2.)  In support, they argue that the no-hire agreements are ancillary to a "broad, legitimate, and procompetitive collaboration" between Saks and the Brand Defendants, in which Saks hosts the Brand Defendants' concessions and sells their products in its stores, and therefore the "ancillary restraints" doctrine applies and Beachum's claim must be considered under the rule of reason.  (Defs.' Mem. 28–30.)

Plaintiffs contend that if the Court declines to apply per se treatment to their claim, it should instead apply "quick look" analysis.  (Pls.' Mem. 33–34.)  In support, Plaintiffs note that in the franchisor-franchisee context, courts have tended to apply either per se or "quick look" treatment to no-hire agreements.  (Pls.' Mem. 34.)  They contend that although the no-hire

---

[21] *See also* n.22, *infra*.

agreements in this case are horizontal and thus "distinguishable from . . . vertical franchisor-franchisee restraints . . . at a minimum, if Defendants' no-hire agreements are not per se unlawful, they should be subject to quick look." (*Id.*)

"'Quick look' is essentially an abbreviated form of rule of reason analysis, to be used in cases in which the likelihood of anticompetitive effects is so obvious that 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *Madison Square Garden, L.P. v. NHL*, 270 F. App'x 56, 58 (2d Cir. 2008) (quoting *Cal. Dental Ass'n*, 526 U.S. at 770); *see also Bd. of Regents of Univ. of Okla.*, 468 U.S. at 110 (holding that a "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis"); *Apple*, 791 F.3d at 339 (Lohier, J. concurring in part) (per se analysis "clearly applie[d]" to horizontal agreement to raise consumer-facing ebook prices, but the majority performed a quick look analysis "in response to the dissent"); *In re Polygram Holding*, 416 F.3d 29, 35, 37 (D.C. Cir. 2005) (an "elaborate market analysis" is unnecessary where the "deleterious effect upon consumers" is easily ascertainable). "'Quick look' [review] effectively relieves the plaintiff of its burden of providing a robust market analysis by shifting the inquiry directly to a consideration of the defendant's procompetitive justifications." *Apple*, 791 F.3d at 330. However, the Supreme Court has clarified that "[m]ost restraints challenged under the Sherman Act — including most joint venture restrictions — are subject to the rule of reason . . . ." *NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021). The Court explained that while the anticompetitive effects of some restraints may be ascertained "in the twinkling of an eye," *id.* (citations omitted), most restraints fall "in the great in-between" and warrant rule of reason analysis, *id.* The Court further clarified that quick look should not be applied in cases where courts have not "amassed

considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances." *Id.* at 2156 (cleaned up).

The Court cannot unequivocally "conclude that the [no-hire agreement between Defendants] would have an anticompetitive effect on customers and markets." *Madison Square Garden,* 270 F. App'x at 58 (quoting *Cal. Dental*, 526 U.S. at 770). As described in Section II.d.ii.1, the Amended Complaint indicates that the no-hire agreements are part of a larger "legitimate business collaboration" between Saks and the Brand Defendants, *Dagher*, 547 U.S. at 6. Thus, "quick look" treatment is not appropriate since the challenged restraints "might plausibly be thought to have a net procompetitive effect," *Cal. Dental*, 526 U.S. at 771, as they allow Saks stores to exist and the Brand Defendants to sell their products through a nationwide retailer. Plaintiffs themselves note that absent the no-hire agreement, there would be a continual risk that the Brand Defendants would use their concessions in Saks stores to recruit employees.[22] (Am. Compl. ¶¶ 56–57, 83.) This indicates that there is a procompetitive rationale for the challenged restraints that forecloses quick look treatment. *See Bogan*, 166 F.3d at 514 n.6 ("Under quick look, once the defendant has shown a procompetitive justification for the conduct, 'the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis.'" (quoting *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993))). Moreover, the Court cannot conclude that courts have "amassed 'considerable experience'" with

---

[22] Girodano's attempt to seek employment with Brand Defendant Loro Piana illustrates the risk that Saks would face absent the no-hire agreement. Giordano alleges that while employed at Saks, she worked at the concession of Loro Piana, and, after having "learned the ins-and-outs of Loro Piana's product lines and customer base," believed she was now "keenly qualified" for a position at a Loro Piana boutique. (Am. Compl. ¶¶ 156–60.) Giordano approached the manager of a Loro Piana store to seek employment, but was informed that she could not be considered since she was a current Saks employee. (*Id.* ¶¶ 159–61.)

the type of restraint challenged in this case. *Alston*, 141 S. Ct. at 2156 (citation omitted). The parties do not cite, and the Court has not found, any case where the quick look standard was applied to the merits of a no-hire agreement. Accordingly, this is not a situation where "in case after case [courts have] reach[ed] identical conclusions," *Cal. Dental*, 526 U.S. at 781, such that the Court can determine the no-hire agreements' effect on competition in "the twinkling of an eye," *Alston*, 141 S. Ct. at 2155. *See also Nostalgic Partners*, 2022 WL 14963876, at *6 (declining to apply quick look review in light of *Alston*).

Plaintiffs rely on several franchisor no-hire cases where courts declined to choose which standard to apply at the pleadings stage to argue that "determination of whether Plaintiffs' claims should be analyzed under a standard other than the per se rule should not be resolved at the pleading stage."[23] (Pls.' Mem. 4.) While the franchisor cases have both horizonal and vertical elements similar to those in this case, they are not sufficiently factually similar that the Court finds them persuasive. In addition, several of the franchisor cases Plaintiffs rely on underscore the wisdom of applying the rule of reason to claims that combine vertical and horizontal

---

[23] *See Fuentes v. Royal Dutch Shell PLC*, No. 18-CV-5174, 2019 WL 7584654, at *1 (E.D. Penn. Nov. 25, 2019) ("[T]his Court declines to determine which mode of analysis applies to the challenged no-poach provision at the pleading stage."); *In re Papa John's Emp. and Franchisee Emp. Antitrust Litig.*, No. 18-CV-825, 2019 WL 5386484, at *9 (W.D. Ky. Oct. 21, 2019) ("The Court declines to announce a rule of analysis at this juncture."); *Blanton v. Domino's Pizza Franchising LLC*, No. 18-CV-13207, 2019 WL 2247731, at *4 (E.D. Mich. May 24, 2019) (same); *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 797 (S.D. Ill. 2018) ("[T]he Court cannot decide at this early stage in the proceedings which rule will apply.").

elements.[24]   For example, in *Deslandes v. McDonald's USA, LLC*,[25] the plaintiff challenged a

provision in the McDonalds franchise agreement that prevented McDonalds franchises from

recruiting or hiring the employees of other McDonalds franchises.  2018 WL 3105955, at *1

(N.D. Ill. June 25, 2018).  The court applied "quick look" at the pleading stage, finding that the

plaintiff had alleged conduct that "might be unlawful under quick-look analysis, [but] the

evidence at a later stage may not support it."  *Id.* at *8.  The court allowed the plaintiff to

proceed with her claim under the quick look standard and permitted her to amend her complaint

to "include a claim under the rule of reason" if she so chose.  *Id.*  The plaintiff did not amend her

complaint to include a rule of reason claim and, after discovery, the court concluded that the

plaintiff's claims required rule of reason analysis and were therefore insufficiently pleaded.

*Deslandes v. McDonald's USA*, LLC, No. 17-CV-4857, 2022 WL 2316187, at *7 (N.D. Ill. June

28, 2022) (finding that plaintiff "failed to allege plausibly that the restraint is unlawful under

rule-of-reason analysis").   While the facts of *Deslandes* are not identical to those before the

Court, given (1) the collaborative elements of the relationship between Saks and the Brand

---

[24]   Plaintiffs also rely on the non-franchisor case *Aya Healthcare Servs., Inc.*, No. 17-CV-205, 2018 WL 3032552 (S.D. Cal. June 19, 2018) to support their argument that the Court should not apply the rule of reason standard at the pleading stage.  *Aya* involved a perpetual, unilateral no-hire agreement between the dominant national travel nurse staffing agency and other staffing agencies with whom it subcontracted.  *Id.* at *1–3. The court found it was "unable to determine at this stage in the litigation 'the level of analysis to apply'" and "must instead make that determination based on factual evidence."  *Id.* at *15 (citations omitted).  However, at summary judgment the district court applied the rule of reason standard and dismissed Aya's claims and the Ninth Circuit affirmed, finding that since "the restraint is ancillary to the parties' broader agreement, the district court correctly subjected it to the rule-of-reason standard."  *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021).

[25]   On July 21, 2022, Defendants submitted a letter notifying the Court of the *Deslandes* decision and submitting it as supplemental authority in support of their position.  (Defs.' July 8, 2022 Letter, Docket Entry No. 125.)  In their July 21, 2022 response, Plaintiffs argued that *Deslandes* is not relevant to this case.  (Pls.' July 21, 2022 Letter, Docket Entry No. 127.)

Defendants, (2) the uncertainty of the ultimate anticompetitive effect of the challenged

agreement, and (3) the lack of judicial experience with no-hire agreements that have both

horizontal and vertical elements, quick look treatment is inappropriate for Beachum's claim.  *See*

*Cal. Dental*, 526 U.S. at 770 ("[Q]uick-look analysis carries the day when the great likelihood of

anticompetitive effects can easily be ascertained . . . .").

 Accordingly, the Court addresses whether Beachum has pleaded sufficient facts to allow

the Court to conduct a rule of reason analysis.

   **iii. The "rule of reason" applied to Beachum's claim**

 "Rule of reason" analysis requires Courts to consider "all of the circumstances of a case,"

including "specific information about the relevant business and the restraint's history, nature, and

effect," in deciding whether the challenged restraint on trade violates Section 1.  *Leegin*, 551

U.S. at 885–86 (citation omitted).  Under the standard rule of reason analysis, courts apply a

three-step burden-shifting framework.  *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d

Cir. 2016).  First, the plaintiff must demonstrate that the defendant's actions "had

an *actual* adverse effect on competition as a whole in the relevant market."  *Id.* (citing *Cap.*

*Imaging*, 996 F.2d at 543 (emphasis in original)).  In the antitrust context, "a market has two

components: a product market and a geographic market."  *Concord Assocs., L.P. v. Entm't*

*Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (citation omitted). To satisfy the initial burden, a

plaintiff may rely either on (1) direct evidence of actual adverse effects in the relevant market or

(2) circumstantial evidence "showing that the defendant has 'sufficient market power to cause an

adverse effect on competition'" in the relevant market.  *Am. Express Co.,* 838 F.3d at 194

(citations omitted).  "Because market power is but a surrogate for detrimental effects, a plaintiff

seeking to use market power as a proxy for adverse effect must show market power, plus some

other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Id.* at 194–95 (cleaned up). If the plaintiff is able to make this *prima facie* showing, "the burden shifts to the defendant to offer evidence of any procompetitive effects of the restraint at issue." *Id.* at 195. Upon rebuttal by the defendant, "the burden shifts back to the plaintiff[ ] to prove that any legitimate competitive benefits offered by defendant[ ] could have been achieved through less restrictive means." *Id.* (alteration in original) (citation omitted).

### 1.  Beachum has plausibly defined a relevant product market

Defendants argue that Plaintiffs' definition of the market for luxury retail labor is deficient because it does not address "cross-elasticity of demand or the interchangeability of [defendants' employees] with one another, with other skilled luxury retail labor, with other skilled retail labor, or even with other labor generally." (Defs.' Mem. 32.)

Plaintiffs argue that, at the pleadings stage, they have sufficiently alleged that LREs' "specialized training and institutional knowledge" makes it unlikely that they will "view jobs at non-luxury retailers . . . as viable substitutes." (Pls.' Mem. 37.) They further argue that "intensive analysis of the relevant market definition is inappropriate at the pleadings stage." (*Id.*)

The determination of the relevant market is a "necessary predicate" to analyzing antitrust claims under the rule of reason. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *see also Ohio v. Am. Express Co. ("Amex")*, 138 S. Ct. 2274, 2285 (2018) ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under § 7 of the Clayton Act, §§ 1 or 2 of the Sherman Act, or New York's Donnelly Act, a plaintiff must allege a plausible relevant market in which competition will be

impaired.").  For Section 1 claims, the market definition "provides the context against which to measure the competitive effects of an agreement."  *Geneva Pharm. Tech. Corp. v. Barr Lab'ys. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  In defining the market, courts examine both the relevant product and the relevant geographic markets.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered.'"  *Id.* (quoting *E.I. du Pont de Nemours & Co.*, 351 U.S. at 404).  A relevant geographic market is the "area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies."  *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) (citation omitted).

"Market definition is ordinarily a deeply fact-intensive inquiry."  *US Airways,* 275 F.3d at 199 (internal quotations marks and citation omitted).  Therefore, "courts hesitate to grant motions to dismiss for failure to plead a relevant product market."  *Todd*, 275 F.3d at 199–200. However, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (citation omitted).

At the motion to dismiss stage, Beachum has adequately alleged the existence of a plausible market for luxury retail employees' labor.  *See Todd*, 275 F.3d at 203 (holding that the plaintiffs adequately defined the market for labor in the oil and petrochemical industry because employees' industry training and experience, including that of employees in "less technical

jobs," raised their wages in the market and supported a plausible product market).  Plaintiffs

explain that luxury retail employees have specialized skills and training, (Am. Compl. ¶¶ 35–38),

and that their skills are in demand because they have "service, selling, and product[ ]knowledge"

specific to the luxury retail industry, (*id.* ¶ 32).  Because at the pleading stage "'[t]he issue is not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims,'" *Todd*, 275 F.3d at 198 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236

(1974)), the Court accepts for purposes of a motion to dismiss that luxury retailer employees

have a distinct and specialized skill set and that the market for their labor is distinguishable from

that of other retail employees.

### 2.   Beachum has plausibly defined a geographic market

Defendants argue that Plaintiffs have failed to allege a plausible geographic market

because their definition of a nationwide market for luxury retail labor is too broad.  (Defs.' Mem.

36–39.)  In support, Defendants argue that luxury retail employers compete locally, not

nationally, for the skills of luxury retail employees.  (*Id.* at 38–39.)

Plaintiffs argue that "intensive analysis of the relevant market definition is inappropriate

at the pleadings stage" and that the national geographic market they allege accurately reflects the

market in which Plaintiffs "may rationally look to sell [their] services."  (Pls.' Mem. 38–40.)

"Courts generally measure a market's geographic scope, the 'area of effective

competition,' by determining the areas in which the seller operates and where consumers can

turn, as a practical matter, for supply of the relevant product."  *Heerwagen v. Clear Channel

Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (first quoting *Tampa Elec. Co. v. Nashville Coal

Co.*, 365 U.S. 320, 327 (1961); and then quoting *United States v. Eastman Kodak Co.*, 63 F.3d

95, 104 (2d Cir. 1995)), *overruled on other grounds by Teamsters Local 445 Freight Div.*

*Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 203 (2d Cir. 2008); *see also Concord Assocs.,*

*L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (same).  "The plaintiff may, but is not

required to, allege a geographic market that is smaller than nationwide."  *PharmacyChecker.com,*

*LLC*, No. 19-CV-7577, 2021 WL 1199363, at *25 (S.D.N.Y. March 30, 2021); *see also United*

*States v. Grinnell Corp.*, 384 U.S. 563, 575–76 (1966) (affirming the district court's holding

"that the geographic market for the accredited central [alarm] station service is national" even

though each station served a limited geographic radius and noting that "the broader national

market that reflects the reality of the way in which [the defendants] built and conduct their

business").

Plaintiffs describe LREs as "highly skilled and well-trained salespersons," (Pls.' Mem. 1

n.3), and provide details of their specific training and skillset, (Am. Compl. ¶¶ 31–38).  They

maintain that "[s]elling luxury goods and apparel requires extensive training," and that luxury

brands invest in making sure LREs can provide "exceptional service" and create a "very deep

connection" with customers.  (*Id.* ¶¶ 32, 38.)  Plaintiffs allege that $65,000 — the annual wage

Saks paid Wang — undercompensated her and that she would have received a higher wage at

one of the Brand Defendants.  (*Id.* ¶¶ 151–154.)  Given that even $65,000 per year is higher than

the U.S. median salary,[26] and that Plaintiffs provide specific allegations of the training and

skillset possessed by LREs, the Court finds it plausible, for purposes of a motion to dismiss, that

LREs sell their labor on a national market.  *See Jien v. Perdue Farms, Inc.*, No. 19-CV-2521,

2022 WL 2818950, at *10 (D. Md. July 19, 2022) (finding a national market for poultry workers

---

[26] According to the U.S. Census Bureau, the median wage for full-time, year-round
workers was $56,287.  U.S. Census Bur., *Income & Poverty in the United States: 2020* at 45 tb.
A-6 (2021), available: https://www.census.gov/content/dam/Census/library/publications/2021-
/demo/ p60-273.pdf.

plausible at the motion to dismiss stage; noting that although "defining the relevant geographic market to extend throughout the entire continental United States may be inconsistent with the practical realities of the low-skilled labor market," because "alleging an overbroad market does not create deficiencies analogous to those that plague contradictory, undefined, or implausibly narrow markets, it does not warrant dismissal at the pleading stage" (citation omitted)).

Accordingly, the Court finds that Plaintiffs have plausibly defined a nationwide geographic market.  *See PharmacyChecker.com, LLC*, 2021 WL 1199363, at \*25.

### 3.   Anticompetitive effect and market power

Defendants argue that because Plaintiffs have not made specific allegations that Defendants hold market power in the relevant market — a "fatal" omission — they have failed to show the requisite anticompetitive affect.  (Defs.' Mem. 41.)

Plaintiffs argue that they need not show market power since they allege "direct evidence of anticompetitive effects sufficient to satisfy their *prima facie* burden under the rule of reason." (Pls.' Mem.  36.)

"An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide."  *Todd*, 275 F.3d at 213.  A successful antitrust plaintiff must show that the defendant's actions "diminish overall competition, and hence consumer welfare." *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 128 (1995) (citation omitted); *see also Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018) (an antitrust plaintiff must show that a defendant's actions "had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice" (emphasis and citation omitted)); *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 475 (S.D.N.Y. 2022) (a

successful antitrust plaintiff must show that "defendant's conduct had an actual adverse effect on competition as a whole" (citation omitted)).

A plaintiff may demonstrate adverse effect on competition either "directly or indirectly." *Amex*, 138 S. Ct. at 2284 (internal quotations and citations omitted).  Direct evidence of adverse effect consists of "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market," *id.*, and "in no precedential opinion in this Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality," *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016).  A plaintiff may make an indirect showing of adverse effect by alleging "market power plus some evidence that the challenged restraint harms competition."  *Amex*, 138 S. Ct. at 2284 (internal quotations and citations omitted). Market power is "the ability to raise price significantly above the competitive level without losing all of one's business."  *K.M.B. Warehouse*, 61 F.3d at 128 (citation omitted).  It may be shown through "specific conduct indicating the defendant's power to control prices or exclude competition."  *Id.* (citation omitted).  "Market share may be used as a proxy for market power." *Id.* at 129.

Plaintiffs argue that several of their allegations indicate direct evidence of adverse effect on competition.  First, they argue that "by preventing Saks's LREs from gaining employment with Brand Defendants, the [c]onspiracy necessarily impairs Saks's LREs' mobility" and this is "direct evidence of anticompetitive effects standing alone." (Pls.' Mem. 35.)  Plaintiffs allege that, due to the no-hire agreement, Hayes was denied a job at the Brand Defendant Gucci for which she was "certainly qualified," as well as the opportunity to be considered for positions at Louis Vuitton and Prada.  (Am. Compl. ¶¶ 109–127.)  They allege that due to the no-hire

agreement, Wang was denied a position at Gucci for which she was "a perfect fit," as well as the opportunity to be considered for a position with Prada, (*id.* ¶¶ 142–150), and that Giordano was denied positions at Loro Piana and Bruno Cucinelli for which she was qualified, (Am. Compl. ¶¶ 159–161, 165–170).  Thus, collectively Plaintiffs allege that pursuant to the no-hire agreement, job mobility was restricted for LREs at Saks.  However, while these allegations, accepted as true, indicate that Plaintiffs and those similarly situated suffered a certain amount of restricted job mobility as a result of the no-hire agreements, this does not lead to the conclusion that the no-hire agreements created "an adverse effect on competition market-wide."[27] *Todd*, 275 F.3d at 213; *see also Cap. Imaging*, 996 F.2d at 546 (where plaintiff conceded that prices would remain the same regardless of whether the challenged behavior was prohibited and failed to show a decrease in the quality of service, plaintiff "ha[d] not made an adequate showing of detrimental effects to obviate the need to show that appellees possess market power sufficient to stifle competition"); *Ogden v. Little Caesar Enters.*, 393 F. Supp. 3d 622, 637 (E.D. Mich. 2019) (where a plaintiff's challenge to a no-hire agreement between fast food franchisees failed to allege "that any anti-competitive effects of the agreements are not negated by the pro-competitive effects on interbrand competition" dismissal was appropriate).  To allege direct

---

[27] Defendants note that in the Amended Complaint, Plaintiffs cite to documents that identify the non-defendant competitor luxury brands Giorgio Armani, Bottega Veneta, Burberry, Cartier, Chanel, Chloe, Dolce & Gabbana, Jean-Paul Gaultier, Hermes, Hugo Boss, Lancel, Mauboussin, Alexander McQueen, Nina Ricci, Ralph Lauren, and Yves Saint Laurent, in addition to specialty retailers and other department stores that sell luxury goods.  (Defs.' Mem. 34–35 (citing Am. Compl. ¶ 25 n.2, Ex. 5, ¶ 28 n.3)).  Defendants argue it is thus unsurprising that Plaintiffs fail "to state any allegation of Defendants' individual or combined share of the purported labor market" and instead rely on "the vague and inert conclusion that 'Defendants are the dominant employers of Luxury Retail Employees in the United States.'" (*Id.* 5–6 (citing Am. Compl. ¶¶ 40, 52.)  The Court agrees that without explaining how the no-hire agreements prevented Plaintiffs from finding employment with the above or other luxury retailers other than Defendants, Plaintiffs cannot not show an "adverse effect on competition market-wide." *Todd*, 275 F.3d at 213.

evidence of adverse effect on competition, Plaintiffs must "offer[] evidence of changed prices, output, or quality" in the relevant market, *MacDermid*, 833 F.3d at 183, which they define as the national "market for LRE services," (Pls.' Mem. 36, 39). However, Plaintiffs offer no facts to support the conclusory assertion that "suppressing LRE compensation at a large LRE employer like Saks removes significant competitive pressure on the Brand Defendants' LRE pay as well." (Pls.' Mem. 18.) Even at the pleading stage, without supporting facts, such conclusory statements are insufficient. *See, e.g.*, *Tops Mkts.*, 142 F.3d at 96 (affirming dismissal and finding that plaintiff "failed to demonstrate an actual detrimental effect on competition" where plaintiff relied on an affidavit that discussed defendant's high market share and competitive advantages but "failed to provide sufficient proof that [the restraint on plaintiff] had, in fact, resulted in any decrease in . . . quality"); *Watkins v. Smith*, No. 12-CV-4635, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012) (conclusory allegations of adverse effect were insufficient to survive a motion to dismiss where "[t]he only targeted business that is named in the amended complaint is the plaintiff's"); *Frangipani v. HBO*, No. 08-CV-5675, 2010 WL 1253609, at *4 (S.D.N.Y. Mar. 16, 2010) ("Plaintiff has not pled a factual basis for the conclusory assertion that [defendants'] alleged anti-competitive conduct harms competition, separate from the alleged injury to Plaintiff alone."). Accordingly, Plaintiffs have not pleaded facts to support the no-hire agreements' direct "adverse effect on competition market-wide." *Todd*, 275 F.3d at 213.

Plaintiffs also contend that the fact that "Saks pays LREs less than Brand Defendants" indicates that they hold market power, (Pls.' Mem. 35–36), which constitutes indirect evidence of adverse effect on competition, *see Amex*, 138 S. Ct. at 2284. Plaintiffs rely on *Tops Markets* to support this proposition. 142 F.3d at 98 (market power "may be proven directly by evidence

of the control of prices"). Plaintiffs' reliance on *Tops Markets* is misplaced.[28]  In *Tops Markets*,

the Court found plaintiff's allegations that defendant could control prices to be "speculative."  *Id.*

at 98.  Although the defendants held a market share of more than 70 percent — "usually 'strong

evidence' of monopoly power" — because the plaintiff had not demonstrated barriers to entering

the market, the court could not conclude that the defendants had the ability to control prices.  *Id.*

at 99.  Plaintiffs do not allege that either Saks individually, or all Defendants collectively, have a

market share that would give rise to an inference of market power.  While Plaintiffs' allegations

indicate that Saks pays its LREs less than the Brand Defendants, standing alone, this does not

indicate that Saks can control LRE salaries market-wide.  "[U]nless a firm has 'the ability to

raise unilaterally prices and profitably maintain those prices above competitive levels and/or

restrict output in the market,' anticompetitive behavior will merely put the firm at a competitive

disadvantage in the market as a whole and will not harm consumer welfare."  *K.M.B. Warehouse*,

61 F.3d at 129 (citations omitted); *see also Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11-

CV-6353, 2012 WL 2376466, at *12 (S.D.N.Y. June 20, 2012) ("[F]irms lacking substantial

market power act against their own self-interest when they raise prices, reduce output, or

otherwise restrain trade.  The marketplace itself will discipline such misguided efforts as buyers

---

[28]  Plaintiffs also rely on *Todd*, which is likewise inapposite.  275 F.3d 191.  In *Todd*, the plaintiff alleged that fourteen major oil and petrochemical companies regularly shared information regarding compensation of employees in order to set salaries at artificially low levels.  275 F.3d at 195.  The Court of Appeals vacated the district court's dismissal, finding that because the plaintiff had alleged both a market share of 80–90% and that the plaintiff's defendant employer had "lowered salaries by a total of $20 million per year," the lower court should allow the plaintiff's claim to proceed.  *Id.* at 206, 214.  However, unlike in *Todd*, Plaintiffs do not provide any allegations regarding Defendants' market share; nor do they allege any non-conclusory facts indicating that LRE salaries were reduced industry-wide or provide other indications of "changed prices, output, or quality."  *MacDermid*, 833 F.3d at 183.

switch to substitutes or new sources of supply enter the market." (quoting *Cap. Imaging*, 996 F.2d at 546)).

Plaintiffs have alleged insufficient facts to support a direct adverse effect on competition and have likewise failed to show that Defendants held market power in the relevant market, thus failing to allege indirect "adverse effect on competition as a whole in the relevant market." *Spinelli*, 903 F.3d at 212.  The Court therefore dismisses Beachum's claim.[29]

### e.   Leave to amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, district courts should "'freely give' leave to amend [a complaint] 'when justice so requires.'"  *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2)); *see also Johnson v. Precythe*, 141 S. Ct. 1622, 1626 (2021) (Sotomayor, J. dissenting) (Rule 15(a) "reflects the principle that the purpose of pleading is to facilitate a proper decision on the merits.  If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." (cleaned up) (quoting *Foman v. Davis*, 371 U.S. 178 (1962))); *Kainz v. Bernstein*, 841 F. App'x 249, 253 (2d Cir. 2020) (citation omitted) (noting that leave to amend should be freely given).

The Court notes that during the pendency of this motion there have been significant developments in the jurisprudence regarding no-poach and no-hire agreements,[30] including the

---

[29]  Because the Court dismisses the claims against all Defendants, it does not address the individual arguments Loro Piana raises in support of its motion to dismiss the claims.  (*See* Defs.' Mem. 47–49.)

[30]  The Court also notes the Department of Justice's increased pursuit of criminal charges against companies that engage in naked no-poach/no-solicitation with competitors.  *See, e.g.*, Plea Agreement, *United States v. VDA OC, LLC*, No. 21-CR-98 (D. Nev. Oct. 27, 2022) (defendant healthcare staffing company pleaded guilty to agreeing with a competitor not to raise

Supreme Court's decision in *Alston*, 141 S. Ct. 2141, which clarified that courts should limit their application of the per se and "quick look" standards to those restraints whose anticompetitive effect can be ascertained "in the twinkling of an eye." *Id.* at 2155 (internal quotations omitted). The Amended Complaint does not provide the Court with a sufficient basis to assess whether "the underlying facts or circumstances relied upon" by Plaintiffs are "a proper subject of relief." *Precythe*, 141 S. Ct. at 1626 (Sotomayor, J., dissenting). Accordingly, the Court grants Beachum the opportunity to amend her Complaint to include factual allegations that will support a rule of reason claim.[31]

In her second amended complaint, Beachum must allege facts sufficient to permit the Court to assess the challenged no-hire agreement's "actual effect on competition" under the rule of reason standard. *Amex*, 138 S. Ct. at 2284 (citation omitted). Any second amended complaint must be filed within thirty days of the date of this Memorandum and Order. A second amended

---

nurse wages and not to hire from each other); Judgment of Acquittal, *United States v. DaVita Inc.*, No. 21-CR-229 (D. Colo. Apr. 20, 2022) (defendant dialysis company and its CEO acquitted of agreeing with competitors not to poach each other's employees); Judgment of Acquittal, *United States v. Rodgers*, No. 20-CR-358 (E.D. Tex. Apr. 18, 2022) (defendant owner and clinical director of physical therapy staffing company acquitted of conspiring with competitors to fix employee wages); *see also* Indictment, *United States v. Manahe*, No. 22-CR-13 (D. Me. Jan 27, 2022) (defendants conspired to fix wages of personal support specialists and not hire each other's workers); Indictment, *United States v. Patel*, No. 21-CR-220 (D. Conn. Dec. 15, 2021) (manager and executives of outsource engineering supplier charged with conspiring to restrict hiring and recruiting of engineers and other skilled-labor employees).

[31] In view of the Court's finding that the claims by Giordano, Hayes, and Wang are time-barred, any amendment of those claims would be futile and the Court therefore does not allow amendment as to those Plaintiffs' claims. *See, e.g.*, *Tompkins v. AlliedBarton Sec. Servs.*, 424 F. App'x 42, 43 (2d Cir. 2011) (district court did not abuse its discretion in denying leave to amend where it was "clear from the record that amendment of [Plaintiff's] complaint . . . would have been futile because the claim was untimely"); *Cornelius v. Walmart, Inc.*, No. 21-CV-511, 2023 WL 118760, at *2 (W.D.N.Y. Jan. 6, 2023) ("[L]eave to amend is not required if it would be futile. Where a claim is time-barred, amendment would be futile." (internal quotation marks and citations omitted)).

complaint will completely replace the Amended Complaint and must stand on its own without reference to the Amended Complaint and must contain all of the claims Beachum seeks to pursue.  The second amended complaint must be captioned "Second Amended Complaint" and bear the same docket number as this Memorandum and Order.  If Beachum elects not to file a second amended complaint or fails to file a second amended complaint within thirty days of this Memorandum and Order, the Court will direct the Clerk of Court to enter judgment.

**III.   Conclusion**

For the reasons stated above, the Court grants Defendants' motion to dismiss.  The Court grants Plaintiffs thirty days from the date of this Memorandum and Order to file a second amended complaint as to Beachum.

Dated: January 31, 2023
        Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

49